GARY M. RESTAINO
United States Attorney
District of Arizona
AMY C. CHANG
Arizona State Bar No. 027566
DAVID A. PIMSNER
Arizona State Bar No. 007480
RAYMOND K. WOO
Arizona State Bar No. 023050
Assistant United States Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: amy.chang@usdoj.gov
Email: david.pimsner@usdoj.gov
Email: raymond.woo@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>　　　　Plaintiff,<br>　　vs.<br>Peter Biar Ajak,<br>　　　　Defendant. | Case No. CR-24-00394-PHX-SPL-2<br><br>**GOVERNMENT'S DETENTION MEMORANDUM** |

   Defendant should be detained pending trial because he is a flight risk and a danger to the community. Defendant, his co-defendant (Abraham Keech), and others have conspired to purchase and cause the export of nearly $4 million worth of export-controlled, military-grade weapons from the United States to South Sudan in violation of U.S. law. Defendant intended to provide these dangerous weapons to military generals in South Sudan to wage an armed effort to topple the current South Sudanese government so that he could take power for himself. Had defendant been successful, his conduct could have potentially contributed to armed violence, displacement, and destabilization throughout the country.

As explained below, defendant has extensive foreign contacts, including family and military contacts in other nations. He has also admitted to investigators that he was planning to leave for South Sudan and abandon his immigration status in the United States. Furthermore, defendant is facing a lengthy prison sentence if convicted and has a strong incentive to flee and avoid prosecution and incarceration. Because defendant poses a danger to the community and is a substantial flight risk, the government respectfully disagrees with Pretrial Services' recommendation for release and recommends that defendant continue to be detained pending trial.

## BACKGROUND

In February 2023, undercover agents from the United States Department of Defense (UC-1) and Homeland Security Investigations (UC-2)—who were posing as arms dealers—began communicating with co-defendant Abraham Keech regarding efforts to procure weapons in support of a movement to overthrow the current government of South Sudan. During an initial videoconference, Keech told the UCs he was in Africa to mobilize forces on the ground. He added that he had recently been in the South Sudanese capital (Juba) and believed the current government would collapse. (Doc. 3 ¶ 34.) Keech and the other participants on the call, including two opposition generals, discussed their desire to obtain weapons from the UCs to help secure key areas in South Sudan near oil fields and gold mines. (Doc. 3 ¶ 35.)

A few weeks later, Keech texted UC-1 that he had arrived in the United States and wanted to set up a meeting to discuss the arms purchase. (Doc. 3 ¶ 38.) In April 2023, Keech traveled to Phoenix, Arizona, to meet with the UCs in person. During the meeting, the UCs showed Keech samples of AK-47 assault rifles, PKM machine guns, PSL sniper rifles, and RPG grenade launchers. Keech agreed to provide the UCs with a detailed list of weapons and ammunition that he wanted to buy. Keech also suggested to the UCs that they smuggle the weapons through a U.S. military base in another African country, to avoid search by that country's government. (Doc. 3 ¶ 39(b).)

Over the next several months, Keech continued to communicate with the UCs via telephone and encrypted messaging application to discuss the purchase and smuggling of weapons and ammunition from the United States to South Sudan. On October 16, 2023, for example, Keech contacted UC-1 via an encrypted messaging application. During the call, Keech told UC-1 he was working to organize supporters within South Sudan, and that the only thing preventing his efforts was the supply of weapons. He added he and his colleagues were also seeking "political support" in the United States, as well as support from private investors in Washington, D.C. Keech further explained that a person in Washington named "Peter"—who was not a government official but was well connected—was not initially convinced that violence was the proper approach, but had since changed his mind. Keech told UC-1 that Peter knew Keech had met with UC-1 and had seen the weapons, and that Peter planned to meet with financiers about funding. (Doc. 3 ¶ 39(e).)

On November 3, 2023, UC-1 conducted a videoconference call via an encrypted messaging application with Keech and defendant (Peter Biar Ajak). Keech introduced defendant as his partner who was helping obtain weapons for South Sudan. (Doc. 3 ¶ 40.) Defendant told UC-1 that his potential suppliers could not supply all the weapons they needed and that he was looking to UC-1 to supply the remaining weapons.[1] UC-1 explained it would be violation of U.S. law to export the weapons. Defendant said he was aware of the sanctions and understood the risk, and that they would therefore be discreet in their conversations with others. (Doc. 3 ¶ 41.)

