GARY M. RESTAINO
United States Attorney
District of Arizona
AMY C. CHANG
Arizona State Bar No. 027566
DAVID A. PIMSNER
Arizona State Bar No. 007480
RAYMOND K. WOO
Arizona State Bar No. 023050
Assistant United States Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: amy.chang@usdoj.gov
Email: david.pimsner@usdoj.gov
Email: raymond.woo@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>vs.<br>Abraham Chol Keech,<br>Defendant. | Case No. CR-24-00394-PHX-SPL-1<br><br>**GOVERNMENT'S DETENTION MEMORANDUM** |

Defendant should be detained pending trial because he is both a flight risk and a danger to the community. For over a year, defendant conspired with his co-defendant and others to purchase nearly $4 million worth of export-controlled, military-grade weapons and cause these items to be exported from the United States to South Sudan to arm opposition groups seeking to topple the current South Sudanese government. Defendant knew smuggling these weapons and ammunition out of the country without a license was illegal. Nevertheless, he and his co-defendant (Peter Biar Ajak) spent months developing a scheme to export these dangerous weapons in an effort to destabilize a foreign government. Indeed, defendant came to the United States for the express purpose of

effectuating this scheme—he otherwise lacks meaningful ties to the community, has an extensive pattern and history of foreign travel, and has significant incentives to flee the country. Because defendant poses a danger to the community and is a substantial flight risk, the government agrees with Pretrial Services' recommendation that he remain detained pending trial.

**BACKGROUND**

In February 2023, undercover agents from the United States Department of Defense (UC-1) and Homeland Security Investigations (UC-2) conducted a videoconference with defendant, as well as several military generals associated with South Sudanese rebel groups who oppose the current president and leadership of South Sudan. During the videoconference, defendant told the UCs that although he is a U.S. citizen living in Utah, he was in Africa to mobilize forces on the ground. Defendant added that he had recently been in the South Sudanese capital (Juba) and believed the current government would collapse. (Doc. 3 ¶ 34.) The call participants then discussed their desire to obtain weapons from the UCs—who were posing as arms dealers—to help secure key areas in South Sudan near oil fields and gold mines. (Doc. 3 ¶ 35.)

A few weeks later, defendant texted UC-1 that he had arrived in the United States and wanted to set up a meeting to discuss the arms purchase. (Doc. 3 ¶ 38.) In April 2023, defendant traveled to Phoenix, Arizona, to meet with the UCs in person. During the meeting, the UCs showed defendant samples of AK-47 assault rifles, PKM machine guns, PSL sniper rifles, and RPG grenade launchers. Defendant agreed to provide the UCs with a detailed list of weapons and ammunition that he wanted to buy. Defendant also suggested to the UCs that they smuggle the weapons through a U.S. military base in another African country, to avoid search by that country's government. (Doc. 3 ¶ 39(b).)

Over the next several months, defendant and his co-defendant (Ajak) communicated regularly with the UCs via telephone and encrypted messaging application to discuss the purchase and smuggling of weapons and ammunition from the United States to South

Sudan. During these discussions, defendants repeatedly acknowledged that the intended conduct was illegal (several examples of willfulness are described below):

- On February 20, 2023, defendant told the UCs, "I'm sure you know the country [South Sudan] is under sanction[s]" (Doc. 3 ¶ 34);
- On April 25, 2023, defendant told UC-1 that any money transferred to purchase weapons should be disguised as a payment for something else (Doc. 3 ¶ 39(c));
- On November 8, 2023, UC-1 told defendants that there are sanctions in place prohibiting the sale of weapons to South Sudan and that their proposal was illegal; defendant responded, "this issue of sanctions, don't worry about it" (Doc. 3 ¶ 43);
- On December 22, 2023, UC-1 told defendants the proposed shipment was illegal because the items require a license to leave the country, the United States is not sending anything to South Sudan, and he would have to "pay[] off individual guys" in the military because such a plan would be "completely unauthorized" by the U.S. military (Doc. 3 ¶ 46);
- On January 11, 2024, defendants asked the UCs to disguise the purchase order to make it appear as if the purchase was for "furniture" or humanitarian aid instead of weapons, and acknowledged the UCs would have to "pay off" people to get the shipment out of the country Doc. 3 ¶ 50);
- On February 12, 2024, defendant told UC-1 that after the regime change, they wouldn't "have to hide anything" because arms deals would be legal and they could work to procure larger items, such as helicopters (Doc. 3 ¶ 59); and
- On February 22, 2024, the UCs reiterated to defendants during an in-person meeting that defendants are "paying [a] premium" because the weapons require licenses from the U.S. government, the UCs were shipping the products without the required licenses, and the UCs were paying off members of the U.S. military to smuggle the products to Africa (Doc. 3 ¶ 70).

