TIMOTHY COURCHAINE
United States Attorney
District of Arizona
AMY C. CHANG
Arizona State Bar No. 027566
RAYMOND K. WOO
Arizona State Bar No. 023050
M. BRIDGET MINDER
Arizona State Bar No. 023356
Assistant United States Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: amy.chang@usdoj.gov
Email: raymond.woo@usdoj.gov
Email: bridget.minder@usdoj.gov

JOHN EISENBERG
Assistant Attorney General
National Security Division
LESLIE C. ESBROOK
New York State Bar No. 5406301
District of Columbia Bar No. 1670737
CHRISTOPHER M. COOK
District of Columbia Bar No. 90013354
Trial Attorneys
Counterintelligence and Export Control Section
950 Pennsylvania Ave, NW
Washington, DC 20530
Email: Leslie.Esbrook@usdoj.gov
Email: Christopher.Cook7@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>vs.<br>Peter Biar Ajak,<br>Defendant. | CR-24-00394-PHX-SPL-002<br>**UNITED STATES' OBJECTION TO DRAFT PRESENTENCE INVESTIGATION REPORT** |

The government agrees with the Draft Presentence Investigation Report (Doc. 169) with one exception: defendant Peter Biar Ajak's leadership role in the offense merits a two-

level upward adjustment to his total offense level under U.S.S.G. § 3B1.1(c) (Aggravating Role), which the draft PSR and its Sentencing Guidelines calculation do not reflect.

As detailed below, defendant oversaw nearly every aspect of the charged weapons export scheme. Defendant admitted as much after his arrest, telling investigators, "I made the decisions[,] and I had the drive for most of what happened. … Anyone else that is caught up in this was probably because they were persuaded by [me]." Defendant exercised this crucial authority, at least in large part, because he had the most to gain from the operation's success—he would become the next leader of South Sudan if his plot succeeded.

Because defendant served as an organizer and leader of the illegal export scheme, he should receive a two-level upward adjustment to his total offense level under U.S.S.G. § 3B1.1(c) (Aggravating Role). The government therefore objects to the omission of this upward adjustment from the draft PSR's offense level calculations. (*See* Doc. 169 at ¶¶ 39, 41, 45, and 78.)

If the Court sustains the government's objection, defendant's Sentencing Guidelines range would be 57 to 71 months, rather than 46 to 57 months as calculated in the PSR. The government believes this guidelines range more accurately reflects the defendant's degree of responsibility in the offense.

## I. Defendant was the organizer and leader of the weapons export scheme.

The Court may impose a two-level upward adjustment if the defendant "was an organizer, leader, manager, or supervisor" of a criminal activity involving fewer than five participants. U.S.S.G. § 3B1.1(c).[1] In assessing whether a leadership enhancement should apply, the Court should consider the defendant's "decision-making authority, the nature of

---

[1] A three- or four-level upward adjustment is appropriate when the defendant served as an organizer, leader, manager, or supervisor and the criminal activity involved five or more participants or was otherwise extensive. *See* U.S.S.G. § 3B1.1(a)-(b). Although defendant's broader efforts to effect a non-democratic regime change in South Sudan required defendant to organize and lead far more than five participants, it is not clear that the narrower charged conduct—the weapons export scheme—involved five or more participants.

participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt. 4; *see United States v. Allen*, 341 F.3d 870, 892-93 (9th Cir. 2003) (recognizing the broad deference afforded to the sentencing court's application of a leadership role enhancement and affirming four-level upward adjustment based on defendants' roles as leaders of white supremacist group). This analysis is not limited to the "elements and acts cited in the count[s] of conviction"; rather, the Court may consider all relevant conduct as contemplated under U.S.S.G. § 1B1.3(a). *See* U.S.S.G. § 3B1.1, Introductory Commentary; *see also United States v. Lillard*, 929 F.2d 500, 503 (9th Cir. 1991) (holding that a role enhancement under § 3B1.1 "is not limited to the offense of conviction").

Taken together, these factors more than justify a role enhancement in this case.

