TIMOTHY COURCHAINE
United States Attorney
District of Arizona
AMY C. CHANG
Arizona State Bar No. 027566
RAYMOND K. WOO
Arizona State Bar No. 023050
M. BRIDGET MINDER
Arizona State Bar No. 023356
Assistant United States Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: amy.chang@usdoj.gov
Email: raymond.woo@usdoj.gov
Email: bridget.minder@usdoj.gov

JOHN EISENBERG
Assistant Attorney General
National Security Division
LESLIE C. ESBROOK
New York State Bar No. 5406301
District of Columbia Bar No. 1670737
Trial Attorney
Counterintelligence and Export Control Section
950 Pennsylvania Ave, NW
Washington, DC 20530
Email: Leslie.Esbrook@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>vs.<br>Abraham Chol Keech,<br>Defendant. | CR-24-00394-PHX-SHD-001<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

For over a year, defendant engaged in a complex scheme to illegally procure and export over $4 million worth of extremely dangerous, military-grade weapons and ammunition from the United States to South Sudan without the required export licenses. At the time of his arrest in March 2024, defendant believed he had arranged for a long list of weapons to be smuggled through a U.S. military base in Kenya, transported to the South

Sudanese border, and provided to military generals who planned to use the weapons to incite the violent overthrow of the current South Sudanese government. Defendant knew that his conduct was illegal—he admitted as much to undercover agents posing as weapons dealers. Defendant also knew that his conduct could endanger countless civilian lives—he anticipated that the coup would be triggered by a government crackdown on protestors in the streets.

Defendant was arrested before these plans could come to fruition. Given the seriousness of the conduct, the government recommends a mid-range sentence, followed by a three-year term of supervised release. The government believes such a sentence appropriately accounts for the nature and circumstances of the offense, defendant's history and characteristics, and the need to promote respect for the law, provide just punishment, and afford adequate deterrence.

## Factual and Procedural Background[1]

This case arises from an attempted coup. Defendant, his co-defendant Peter Biar Ajak, and others sought to install a new government in their homeland of South Sudan. At some point, defendants determined that their hopes for effecting a democratic regime change (*e.g.*, through free and fair elections) were not feasible. And they knew that effecting a non-democratic regime change—a coup—required (among other things) weapons and ammunition. In early 2023, defendant, a naturalized U.S. citizen living in Uganda, decided to return to the United States to procure these weapons.

Through several associates, defendant was introduced to undercover agents from the U.S. Department of Defense (UC-1) and Homeland Security Investigations (UC-2) who were posing as Arizona-based arms dealers.[2] On February 20, 2023, defendant participated in a video conference with the UCs and several other South Sudanese military generals and

[1] A detailed summary of the factual background and regulatory framework for export cases can be found in the draft Presentence Investigation Report (PSR, Doc. 175, ¶¶ 6-29) and Complaint (Doc. 3).

[2] Additional information regarding defendant's introduction to the UCs can be found in the Government's Response to Defendant's Motion to Dismiss (Doc. 132, filed under seal).

opposition leaders. During the videoconference, defendant told the UCs he had been in South Sudan "for the last year, … moving from state to state, from town to town, just to mobilize the [military] officers … that are with the government." He added that he was "still underground," but was coordinating with forces within the country. Defendant told the UCs he believed the South Sudanese government would collapse, but that the opposition forces needed "logistics," including ammunition, to topple the "very, very weak government." Defendant told the UCs, "I'm sure you know the country is under sanction[s]," and that a United Nations weapons embargo meant that "there should be no arms [going] to the country" or the current government of South Sudan. UC-1 responded that his company would be willing to "circumvent" these policies and arm defendant's movement, but that doing so came with risk because "U.S. policies [did not] support the shipment of these weapons to groups like [defendant's]." (PSR, ¶ 9.)