On November 8, 2023, the UCs conducted a videoconference with defendants via an encrypted messaging application.[2] During the videoconference, defendant explained he

---

[1] In a subsequent call on February 16, 2024, defendant mentioned that he "could easily buy [weapons] from [another African country] or from any of our neighboring countries that have hostility towards South Sudan and just truck [the weapons] across the border." (Doc. 3 ¶ 65.)

[2] Beginning on November 8, 2023, defendant began using an alias account on the encrypted messaging platform under the name "Doctor Agutdau." Based on information obtained from legal process, this account is associated with a telephone number that

was looking for "basically a coup … with both internal and external fronts" against the current South Sudanese government. Defendant told UC-1 he wanted to "knock it over and rebuild a new country," and that he would be installed as the new "Prime Minister" and "head of the government." Defendant added he needed anti-tank weapons to disable the thirteen to fifteen functioning tanks in South Sudan, and also asked about obtaining anti-aircraft systems to disable the South Sudanese military's helicopters. UC-1 reminded defendants that current sanctions prohibited the sale of weapons to South Sudan and that their proposal was illegal. Keech told UC-1 to not worry about the sanctions, and defendant told UC-1 that after the regime change, the sanctions would be "lifted immediately." Defendant further offered to execute a Memorandum of Understanding that would make the UCs' company the official arms supplier to South Sudan after the regime change. (Doc. 3 ¶ 43.)

From November 2023 to February 2024, defendants continued to communicate regularly with the UCs. During these discussions, defendants repeatedly acknowledged that the intended conduct was illegal (several examples of willfulness are described below):

- On December 22, 2023, UC-1 told defendants the proposed shipment was illegal because the items require a license to leave the country, the United States is not sending anything to South Sudan, and UC-1 would have to "pay[] off individual guys" because such a plan would be "completely unauthorized" by the U.S. military (Doc. 3 ¶ 46);

- On January 11, 2024, defendant told the UCs he had met with his financier. According to defendant, the financier knew about the weapons deal, but did not want it known that the financier was paying for weapons. Defendant therefore

---

appears to have been activated in October 2023, and is linked to a device with a Mobile Station International Subscriber Directory Number name of "Peter Ajak." Defendant continued to use the alias "Doctor Agutdau" to exchange encrypted messages with UC-1.

asked the UCs to disguise the purchase order to make it appear as if the financier was buying "furniture" or humanitarian aid instead of weapons (Doc. 3 ¶ 50)[3];

- On January 25, 2024, defendant asked UC-1 to procure a helmet, bulletproof vest, and rifle for his own personal use, noting he was "obviously going to be leading this mission" and needed "something really dependable and something that is easy and something that is pretty bad ass." During the call, defendant also told UC-1 that while several generals remained involved in his plan, defendant was the ultimate decision-maker on the purchase (Doc. 3 ¶ 55);

- On February 12, 2024, UC-1 sent defendant an updated copy of the weapons contract and in response, defendant instructed UC-1 to prepare "another invoice for humanitarian aid supplies of the equivalent amount" (Doc. 3 ¶ 58);

- On February 12 and 13, 2024, defendant provided UC-1 with specific language to include in the fake invoice and noted that he "just want[ed] to cover our bases with a paper trail" (Doc. 3 ¶¶ 60-62); and

- On February 22, 2024, the UCs reiterated to defendants during an in-person meeting that defendants were "paying [a] premium" because the weapons required licenses from the U.S. government, the UCs were shipping the products without the required licenses, and the UCs were paying off members of the U.S. military to smuggle the products to Africa (Doc. 3 ¶ 70).

Despite knowing the illegality of the procurement and export scheme, on February 22, 2024, defendant signed a contract with the UCs to purchase the following defense articles, weapons, and ammunition, totaling close to $4 million (Doc. 3 ¶ 67):

---

[3] During this call, defendant also acknowledged the UCs would have to "pay off" people to get the shipment out of the country. Defendant acknowledged the risk, but asked the UCs to lower the "delivery fee," noting "[w]hen you bribe, you bribe one time, right?" (Doc. 3 ¶ 52, n.10.)