Despite knowing the illegality of the procurement and export scheme, on February 22, 2024, Ajak signed a contract with the UCs to purchase the following defense articles, weapons, and ammunition, totaling close to $4 million (Doc. 3 ¶ 67):

| Item | Quantity | Unit Price | Total |
|---|---|---|---|
| 1. AK-47 Rifles (Full Auto) | 1,000 | $350.00 | $350,000.00 |
| 2. PKM Rifles | 300 | $675.00 | $202,500.00 |
| 3. RPG-7 launcher | 200 | $575.00 | $115,000.00 |
| 4. 7.62x39 ammo | 2,000,000 | $.17 | $340,000.00 |
| 5. 7.62x54 ammo | 1,500,000 | $.21 | $315,000.00 |
| 6. PG-7 HE round | 1000 | $600.00 | $600,000.00 |
| 7. PSL Sniper Rifle | 70 | $1092.50 | $76,475.00 |
| 8. FIM92 Stinger System | 10 | $80,000.00 | $800,000.00 |
| 9. Satellite phone | 20 | $1,200.00 | $24,000.00 |
| 10. Handheld Radio | 50 | $500.00 | $25,000.00 |
| 11. M67 Hand Grenades | 500 | $60.00 | $30,000.00 |
| 12. PG-7VT/PG-7T AT Round | 500 | $800.00 | $400,000.00 |
| 13. AN/PVS Monocular | 10 | $12,000.00 | $120,000.00 |
| | | Subtotal- | $3,397,975.00 |
| | | Transportation- | $575,000.00 |
| | | **Total -** | **$3,972,975.00** |

Under the contract, the parties agreed that the weapons would be sent via air cargo from the United States to another African country, and then via truck convoy from that African country to South Sudan. In addition to this weapons contract, Ajak also signed a "fake" security provision contract for the same purchase amount for purported humanitarian consulting services and related items (Doc. 3 ¶ 67):

Line Item:

| | |
|---|---|
| 1. Consulting Services to Develop Security Provisions for Field Activities Related to Human Rights, Humanitarian, and Civic Engagement Inside South Sudan Refugee Camps. | $1,000,000.00 |
| 2. Items Required to Implement Activities Associated with Contingency Refugee Operations (to include but not limited to initial site surveys, communications equipment for associated personnel, access control equipment, perimeter fencing, traffic control equipment, fire suppression/prevention equipment etc.) | $1,000,000.00 |
| 3. Shipping, Installation and Training of Systems and Equipment. | $1,972,975.00 |
| **Total -** | **$3,972,975.00** |

In furtherance of this scheme, in multiple installments from on or about February 19, 2024, to on or about February 26, 2024, Ajak caused a total of $2 million to be deposited into an Arizona-based bank account used by the UCs. (Doc. 3 ¶ 68.)

On February 29, 2024, the United States charged defendants by criminal Complaint with Conspiracy to Violate the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR) (in violation of Title 22, United States Code, Section 2778(b)(2), (c); and Title 22, Code of Federal Regulations, Parts 121.1, 123.1, 126.1, 127.1(a)(4), and 127.3); Conspiracy to Violate the Export Control Reform Act (ECRA) and the Export Administration Regulations (EAR) (in violation of Title 50, United States Code, Sections 4819(a)(1), (a)(2)(D), and 4819(b); and Title 15, Code of Federal Regulations, Parts 736.2(b)(1) and 774, Supp. No. 1); and Smuggling of Goods from the United States (in violation of 18 U.S.C. Section 554(a)).[1] (Doc. 3.)

Defendants were arrested the following day. During a post-*Miranda* interview, defendant acknowledged that he knew moving the weapons to South Sudan was illegal; he explained he knew a license was required to ship weapons from the United States to South Sudan, and that the UCs had told him they could not get such a license. Defendant further stated that once the weapons arrived in Africa, he planned to meet the weapons and oversee their transport to South Sudan. He then planned to provide the weapons to opposition generals in South Sudan and use the weapons to "support a coup," which would start as soon as the weapons arrived. He added that the coup would be incited by government crackdowns when protestors took to the streets.

Defendant also told investigators he had come to the United States for the purpose of procuring weapons for the coup, and had planned to leave the United States for Uganda that evening (March 1, 2024). When he was arrested, defendant had six pieces of luggage with him; pursuant to a consent search, investigators found five pairs of high-powered

[1] On March 6, 2024, a grand jury in the District of Arizona indicted defendants on these same charges. (Doc. 14.)

binoculars and military-style apparel in his luggage that defendant said he planned to use when he arrived in Africa.