**A. Defendant oversaw nearly every aspect of the weapons export scheme.**

The nature, scope, and degree of defendant's participation in the planning, organizing, and commission of the offense strongly support a role enhancement. Defendant actively participated in—and was in fact, the driving force behind—nearly every aspect of a scheme to procure and export military-grade weapons and ammunition from the United States to South Sudan without the required licenses. As detailed in the draft PSR, defendant engaged in dozens of recorded phone calls and exchanged hundreds of text messages with the UCs regarding the scheme. He also traveled to Phoenix (twice) for in-person meetings and weapons inspections with the UCs, and he recruited an associate—who defendant described as a "weapons expert"—to attend the February 22, 2024, weapons inspection (PERSON-6 in the Complaint, Doc. 3). (Doc. 169 at ¶¶ 13-24.)

Defendant was also responsible for securing funding for the weapons purchase, executing the invoices with the UCs (both real and fake), and directing payments to the UCs, Keech, and himself and his family members. (Doc. 169 at ¶¶ 21, 24.) Although Keech first communicated with the UCs regarding the scheme in February 2023, it was not

until defendant became involved in fall 2023 that the criminal activity began to gain momentum. Prior to defendant's involvement, Keech repeatedly told the UCs that his fundraising efforts had stalled and they did not have the money to proceed; that limbo, however, became unstuck when defendant—who Keech described as a "well-connected" person coordinating with private investors in support of the effort—stepped in. (Doc. 169 at ¶ 12; *see e.g.*, Bates 5167; 5199; 11884 – 12007; 11453 – 75.)

For months, defendant met numerous times with his financier and/or others regarding funding for the weapons scheme and the broader project of regime change. On February 9, 2024, defendant called UC-1 and told him he had secured funding and would pay for the weapons via a wire transfer from a U.S.-based account.[2] (Doc. 169 at ¶¶ 21, 30.) The scheme's success thus largely turned on defendant's efforts and ability to raise money to fund the weapons purchase. *See United States v. Motz*, 936 F.2d 1021, 1026 (9th Cir. 1991) (affirming two-level upward adjustment when district court found defendant was the leader of the conspiracy because "without [defendant] there would not have been financial backing for the operation"); *United States v. Ortiz*, 509 Fed. App'x 950, 952 (11th Cir. 2013) (affirming three-level upward adjustment when defendant provided money and shipping information as part of a scheme to illegally export firearms components to Colombia).

Defendant not only came up with the money to buy the weapons, he came up with the idea for how to conceal the illegal purchase and export scheme. Once defendant secured funding, he then directed the UCs to prepare both a real weapons invoice and a fake security services invoice to conceal the transaction. On February 9, 2024, for example, defendant told UC-1 to "bill [the weapons] as, like, something that is more

---

[2] During his post-arrest interview, defendant explained that he was responsible for securing funding, telling investigators, "What happened is I convinced somebody to … give me money, but I told [the financier] that I wanted to restore human rights, to engage in humanitarian activities, and civic activities in South Sudan." Defendant explained that the financier "[did not] know what the real effort [was]," adding "There is the part that I have told him. And there is one that I am doing." (Bates 5198; 11734 – 883.)

creative," such as "humanitarian whatever," or "humanitarian support for democracy." (Bates 5190; 11257 – 98.) Defendant later provided UC-1 with the specific language to include in the fake invoice to make the invoice "appear like costs for what a normal security company would need, [in order] to provide security inside a country that has hostilities."[3] (Doc. 169 at ¶ 22.) On February 22, 2024, defendant signed both the real weapons invoice and the fake security services invoice. (Doc. 169 at ¶ 24; Doc. 153 at ¶ 10.) That defendant had signing authority for the weapons purchase further supports the conclusion that he played a leadership role in the scheme. *See United States v. Hawkins*, 796 F.3d 843, 872 (8th Cir. 2015) (affirming three-level upward adjustment when defendant "negotiated and signed 'contracts' on behalf of [fraudulent company]"); *United States v. Gilberg*, 75 F.3d 15, 19 (1st Cir. 1996) (affirming four-level upward adjustment when defendant, a sophisticated real estate developer, supplied false purchase prices, instructed others to conceal false statements, and hid documentation containing the actual terms).