On April 10, 2023, defendant and one of his associates traveled to Phoenix, Arizona, to meet with the UCs in person and inspect samples of the military-grade weapons defendant wanted to purchase. During the meeting, defendant conducted a "show-and-tell" of various weapons, displaying an AK-47 assault rifle, machine gun, sniper rifle, and RPG launcher for two South Sudanese generals who participated via videoconference:



During the in-person meeting in April 2023, defendant discussed potential shipment methods to South Sudan and asked the UCs whether they had "connection[s]" with the U.S. military in Kenya. Defendant explained that if the UCs had such connections, they "[could] easily even just ship [the weapons and ammunition] to South Sudan … [f]rom the base in Kenya." He added, "The contact person in Kenya at the U.S. military base can receive them. And, you know, we can even just hire … a smaller plane that can actually pick [the weapons and ammunition] up from there" without "being sighted by the Kenyan government." Defendant also reassured the UCs that only the first few shipments would be "dealing with illegal business" and that subsequent shipments (after the coup) would be "legal" and could be made directly to South Sudan ("Everything will be just, yeah, easy"). (PSR, ¶ 10.)

After the in-person meeting in April 2023, defendant continued to communicate with the UCs about buying and shipping weapons. On November 3, 2023, defendant introduced his co-defendant (Ajak) to the UCs. A few days later, on November 8, 2023, defendant and Ajak participated in another videoconference with the UCs. Ajak told the UCs he needed anti-tank weapons to "knock out" the ten to thirteen functioning tanks in South Sudan, as well as anti-aircraft systems to shoot down the South Sudanese military's two to five operational helicopters. When UC-1 reminded defendants that U.S. sanctions "prevent[ed] the movement of these weapons" to South Sudan and that they could not export the weapons legally, Ajak told the UCs the sanctions would be "lifted immediately" after the regime change. Defendant further reassured the UCs, saying "[T]his issue of sanctions, don't worry about it." (PSR, ¶ 12-13.)

On December 22, 2023, defendant sent UC-1 a photo of a hand-written "shopping list" of weapons for "Immediate Consignment for Operation Free South Sudan." The shopping list included hundreds of rifles, more than a million rounds of ammunition, and three Stinger missile systems, totaling more than $1 million. The list also included a $213,145 transportation fee (roughly 20% of the total cost) for transportation from "AZ to South Sudan" (PSR, ¶ 16):




13/12/2023

Immediate Consignment for Operation Free South Sudan

| | Item | Quantity | Unit price | Total |
|---|---|---|---|---|
| 1. | AK47 Rifles | 1,000 | $200.00 | $200,000.00 |
| 2. | PKM Rifles | 100 | $675.00 | $67,500.00 |
| 3. | RPG-7 | 100 | $575.00 | $57,500.00 |
| 4. | AK47 Ammos | 1,000,000 | $0.17 | $170,000.00 |
| 5. | PKM Ammos | 500,000 | $0.21 | $105,000.00 |
| 6. | RPG-Ammo (Regular) | 500 | $80.50 | $40,250.00 |
| 7. | RPG-Ammo (Antitank) | 100 | $600.00 | $60,000.00 |
| 8. | Sniper Rifle | 70 | $1,092.50 | $76,475.00 |
| 9. | Stinger | 3 | $80,000.00 | $240,000.00 |
| 10. | Thuraya phones | 20 | $1,200.00 | $24,000.00 |
| 11 | Walkie-Talkies | 50 | $500.00 | $25,000.00 |
| | Sub-Total | | | $1,065,725.00 |
| | Transportation (from AZ to South Sudan) 20%: | | | $213,145.00 |
| | Direct Cash Support | | | $100,000.00 |
| | Grand Total: | | | $1,378,870.00 |

Over the next few months, this shopping list grew, as defendants participated in dozens of recorded calls and exchanged hundreds of text messages, together and separately, with the UCs, regarding product types and quantities. On February 22, 2024, defendant and Ajak traveled to Phoenix and met with the UCs to inspect a sample of the weapons they wanted to purchase. Both defendants handled the weapons, and Ajak signed an invoice to purchase nearly $4 million worth of weapons and ammunition, including ten Stinger missiles (costing $800,000), two hundred grenade launchers, more than a thousand machine guns and rifles, and over 3.5 million rounds of ammunition.[3] This purchase price included a $575,000 "transportation" and risk fee. (PSR, ¶ 23.)