- 5 -

| Item | Quantity | Unit Price | Total |
|---|---|---|---|
| 1. AK-47 Rifles (Full Auto) | 1,000 | $350.00 | $350,000.00 |
| 2. PKM Rifles | 300 | $675.00 | $202,500.00 |
| 3. RPG-7 launcher | 200 | $575.00 | $115,000.00 |
| 4. 7.62x39 ammo | 2,000,000 | $.17 | $340,000.00 |
| 5. 7.62x54 ammo | 1,500,000 | $.21 | $315,000.00 |
| 6. PG-7 HE round | 1000 | $600.00 | $600,000.00 |
| 7. PSL Sniper Rifle | 70 | $1092.50 | $76,475.00 |
| 8. FIM92 Stinger System | 10 | $80,000.00 | $800,000.00 |
| 9. Satellite phone | 20 | $1,200.00 | $24,000.00 |
| 10. Handheld Radio | 50 | $500.00 | $25,000.00 |
| 11. M67 Hand Grenades | 500 | $60.00 | $30,000.00 |
| 12. PG-7VT/PG-7T AT Round | 500 | $800.00 | $400,000.00 |
| 13. AN/PVS Monocular | 10 | $12,000.00 | $120,000.00 |
| | | Subtotal- | $3,397,975.00 |
| | | Transportation- | $575,000.00 |
| | | **Total -** | **$3,972,975.00** |

Under the contract, the parties agreed that the weapons would be sent via air cargo from the United States to another African country, and then via truck convoy from that African country to South Sudan. In addition to this weapons contract, Ajak also signed a "fake" security provision contract for the same purchase amount for purported humanitarian consulting services and related items (Doc. 3 ¶ 67):

| Line Item: | |
|---|---|
| 1. Consulting Services to Develop Security Provisions for Field Activities Related to Human Rights, Humanitarian, and Civic Engagement Inside South Sudan Refugee Camps. | $1,000,000.00 |
| 2. Items Required to Implement Activities Associated with Contingency Refugee Operations (to include but not limited to initial site surveys, communications equipment for associated personnel, access control equipment, perimeter fencing, traffic control equipment, fire suppression/prevention equipment etc.) | $1,000,000.00 |
| 3. Shipping, Installation and Training of Systems and Equipment. | $1,972,975.00 |
| **Total -** | **$3,972,975.00** |

In furtherance of this scheme, in multiple installments from on or about February 19, 2024, to on or about February 26, 2024, Ajak caused a total of $2 million to be deposited into an Arizona-based bank account used by the UCs. (Doc. 3 ¶ 68.)

On February 29, 2024, the United States charged defendants by criminal Complaint with Conspiracy to Violate the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR) (in violation of Title 22, United States Code, Section 2778(b)(2), (c); and Title 22, Code of Federal Regulations, Parts 121.1, 123.1, 126.1, 127.1(a)(4), and 127.3); Conspiracy to Violate the Export Control Reform Act (ECRA) and the Export Administration Regulations (EAR) (in violation of Title 50, United States Code, Sections 4819(a)(1), (a)(2)(D), and 4819(b); and Title 15, Code of Federal Regulations, Parts 736.2(b)(1) and 774, Supp. No. 1); and Smuggling of Goods from the United States (in violation of 18 U.S.C. Section 554(a)).[4]  (Doc. 3.)

Defendants were arrested the following day.  During a post-*Miranda* interview, defendant admitted he was aware of the arms embargo on South Sudan, and that his hometown of Bor, South Sudan, was the intended final destination for the weapons.  He further admitted that he had signed both the weapons contract and the fake security contract, and that he had caused $2 million to be transferred through an intermediary bank account for the purchase.