On March 4, 2024, defendants appeared for an Initial Appearance, and a pretrial services report (PTSR) was prepared. (Doc. 6.) The PTSR detailed defendant's lack of community ties, including that he had returned to the United States in March 2023 and has lived (alone) at his current residence for only the past five months. The PTSR also noted defendant's extensive international travel, including to see family in Uganda (where his wife and children live), Kenya (where his siblings live), and South Sudan, Dubai, and Europe (where other family members live). Based on these factors—and the fact that none of his social, employment, financial, health, or substance use history could be verified—the PTSR recommended detention based on defendant's risk of flight. (Doc. 6 at 4.)

## ARGUMENT

### A. Legal Standard

A defendant must be detained pending trial when "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In making an individualized detention determination, a court must consider (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the person, including character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, and past conduct; and (4) the nature and seriousness of the danger to the community that would be posed by the person's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). Consideration of non-statutory factors is disfavored. *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Detention is appropriate when a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. The government must establish danger by clear and convincing

evidence and must show flight risk by a preponderance of the evidence. *United Sates v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990).

**B. Defendant Is a Significant Flight Risk.**

Defendant is a significant flight risk and should be detained on that basis alone. As noted above, defendant is charged with willfully violating U.S. export laws by conspiring to export and cause to be exported dangerous, military-grade weapons to facilitate an armed uprising in South Sudan. Had investigators not disrupted defendants' scheme, defendant would have delivered these weapons—which include fully automatic rifles, machine guns, grenade launchers, anti-aircraft missile systems, and anti-tank explosives—to opposition generals in South Sudan, in violation of U.S. laws and U.N. sanctions meant to prevent further destabilization within the country. Furthermore, this is not a case in which defendant exhibited an isolated lapse in judgment. Rather, defendant engaged in a long-running pattern of concerning behavior that spanned over a year, disregarding repeated admonishments from the UCs that the conduct was illegal. The nature and circumstances of this offense are therefore extremely serious and overwhelmingly support detention in this case.

The weight of the evidence also supports detention. Nearly all the undercover telephone calls, videoconferences, and in-person meetings between the UCs and defendants were audio and/or video recorded. Dozens of text messages between defendants and the UCs have also been preserved as evidence. Investigators have also obtained extensive documentary evidence, including signed copies of both the weapons contract and the "fake" security provision contract, as well as license determinations and license history checks from the relevant licensing agencies. Thus, even though the weight of the evidence is generally considered the "least important" factor, *Winsor*, 785 F.2d at 757, the overwhelming evidence discovered as part of the investigation supports detention in this case. *See, e.g., United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (finding that the weight of the evidence—and defendants' resulting belief they may be

convicted as a result—weighed in favor of detention based on flight risk); *United States v. Martinez Lopez*, No. 22-CR-00211-LK, 2023 WL 197293, at *5 (W.D. Wash. Jan. 17, 2023) ("Although the Court makes no determination as to [defendant's] guilt, it acknowledges the strength of the evidence against him and concludes that pretrial release is inappropriate under [this] factor.").

Defendant's history and characteristics also weigh in favor of detention. As detailed in the PTSR, defendant returned to the United States in March 2023 after living in South Sudan for the previous sixteen years. During a post-*Miranda* interview, defendant told investigators he had only returned to the United States in order to procure weapons. He has no known family in the United States, has lived in his current residence for only five months, and has been at his current job for just ten months. These threadbare community ties stand in stark contrast with his many international connections and history of recent (and frequent) international travel. As detailed in the PTSR, defendant has traveled to see family in Uganda (where his wife and children live), Kenya (where his siblings live), and South Sudan, Dubai, and Europe (where other family members live). In fact, defendant was in a foreign country when he first met the UCs over videoconference, and he has been in contact with several military generals abroad who are affiliated with South Sudanese opposition group(s). Even more concerning, defendant had a confirmed airline ticket and all of his luggage packed and ready to leave the United States for Uganda on the day of his arrest. Defendant's lack of community ties—coupled with his extensive historic and prospective international travel and connections—therefore weigh strongly in favor of detention. *See United States v. Gentry*, 455 F. Supp. 2d 1018, 1029 (D. Ariz. 2006) (finding that defendant's travel to foreign countries and contacts with fugitives in foreign countries "strongly favor[ed] … [defendant's] continued detention").

In addition, during his post-*Miranda* interview, defendant told investigators that he had received $50,000 from one of Ajak's connections via the same intermediary bank account that provided funding for the weapons purchase. According to defendant, this

money was "supposed to be sent to the people on the ground"—defendant said he sent around half of the $50,000 to the generals. Based on bank records provided in response to legal process, investigators learned that in addition to this $50,000, defendant also received another payment of $225,000 into his Ugandan bank account from the same source. Not only is defendant's failure to disclose this additional payment concerning, defendant's access to significant funding sources weighs in favor of detention because these funds may afford him the means to flee. *See United States v. Hoover*, No. CR-14-554-1-PHX-SRB, 2014 WL 2094201, at *5 (D. Ariz. May 20, 2014) (concluding that no combination of release conditions would reasonably assure defendant's appearance given his "significant patterns and practices of criminal deception," extensive foreign connections, and access to substantial financial assets); *Townsend*, 897 F.2d at 996 (considering defendants "access to substantial sums of cash" as weighing in favor of detention).