Defendant also controlled how the money he raised was spent, directing payments to the UCs, Keech, and himself and his wife. Between February 19, 2024, and February 26, 2024, defendant caused a total of $2 million to be deposited into the UCs' Arizona-based bank account. (Doc. 169 at ¶ 23; *see also* Doc. 153 at ¶ 10.) On February 19, 2024, defendant sent UC-1 a message that he was spreading out the payments "to avoid a bank review" and to "avoid suspicion, which is good for you and us." (Doc. 169 at ¶ 23.) During his post-arrest interview, defendant told investigators he was responsible for arranging the payments to the UCs. (Bates 5198; 11734 – 883.) Defendant also directed payments to himself ($50,000), his wife ($75,000), and his co-defendant Keech ($275,000). (Doc. 169 at ¶ 26; *see also* Doc. 60 at 11-12, & n. 10.) Defendant's control over these disbursements further supports a role enhancement. *See United States v. Adetiloye*, 716 F.3d 1030, 1037

---

[3] During his post-arrest interview, defendant told investigators that "[he] asked [UC-1] to make a different contract," and acknowledged that while it was "both of our ideas," he provided the language for the fake invoice. (Bates 5198; 11734 – 883.)

(8th Cir. 2023) (affirming role enhancement when defendant "directed another person to send money from a U.S. address to avoid arousing suspicion" as part of mail fraud scheme).

**B. Defendant had decision-making authority and directed co-conspirators.**

Not only did defendant participate in nearly every aspect of the scheme, he was the primary decision-maker regarding essential questions of "who, what, when, where, and how." Defendant decided *what* weapons and ammunition to purchase for the coup. On December 13, 2023, defendant texted Keech a "shopping list" of items needed for their coup. During a December 22, 2023, telephone conference with Keech and UC-1, defendant directed Keech to send this "shopping list" to UC-1, which Keech then did. Over the next several months, defendant continued to adjust the items and quantities for purchase, adding and subtracting items until he was happy with the final purchase order, including increasing the number of Stinger missiles from three to ten. (Doc. 169 at ¶¶ 16-17, 21, 24.)

Defendant also decided *when*, *where*, and *how* to ship the weapons and ammunition. It was defendant who ultimately directed UC-1 to forgo a sea cargo shipment in favor of an air shipment via a U.S. military base. On February 15, 2024, for example, defendant told UC-1 that the "situation is so desperate right now in [South Sudan] that there might be a revolution while [the weapons] are stuck in the sea, and then we will miss out on the action." Defendant added, "[W]e don't have time to waste, so we just want you to [air] lift things as quickly as possible." (Bates 5197; 11321 – 44.)

Defendant also exercised authority and control over others, dictating *who* was to travel *when* and *where*. As mentioned above, defendant brought PERSON-6 (who lives in Canada) to the February 22, 2024, weapons inspection in Phoenix. (Doc. 169 at ¶ 24.) In addition, on February 23, 2024, defendant, Keech, and UC-1 agreed that although Keech had already booked a ticket to travel to Uganda, he would delay his ticket and travel instead to Phoenix for a consolidated weapons inspection on March 1, 2024. Defendant added that Keech would "leave immediately after the inspection" and "fly to Kenya" on a one-way ticket to meet the weapons, and "[could] figure out when he [would] be coming back later." (Bates 5300; 11427 – 52.)