[3] In order to conceal the nature of the transaction from U.S. banks, Ajak also signed a second, fictitious invoice for the same purchase amount for "consulting services to develop security provisions for field activities related to human rights, humanitarian, and civic engagement inside South Sudan refugee camps." Between February 19, 2024, and February 26, 2024, Ajak caused a total of $2 million to be deposited into the UCs' Arizona-based bank account in four separate installments. (PSR, ¶¶ 21-22.)













On March 1, 2024, defendant and Ajak planned to meet with the UCs for a final weapons inspection. After traveling to Phoenix for the third time, defendant was arrested by authorities on a federal criminal complaint. (PSR, ¶ 24; Docs. 3, 25). In a post-*Miranda* interview, defendant told investigators he had come to the United States specifically to procure weapons for the coup and planned to leave for Uganda after the weapons inspection. He acknowledged that "South Sudan is sanctioned" and that he knew he was breaking the law. Defendant explained that once the weapons arrived in Africa, he planned to "transport them all the way to South Sudan" and "hand them over to the generals." He added the weapons would be used "to support a coup," which would be incited when government forces "crush[ed]" protestors in the streets. He also explained that if the current president were not armed, "he should not be harmed" and "was supposed to be kept alive." When asked about the fates of those around the president, defendant said they

"[had] killed so many people" and therefore "[could] be harmed or arrested" and "may not be safe." (PSR, ¶ 25.)

On March 6, 2024, a Phoenix grand jury returned an indictment charging defendants with three export crimes related to the weapons procurement and export scheme. (Doc. 14.) Because defendants sought to export Stinger missile systems—which are heat-seeking, man-portable, shoulder-fired, supersonic missiles designed to shoot down aircraft—a superseding indictment was returned on April 30, 2025, to add a charge (Count 4) related to these weapons systems. (Doc. 71.[4]) On August 25, 2025, defendant pleaded guilty to Counts 1 and 2 of the superseding indictment. (Docs. 162, 163.) Pursuant to the parties' plea agreement, which has been accepted by the Court, the government has agreed to dismiss Counts 3 and 4; the dismissal of Count 4 allows defendant to avoid a mandatory minimum sentence of 25 years in custody. (Doc. 163.) The parties have further agreed that defendant's sentence shall not exceed the high-end of the applicable sentencing guidelines range. (Doc. 163; PSR, ¶ 4.)

**The Guidelines Range and PSR**

The draft Presentence Investigation Report correctly calculates an offense level of 23 and a criminal history category of I, which corresponds to a sentencing guidelines range of 46 to 57 months in custody. (PSR, ¶ 76.) The PSR further observes that if defendant had been convicted of all counts at trial, his resulting sentencing guidelines range would have been life in custody.[5] (PSR, ¶ 92.) The government agrees with the PSR's

---

[4] Count 1 charges a violation of 18 U.S.C. § 371, Conspiracy to Violate the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR) (22 U.S.C. § 2778 and 22 C.F.R. Part 120, *et seq*.); Count 2 charges a violation of 50 U.S.C. §§ 4819 and 15 C.F.R. Parts 736.2 and 774, Conspiracy to Violate the Export Control Reform Act (ECRA) and the Export Administration Regulations (EAR); Count 3 charges a violation of 18 U.S.C. § 554, Smuggling Goods from the United States; and Count 4 charges a violation of 18 U.S.C. § 2332g, Conspiracy to Export Missile Systems Designed to Destroy Aircraft.

[5] As noted above, had defendant been convicted of all counts at trial, he would also have been subject to a 25-year mandatory minimum sentence on Count 4, *see* 18 U.S.C. § 2332g(c)(1) (setting criminal penalty of 25 years to life imprisonment).

guidelines calculations. The PSR recommends a mid-range sentence of 52 months, followed by three years of supervised release. (PSR, p. 24-26.)