Defendant also explained that he did not believe the current South Sudanese government would be willing to hold free and fair elections; because merely advocating for such elections had not been effective, he believed "something different needed to be done."  That "something different," defendant explained, was to "agitate" for a popular uprising and armed takeover of the country.  Defendant also detailed his plan for inciting the popular uprising.  He noted that the current South Sudanese government had made it known that it does not have tear gas or rubber bullets, and that the military would respond to popular protests with live ammunition.  Defendant therefore "wanted … to create a situation where people were going to protest," and anticipated that the South Sudanese

---

[4] On March 6, 2024, a grand jury in the District of Arizona indicted defendants on these same charges.  (Doc. 14.)

- 7 -

"[g]overnment would probably shoot people down," resulting in outrage that would "spark a revolution."

Defendant further stated that Keech planned to meet the weapons when they arrived in Africa, and that once the weapons arrived in South Sudan, they planned to provide the weapons to military personnel in Bor for use in the campaign. Defendant said that while he hoped for a bloodless uprising, the weapons would be seen as "a show of force," and he would return fire if shot at. Defendant added that the uprising would not occur until he arrived in South Sudan, and that he was planning to leave for South Sudan and abandon his immigration status in the United States. He further stated he would become the interim president once the current government was overthrown. Defendant said he was to receive $8 million from his financier to establish a democracy in South Sudan, and that he intended to use $2.2 million to bribe the military.

On March 4, 2024, defendants appeared for an Initial Appearance, and a pretrial services report (PTSR) was prepared. (Doc. 7.) The PTSR noted defendant's numerous family ties to other countries, such as Belgium (where a daughter resides), South Sudan (where his father resides), and Canada, Australia, and India (where his half-siblings reside). (Doc. 7 at 2.) The PTSR further noted defendant possesses a South Sudanese passport and owns a residence in Kenya. (Doc.7 at 2-3.)

While the PTSR acknowledged defendant poses of risk of nonappearance based on the conduct charged and family ties to foreign countries, it recommended release conditions to minimize these risks. The PTSR noted there were no known factors that defendant posed a risk of danger to the community but failed to note defendant's danger to communities in South Sudan. Based on these factors, the PTSR recommended defendant's release on his own personal recognizance with certain conditions. (Doc. 7 at 4-5.)

**ARGUMENT**

**A.     Legal Standard**

A defendant must be detained pending trial when "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In making an individualized detention determination, a court must consider (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the person, including character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, and past conduct; and (4) the nature and seriousness of the danger to the community that would be posed by the person's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). Consideration of non-statutory factors is disfavored. *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Detention is appropriate when a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. The government must establish danger by clear and convincing evidence and must show flight risk by a preponderance of the evidence. *United Sates v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990).

**B.     Defendant Is a Significant Flight Risk.**

Defendant is a significant flight risk and should be detained on that basis. As noted above, defendant is charged with conspiring to export and cause the export of dangerous, military-grade weapons, including fully automatic rifles, machine guns, grenade launchers, anti-aircraft missile systems, and anti-tank explosives. Defendant intended that these weapons be used to facilitate an armed uprising in South Sudan, in violation of U.S. laws and U.N. sanctions meant to prevent further destabilization within the country. Furthermore, defendant pursued this scheme over the course of several months, despite receiving numerous admonishments from the UCs about the illegality of his conduct. Because defendant knew the arms deal was illegal, he took myriad steps to conceal the

scheme, including communicating through encrypted means, directing the creation of fictious invoices, and facilitating money transfers through intermediary accounts. The nature and circumstances of defendant's conduct are thus extraordinarily serious and weigh in favor of detention.

The weight of the evidence also supports detention. Nearly all the undercover telephone calls, videoconferences, and in-person meetings between the UCs and defendants were audio and/or video recorded. Dozens of text messages between defendants and the UCs have been preserved as evidence. Investigators have also obtained extensive documentary evidence, including signed copies of both the weapons contract and the "fake" security provision contract, as well as license determinations and license history checks from the relevant licensing agencies. Thus, even though the weight of the evidence is generally considered the "least important" factor, *Winsor*, 785 F.2d at 757, the overwhelming evidence discovered as part of the investigation supports detention in this case. *See, e.g., United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (finding that the weight of the evidence—and defendants' resulting belief they may be convicted as a result—weighed in favor of detention based on flight risk); *United States v. Martinez Lopez*, No. 22-CR-00211-LK, 2023 WL 197293, at *5 (W.D. Wash. Jan. 17, 2023) ("Although the Court makes no determination as to [defendant's] guilt, it acknowledges the strength of the evidence against him and concludes that pretrial release is inappropriate under [this] factor.").