Finally, defendant faces twenty-year sentences on two of the three counts charged in the Indictment, and a ten-year sentence on the remaining count. Given these potential penalties, defendant has a strong incentive to flee and avoid prosecution. *See Townsend*, 897 F.2d at 995 (9th Cir. 1990) (noting that defendants had a greater incentive to flee when faced with the possibility of lengthy prison sentences); *United States v. Garivay*, No. CR-13-1070-PHX-SRB, 2013 WL 6577320, at *4 (D. Ariz. Dec. 16, 2013) (considering "a likely significant prison sentence" in detaining defendant); *United States v. Holloway*, No. CR-11-866-PHX-GMS, 2011 WL 4625962, at *3 (D. Ariz. Oct. 6, 2011) (similar).

Based on these factors, the government submits there are no conditions, or combination of conditions, that could reasonably assure defendant's presence at trial.[2]

---

[2] The government further believes that while an effective tool in some circumstances, GPS monitoring has limited utility in preventing defendant from fleeing. Supervisees on GPS monitoring are not subject to around-the-clock, real-time monitoring by their supervising officer. Moreover, arrest warrants are not issued the moment a defendant leaves his designated area—for example, that process may take days if a defendant absconds over a weekend. Defendants may use such a delay to leave the Court's jurisdiction. *See, e.g.*, *Townsend*, 897 F.2d at 994-95 ("[W]earing of an electronic device [does not] offer assurance against flight occurring before measures can be taken to prevent

Detention is therefore appropriate in this case. *See Townsend*, 897 F.2d at 996 (concluding defendants were flight risks because the "crimes charged required intelligence, planning, capital, facility in deception, international communications, and international motives," and "carry severe penalties").

**C. Defendant Is a Danger to the Community**

Defendant also poses a danger to the community. As explained above and in the Complaint (Doc. 3), defendant sought to purchase nearly $4 million worth of extraordinarily dangerous, military-grade weapons and ammunition and illegally export these articles to South Sudan. Had the arms dealers in this case not been undercover law enforcement agents, defendant would have supplied these weapons to military generals opposed to the current South Sudanese government for use to "support a coup." Defendant told investigators he anticipated that if the people of South Sudan were to take to the streets to protest conditions in South Sudan, the government would try to shut down such protests by force, triggering a coup. Defendant's conduct—in conspiring to export the battlefield instruments of that uprising—could have potentially contributed to armed violence, displacement, and destabilization in the country. *See* United Nations Security Council, Resolution 2428 and subsequent renewals (imposing an arms embargo on South Sudan and expressing "concern over the continued intensification of violence prolonging the political, security, economic, and humanitarian crisis in most parts of the country"; the "increased violence between armed groups … which has killed and displaced thousands"; and the "threat to peace and security in South Sudan arising from the illicit transfer, destabilizing accumulation and misuse of small arms and light weapons").

In light of the nature of the crime and the potential for substantial, harmful effects on communities overseas, the government believes defendant poses a danger to the community and should be detained. *See United States v. Hir*, 517 F.3d 1081, 1087-89 (9th

---

a detected departure from the jurisdiction."); *United States v. Rhule*, No. CR-20-0105-JCC-2, 2020 WL 5984072, at *6 (W.D. Wash. Oct. 8, 2020) ("A GPS tracker can be removed, and once it is, [defendant] could flee.").

Cir. 2008) (holding that when a defendant is "charged with committing a crime under United States law that had a substantial harmful effect on a community overseas," a court "making a pretrial release determination under Section 3142(e) of the Bail Reform Act may … consider the danger that a defendant poses to a foreign community" if released pending trial).[3]

## CONCLUSION

For the foregoing reasons, the government asks that defendant continue to be detained pending trial.

Respectfully submitted this 12th day of March, 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

*S/ Amy Chang*

AMY C. CHANG
DAVID A. PIMSNER
RAYMOND K. WOO
Assistant U.S. Attorneys

---

[3] In addition to the potential danger posed to communities overseas, the transfer of $4 million worth of military-grade weapons through the District of Arizona would also pose a danger to the community here.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF sealed system for filing lodged proposed sealed documents, and that I served the attached document by electronic mail, on the following, who may or may not be registered participants of the CM/ECF System:

Chalet Braziel, *Counsel for Defendant*.

*/s/ Alexandria Gaulin*
U.S. Attorney's Office