Defendant thus directed his co-defendant's travel and activities and was the final authority on key logistical decisions regarding the weapon types and quantities and the timing and method for shipping the weapons out of the United States. Tellingly, when UC-1 asked defendant during a January 25, 2024, call whether two South Sudanese generals remained involved in the scheme, defendant responded that while they remained "involved in the movement," the generals were "not the decision makers." Defendant added, "[U]ltimately, if I'm happy, then everybody should be happy."[4] (Doc. 169 at ¶ 20; Bates 5188, 11225 – 56.) Defendant's decision-making authority and degree of control over others therefore weigh strongly in favor of a role adjustment to his offense level. *See United States v. Barnes*, 993 F.2d 680, 685 (9th Cir. 1993) (affirming role enhancement when defendant "was the principal negotiator between the [UCs] and the conspirators," and "alone negotiated with the agents over the price of the cocaine and the logistics of the delivery"); *United States v. Monroe*, 943 F.2d 1007, 1019-20 (9th Cir. 1991) (concluding that defendant "played decisive role" and "exercised decision[-]making authority as to the logistics of the shipments to Mexico and distribution in the United States," warranting an upward adjustment); *United States v. Farias*, 147 F.4th 764, 776 (7th Cir. 2025) (holding that defendant exercised substantial authority over his co-conspirators when defendant facilitated co-conspirator's travel on several occasions).

**C. Defendant would have benefitted most from the scheme.**

Defendant likely was the key decision-maker because he had the most to gain from the operation's success. From nearly his first communication with the UCs to the day of his arrest, defendant made clear that he would be the next leader of South Sudan. For example, during a November 8, 2023, call, defendant told UC-1 that he was looking to start "basically a coup," and that he would be installed as the new "Prime Minister" and "head

[4] During his post-arrest interview, defendant acknowledged his decision-making authority, telling investigators, "I made the decisions[,] and I had the drive for most of what happened. … Anyone else that is caught up in this was probably because they were persuaded by [me]." (Bates 5198; 11734 – 883.)

of government." As the conspiracy developed, defendant repeatedly told the UCs that he would "obviously … be leading this mission" and had to "lead[] from the front, not the back." After his arrest, he similarly told investigators that he would be named interim president after the coup.[5] (Doc. 169 at ¶ 14, 20, 24, 28; Doc. 153 at ¶ 10.)

Defendant thus anticipated a larger share of the fruits of the crime—namely, the leadership of an entire country and all the power and authority that came with it. Because defendant stood to benefit most from the scheme's success, this factor too weighs in favor of an upward adjustment. *See United States v. McKnight*, No. 21-30189, 2023 WL 5378849, at *2 (9th Cir. Aug. 22, 2023) (affirming role enhancement when defendant held a "higher position" in the organization and "profited far more than his fellow co-defendants"); *United States v. Hembree*, No. 22-5890, 2023 WL 6184254, at *2 (6th Cir. Sept. 22, 2023) (affirming role enhancement for defendant who described himself as "the top dog," sitting "at the head of [the] table").

## II. Conclusion

As described above, defendant oversaw nearly every aspect of the weapons export scheme and would have benefitted most from the scheme's success. In an effort to become the next leader of South Sudan, defendant became the clear leader of this criminal conspiracy. The government therefore respectfully asks that Paragraph 39 of the Draft PSR be revised to include a two-level upward adjustment for defendant's aggravated role in the offense. This revision would result in a total offense level of 25 after acceptance of responsibility; with defendant's criminal history category of I, the applicable Guidelines range would be 57 to 71 months in custody.[6]

---

[5] Keech, for his part, was not promised any government position in the new regime. On January 20, 2024, defendant sent Keech a list of proposed cabinet leaders in the new government. Although defendant had tagged various individuals for prominent roles after the coup—including several of the opposition generals involved in the coup planning, who would assume the titles of "Minister of Defense" and "Chief of Defense Forces"—Keech was not listed for any cabinet position. (Bates 4653.)

[6] If two levels are added to the adjusted offense level in Paragraph 39, corresponding revisions should also be made to Paragraphs 41, 45, and 78.

Respectfully submitted this 29th day of September, 2025.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*s/Amy C. Chang*
AMY C. CHANG
RAYMOND K. WOO
M. BRIDGET MINDER
Assistant U.S. Attorneys

LESLIE C. ESBROOK
CHRISTOPHER M. COOK
Trial Attorneys, National Security Division

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrants:

Kurt Altman, *Attorney for Peter Biar Ajak*

*s/Alexandria Gaulin*
U.S. Attorney's Office