**The § 3553(a) Factors**

After considering the nature and circumstances of the offense, defendant's history and characteristics, and the relevant public policy factors, the government respectfully recommends a sentence in the middle of the final adjusted guidelines range, followed by three years of supervised release. The government believes such a sentence is sufficient but not greater than necessary to comply with the § 3553(a) factors.

**I. The nature and circumstances of the offense**

By any measure, defendant's offense conduct was exceptionally serious. For more than a year, defendant engaged in a scheme to procure and export military-grade weapons to overthrow a sitting government. These weapons included ten Stinger missiles, two hundred grenade launchers, more than a thousand machine guns and rifles, and millions of rounds of ammunition—an extraordinarily dangerous cache. Over the course of dozens of phone calls, hundreds of text messages, and two in-person meetings, defendant engaged in a sustained effort to illegally move these weapons to South Sudan. What's more, defendant did so knowing that his conduct was illegal. Throughout their communications, the UCs repeatedly admonished defendant that the exports were unauthorized, a fact defendant acknowledged on multiple occasions.

Equally concerning, defendant's plans for regime change were thwarted only by his arrest—had the arms dealers in this case not been undercover law enforcement agents, defendant would have supplied these weapons to military generals to incite a coup and install his co-defendant as South Sudan's new president, endangering countless civilian lives in the process. In conspiring to export the battlefield instruments of this uprising, defendant's conduct would have contributed to armed violence, displacement, and destabilization throughout South Sudan and the region, the very concerns animating the export controls in the first place. *See*, *e.g.*, United Nations Security Council (U.N.S.C.), Resolution 2428 and subsequent renewals (imposing an arms embargo on South Sudan and

expressing "concern over the continued intensification of violence … prolonging the political, security, economic, and humanitarian crisis in most parts of the country"; the "increased violence between armed groups … which has killed and displaced thousands"; and the "threat to peace and security in South Sudan arising from the illicit transfer, destabilizing accumulation and misuse of small arms and light weapons") (most recent renewal via U.N.S.C. Resolution 2781, dated May 30, 2025).

Defendant's seeming disregard for the dangerous consequences of the offense therefore weigh strongly in favor of a significant sentence.

## II. Defendant's history and characteristics

Although the nature and circumstances of the offense are serious, defendant's history and characteristics are to some extent mitigating. Defendant has no criminal history. And as detailed in the PSR, defendant experienced a "traumatic and tumultuous childhood," fleeing his hometown as a young child due to a civil war in South Sudan and living in refugee camps until obtaining asylum in the United States in 2001. Despite his uncommonly difficult childhood, defendant completed his education, including a college degree in social work, and served as a political activist in South Sudan. (PSR, ¶¶ 53, 56-57.)

The government recognizes that defendant's history and characteristics are unique and has therefore accounted for these specific mitigating factors in its plea agreement and sentencing recommendation. Indeed, the government carefully considered defendant's history and characteristics (among other factors) when offering a plea agreement that allowed defendant to plead guilty to Counts 1 and 2 (which carry five- and 20-year statutory maximums, respectively), rather than Count 4 (which carries a mandatory minimum sentence of 25 years in custody and a statutory maximum—and recommended guidelines sentence—of life). *See* U.S.S.G. App. B, Part III, § 5K2.21 (Dismissed and Uncharged Conduct) (allowing Court to consider dismissed or uncharged conduct when determining seriousness of the offense). No further downward variance is therefore warranted.

## III. Public policy factors

The government further believes a sentence in the middle of the final adjusted guidelines range is sufficient but not greater than necessary to satisfy the public policy factors set forth in 18 U.S.C. § 3553(a). Such a sentence appropriately reflects the seriousness of the offense and the need to promote respect for the law and provide just punishment; avoids unwarranted sentencing disparities; and affords adequate deterrence and protects the public from further crimes. *See* 18 U.S.C. § 3553(a)(2)(A)-(C), (a)(6).