Furthermore, defendant's history and characteristics suggest he will flee if released. Although defendant's immediate family resides in Maryland, defendant has extensive foreign contacts who could provide support for a life abroad. As described in the PTSR, defendant has family in Belgium (where a daughter resides), South Sudan (where a parent resides), and half-siblings in Canada, Australia, and India. Defendant also has contacts with military leaders abroad, including those with whom he was planning the uprising. In addition, defendant has a South Sudanese passport and owns a residence in Kenya.

Defendant also admitted to agents in his post-*Miranda* interview that he was planning to go to South Sudan and abandon his immigration status in the United States. These characteristics therefore weigh in favor of detention. *See United States v. Gentry*, 455 F. Supp. 2d 1018, 1029 (D. Ariz. 2006) (finding that defendant's travel to foreign countries and contacts with fugitives in foreign countries "strongly favor[ed] … [defendant's] continued detention").

In addition to these foreign contacts, defendant may also have access to significant funding sources. As noted above, defendant told investigators he received $8 million in funding to effectuate the regime change, a portion of which was used for the weapons purchase. Defendant's access to significant funding sources weighs in favor of detention, as such funds could be used to flee the United States and live abroad. *Townsend*, 897 F.2d at 996 (considering defendants "access to substantial sums of cash" as weighing in favor of detention).

Defendant's deceptive conduct over the course the past months also weighs in favor of detention. As part of the scheme, defendant instructed the UCs to create fictitious documents to conceal the nature of the weapons purchase, facilitated money transfers through intermediary accounts to conceal the source of the funds, and used encrypted communications and aliases (e.g., "Doctor Agutdau") to discuss his scheme with the UCs and others. These efforts to conceal his misconduct make him more likely to hide information from supervising officers and less likely to abide by conditions of release set by the Court. *See United States v. Hoover*, No. CR-14-554-1-PHX-SRB, 2014 WL 2094201, at *5 (D. Ariz. May 20, 2014) (concluding that no combination of release conditions would reasonably assure defendant's appearance given his "significant patterns and practices of criminal deception," extensive foreign connections, and access to substantial financial assets); *United States v. Seif*, CR-01-0977-PHX-PGR, 2001 WL 1415034, at *3 (D. Ariz. Nov. 8, 2001) (noting that given defendant's past deception, his

promise to appear at future court proceedings was "likely unreliable and trustworthy" and deserving of "little weight").

Finally, defendant faces twenty-year sentences on two of the three counts charged in the Indictment, and a ten-year sentence on the remaining count. Given these potential penalties, defendant has a strong incentive to flee and avoid prosecution. *See Townsend*, 897 F.2d at 995 (9th Cir. 1990) (noting that defendants had a greater incentive to flee when faced with the possibility of lengthy prison sentences); *United States v. Garivay*, No. CR-13-1070-PHX-SRB, 2013 WL 6577320, at *4 (D. Ariz. Dec. 16, 2013) (considering "a likely significant prison sentence" in detaining defendant); *United States v. Holloway*, No. CR-11-866-PHX-GMS, 2011 WL 4625962, at *3 (D. Ariz. Oct. 6, 2011) (similar).

Based on these factors, the government submits there are no conditions, or combination of conditions, that could reasonably assure defendant's presence at trial.[5] Detention is therefore appropriate in this case. *See Townsend*, 897 F.2d at 996 (concluding defendants were flight risks because the "crimes charged required intelligence, planning, capital, facility in deception, international communications, and international motives," and "carry severe penalties").