As noted above, the seriousness of defendant's offense cannot be overstated. Throughout our history, Congress and the President have controlled and regulated the export of arms and other goods to further U.S. national security and foreign policy interests. *See generally United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 322-324 (1936) (summarizing the extensive use through the nation's history of embargoes and export controls, and reversing lower court's dismissal of an indictment charging conspiracy to export firearms to South America in violation of arms embargo). The Ninth Circuit has similarly long recognized the government's "important interest" in the regulation of international arms traffic. *See*, *e.g.*, *United States v. Chi Mak*, 683 F.3d 1126, 1135-36, (9th Cir. 2012) (observing that the AECA and its predecessor statute "substantially advance important governmental interests" in regulating international arms exports); *see also* 22 U.S.C. § 2778(a)(1) (authorizing the President to control the export of defense articles "[i]n furtherance of world peace and the security and foreign policy of the United States"); 50 U.S.C. § 4811 (authorizing export controls for "national security and foreign policy" reasons, including to control the proliferation and acquisition of conventional weapons). Defendant's conduct—in seeking to illegally export highly-controlled defense articles into a volatile situation abroad—exemplifies the grave harm to U.S. national security that Congress sought to punish and deter through these statutes.

A mid-range sentence reflects not only the seriousness of the offense but is also consistent with the sentences imposed in cases involving similarly situated defendants. *See*, *e.g.*, *United States v. Nasriddinov*, No. 23-CR-452-002, Doc. 102 (E.D.N.Y. Oct. 3,

2025) (imposing mid-range sentence of 36 months for defendant who conspired to export millions of dollars' worth of electronic components to Russia, including those that were later found in Russian equipment on the battlefield in Ukraine); *United States v. Goltsev*, No. 23-CR-452-001, Doc. 93 (E.D.N.Y. Jan. 8, 2025) (imposing 40-month sentence for more culpable co-defendant in same case); *United States v. Hunt*, No. 22-CR-00375, Doc. 70 (N.D. Ala. Feb. 25, 2025) (imposing high-end guidelines sentence of 60 months for defendant who sold industrial equipment to Iran in violation of economic sanctions); *United States v. Kuznetsov*, No. 21-CR-00099, Doc. 51 (E.D.N.Y. Apr. 30, 2024) (imposing guidelines sentence of 46 months for defendant who attempted to ship thousands of dollars' worth of specialized rifle components and accessories to Russia). Indeed, as courts have recognized, the "best way to curtail unwarranted disparities is to follow the [sentencing guidelines], which are designed to treat similar offenses and offenders similarly." *United States v. Alford*, 89 F.4th 943, 953 (D.C. Cir. 2024) (internal quotations and citations omitted).

Finally, a mid-range a sentence is also significant enough to deter future crimes by defendant and protect the public. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). Defendant has no criminal history, and a mid-range sentence represents a meaningful sanction for a first-time offender. As importantly, a within-guidelines sentence sends an appropriate message to others contemplating or committing similar conduct today. *See United States v. Zakhor*, 58 F.3d 464, 467 (9th Cir. 1995) (general deterrence is among the legitimate purposes of sentencing). Imposing a mid-range sentence would thus promote respect for the law, provide just punishment, and protect the public.

///

///

///

## Conclusion

For the foregoing reasons, the government respectfully asks the Court to impose a sentence in the middle of the final adjusted sentencing guidelines range, followed by a three-year term of supervised release.

Respectfully submitted this 9th day of December, 2025.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*s/Amy C. Chang*
AMY C. CHANG
RAYMOND K. WOO
M. BRIDGET MINDER
Assistant U.S. Attorneys

LESLIE C. ESBROOK
Trial Attorney, National Security Division

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrants:

Richard Bock and Dominic Rizzi, *Attorneys for Abraham Chol Keech*

*/s Alexandria Gaulin*
U.S. Attorney's Office