### C.  Defendant Is a Danger to the Community

Defendant also poses a danger to the community. As explained above and in the Complaint (Doc. 3), defendant sought to purchase nearly $4 million worth of extraordinarily dangerous, military-grade weapons and ammunition and illegally export

---

[5] The government further believes that while an effective tool in some circumstances, GPS monitoring has limited utility in preventing defendant from fleeing. Supervisees on GPS monitoring are not subject to around-the-clock, real-time monitoring by their supervising officer. Moreover, arrest warrants are not issued the moment a defendant leaves his designated area—rather, that process may take days if a defendant absconds over a weekend. Defendants may use such a delay to leave the Court's jurisdiction. *See, e.g., Townsend*, 897 F.2d at 994-95 ("[W]earing of an electronic device [does not] offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction."); *United States v. Rhule*, No. CR-20-0105-JCC-2, 2020 WL 5984072, at *6 (W.D. Wash. Oct. 8, 2020) ("A GPS tracker can be removed, and once it is, [defendant] could flee.").

these articles to South Sudan. For example, defendant repeatedly asked the UCs to obtain Stinger missile systems—a man-portable air-defense system that operates as an infrared homing surface-to-air missile—to disable South Sudanese military helicopters. (Doc. 3 at ¶ 43.) In fact, although Keech's original, hand-written order called for only three Stinger missiles, the final contract included the purchase of ten Stinger missile systems. (Doc. 3 at ¶¶ 48, 67.) Similarly, defendant also told the UCs he needed anti-tank weapons to disable the thirteen to fifteen functioning tanks in South Sudan—the final weapons contract included 500 high-explosive, anti-tank rounds to be used with the 200 grenade launchers in the purchase order. (Doc. 3 at ¶ 67.)

Had the arms dealers in this case not been undercover agents, defendant would have supplied these weapons to military personnel who opposed the current South Sudanese government.[6] During his post-arrest interview, defendant told investigators that the current government had made it known it does not have tear gas or rubber bullets. Defendant therefore "wanted … to create a situation where people were going to protest," because he anticipated that the South Sudanese government "would probably shoot people down" with live ammunition, resulting in outrage that would "spark a revolution." Defendant added that while he hoped for a bloodless uprising, the exported weapons would be seen as "a show of force," and he would return fire if shot at. Indeed, he had previously asked the UCs to provide him a helmet, bulletproof vest, and rifle for his personal use because he was "going to be leading this mission" and needed "something really dependable and something that is easy and something that is pretty bad ass." (Doc. 3 at 55.)

Thus, had his plans unfolded as he intended, defendant's conduct could have potentially contributed to armed violence, displacement, and destabilization throughout South Sudan. *See* United Nations Security Council, Resolution 2428 and subsequent

---

[6] As noted above, defendant was also in contact with other weapons suppliers to obtain the weapons and ammunition. He also mentioned to UC-1 that he could "easily buy [weapons] from [another African country] or any of our neighboring countries … and just truck [the weapons] across the border." (Doc. 3 ¶¶ 41, 65.)

renewals (imposing an arms embargo on South Sudan and expressing "concern over the continued intensification of violence prolonging the political, security, economic, and humanitarian crisis in most parts of the country"; the "increased violence between armed groups … which has killed and displaced thousands"; and the "threat to peace and security in South Sudan arising from the illicit transfer, destabilizing accumulation and misuse of small arms and light weapons"). Considering the nature of the crime and the potential for substantial, harmful effects on communities overseas, the government believes defendant poses a danger to the community and should be detained. *See United States v. Hir*, 517 F.3d 1081, 1087-89 (9th Cir. 2008) (holding that when a defendant is "charged with committing a crime under United States law that had a substantial harmful effect on a community overseas," a court "making a pretrial release determination under Section 3142(e) of the Bail Reform Act may … consider the danger that a defendant poses to a foreign community" if released pending trial).[7]

## CONCLUSION

For the foregoing reasons, the government asks that defendant continue to be detained pending trial.

Respectfully submitted this 12th day of March, 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

*S/ Amy Chang*

AMY C. CHANG
DAVID A. PIMSNER
RAYMOND K. WOO
Assistant U.S. Attorneys

---

[7] In addition to the potential danger posed to communities overseas, the transfer of $4 million worth of military-grade weapons through the District of Arizona would also pose a danger to the community here.

# CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF sealed system for filing lodged proposed sealed documents, and that I served the attached document by electronic mail, on the following, who may or may not be registered participants of the CM/ECF System:

Kurt Altman, *Counsel for Defendant*.

*/s/ Alexandria Gaulin*
U.S. Attorney's Office