UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_________________

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. 2:24-00394-01-SHD |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Phoenix, Arizona |
| **Abraham Chol Keech,** | ) | December 18, 2025 |
| | ) | |
| Defendant. | ) | |
| ________________________________ | ) | |

**BEFORE: THE HONORABLE SHARAD H. DESAI, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**SENTENCING**

Official Court Reporter:
**Kimberly Portik, RMR, CRR, CRC**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
United States Attorney's Office
By: **Amy Chang, Esq.**
**Mary Bridget Minder, Esq.**
**Raymond K. Woo, Esq.**
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004

For the Defendant:
Law Office of Dominic Rizzi
By: **Dominic J. Rizzi, Esq.**
100 North Stone Avenue, Suite 601
Tucson, Arizona 85701-1519

Law Office of Richard C. Bock
By: **Richard C. Bock, Esq.**
100 North Stone Avenue, Suite 1003
Tucson, Arizona 85701-1517

**P R O C E E D I N G S**

(Defendant is present and in custody.)

THE COURTROOM DEPUTY: This is Case No. CR2024-0394, United States of America vs. Abraham Chol Keech. This is the time set for sentencing.

Would the parties please announce for the record.

MS. CHANG: Good afternoon, Your Honor. Amy Chang, Ray Woo, and Bridget Minder for the United States.

THE COURT: Good morning, Ms. Chang, Ms. Minder, and Mr. Woo.

MR. RIZZI: Good afternoon, Your Honor. Dominic Rizzi and Co-Counsel Richard Bock at the Defense table, here on behalf of Abraham Keech, who is present here in custody.

THE COURT: Good afternoon, counsel, and good afternoon, Mr. Keech.

My name is Sharad Desai, and I'm the district judge who is sentencing you today on Count 1, conspiracy to violate the Arms Export Control Act, and Count 2, conspiracy to violate the Export Control Reform Act. And I didn't go into greater detail on those counts, but that's all laid out in the superseding indictment.

Today we will discuss the presentence report and the United States Sentencing Guidelines recommended sentence in your case. I will then offer the lawyers and you an opportunity to speak. I will discuss the factors that I have

considered in reaching my sentencing decision. I will then impose your sentence, and lastly I will advise you of your right to appeal.

If at any point during this hearing you have any questions, please let your counsel know, and I'd be happy to give you the opportunity to speak with him.

Does that sound fair?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Thank you. We are ready to proceed with your sentencing.

Can you please state your full name and date of birth.

THE DEFENDANT: Abraham Chol Keech, January 1st, 1980.

THE COURT: Thank you.

In preparation for today's hearing, I did review a significant amount of material. I reviewed the superseding indictment, which includes some very serious charges which will be dismissed if we proceed with the plea agreement; the presentence report; the plea agreement itself; the Government's sentencing memorandum; as well as three letters I received from the Defense a short time ago from Mr. Keech, his brother Daniel Keech, and Abraham Mach, the chairman of the Bor community in the United States. I've also reviewed all other pertinent filings in this case.

MR. RIZZI: Your Honor, if I may, on the 15th the Defense also submitted a rather lengthy, nine-page sentencing

memorandum with some additional attached letters.

Did the Court receive that as well?

THE COURT: I did, and I reviewed everything that has been filed in this case.

MR. RIZZI: Thank you, Your Honor.

THE COURT: Counsel, have you reviewed the presentence report with your client?

MR. RIZZI: Mr. Bock did, Your Honor.

THE COURT: Okay. And are you aware of any errors in the presentence report?

MR. RIZZI: There are none.

THE COURT: Your client's letter actually referenced one error with respect to where his children are living.

MR. RIZZI: Okay.

THE COURT: So do you want to chat with him really briefly about --

(The defendant and counsel confer.)

MR. RIZZI: Yes, Your Honor. The only correction he has is -- and my apologies, but that his children are living with his current wife, not his ex-wife, in Uganda.

THE COURT: I understand. When I read that in the presentence report I was a little confused, so I appreciate the clarification.

(The defendant and counsel confer.)

MR. RIZZI: He also wanted the Court to know that

there is a period of time from 2009 to 2012 -- to 2019 that it showed unemployment, a break, but he was actually employed with --

THE DEFENDANT: With the National Democratic Institute, a U.S. aid project.

MR. RIZZI: If the Court heard that.

THE COURT: I didn't hear, Mr. Keech.

If possible, can we find a way to get the microphone much closer to him?

MR. RIZZI: This is as high as the table goes, Your Honor. I know Mr. Keech is pretty tall.

THE COURT: Can we do some real-time problem-solving?

THE DEFENDANT: In the PSR report, Your Honor, it said that I -- 2009 to 2019 I was unemployed. No. I was actually working for a U.S. aid project with the National Democratic Institute --

THE COURT: Okay.

THE DEFENDANT: -- as a civic engagement officer.

THE COURT: I'm happy to incorporate those changes by reference into the PSR.

Does the Government have any objection?

MS. CHANG: No, Your Honor. Thank you.

THE COURT: Does the presentence report writer have any concerns?

THE PROBATION OFFICER: No, Your Honor.

THE COURT: Thank you.

Okay. Aside from those corrections, Counsel, are you aware of any other errors in the presentence report?

MR. RIZZI: I'm not, Your Honor.

THE COURT: Do you have any objections to the presentence report?

MR. RIZZI: I do not.

THE COURT: Mr. Keech, have you discussed the presentence report with your counsel?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And are you satisfied with the services of your counsel?

THE DEFENDANT: Yes.

THE COURT: Thank you.

Ms. Chang, is the Government aware of any errors in the presentence report?

MS. CHANG: No, Your Honor. Thank you.

THE COURT: Do you have any objections to the presentence report?

MS. CHANG: None, Your Honor. Thank you.

THE COURT: Thank you.

Other than as we previously discussed, I will adopt the contents of the presentence report as providing the factual foundation for my sentencing decision.

I find that the advisory sentencing guidelines range

in this case is 46 to 57 months based on a total offense level of 23 and a criminal history category of I. The plea agreement calls for a sentencing stipulation that does not exceed the high end of the range. The presentence report writer has recommended a sentence of 52 months. And I look forward to hearing from the parties as to what the appropriate sentence should be in this case.

I'll turn it over first to the Defense, and I have one question for you that I'd like you to address in your remarks. I understand that Mr. Keech is interested in returning to Uganda after he serves his custodial sentence and potentially during supervised release. Can you address his intentions after he returns to Uganda with respect to South Sudan and whether or not he intends to engage in similar activity as what he has been engaged in previously and has gotten him in this mess?

MR. RIZZI: Of course, Your Honor.

So to address -- and I will answer this question. But to sort of address our position on sentencing as a whole first, when the Defense considers the goals and objectives of what the purpose of a sentencing in a criminal case is about, we strongly believe that the number one consideration would be safety to the community, and then of course the secondary consideration would be whether or not the defendant can be rehabilitated. Of course there are some cases that become --

come before a judge in these types of cases where there is a very serious concern for safety or that there is a very serious doubt that a defendant can be rehabilitated.

In this case, Your Honor, I do want to point out that Mr. Keech is someone who has absolutely no criminal history whatsoever aside from this case. Before his arrest in this case, Mr. Keech had never been investigated for, arrested for, accused of, convicted of any sort of criminal activity whatsoever, whether it be a federal offense, a state offense, a misdemeanor offense, nothing. Mr. Keech for years has been nothing but a law-abiding citizen, a productive member of society, and somebody who has had a very significant impact in this country and his community alike.

As the Court can see just looking in the gallery, Mr. Keech has very significant family and community support. Many of the folks here have traveled from out of state just to be here for Mr. Keech today.

If those of you who have come from out of state, if you could just raise your hand so that the judge can see how many people have traveled all this way for Mr. Keech.

Your Honor, I submit to the Court that Mr. Keech is someone who has done nothing his entire life but make a positive impact on people.

The other things I would really hope that the Court would consider in deciding an appropriate sentence for

Mr. Keech is the difficulty of everything Mr. Keech has gone through his entire life to get to where he is at this point. And he will tell you, I'm sure, Your Honor, that he is not proud of where he is today, but he is very proud of the man he is in general. He is a father, he is a brother, he is an uncle, he is a son, and he is someone who is really a role model and a symbol of hope to a lot of people. And I don't mean that he's a symbol of hope because of what he engaged in in this case, Your Honor. In fact, he is very ashamed of what he did in this case. But he is a symbol of hope for all the other things he's done in his country and in this country alike.

This would include things like organizing protestors to stand up against atrocities that have happened to them. He is someone who has been on the ground with people who are suffering and taught them how to speak up for themselves. He is someone who has been a friend and an aid to folks from his country who are in need of monetary help and things like that.

When Mr. Keech was a child, you saw in my memorandum, Your Honor, he grew up in a very, very -- under difficult circumstances to say the least. Mr. Keech, from the age three to seven, grew up living amongst cattle in the same conditions of the cattle. And then after that he fled his home country on foot over a thousand-mile journey.

There was a movie that came out this year called *The*

*Long Walk* based on a Stephen King book where characters are walking a very long distance for a political purpose. Mr. Keech lived that in real life. And on that walk, he had hundreds of his friends, young children his age who died with him throughout this journey, and he quite literally had to bury his friends as early as seven, eight years old.

Mr. Keech is someone who his entire life has seen death and destruction, and despite that he is a very positive person. He is someone who loves this country, he loves his country, and he loves his fellow countrymen. And, you know, I think that that is why we have so many people here in the courtroom for him, Your Honor.

He is someone who understands the severity of the conduct he engaged in. He is someone who accepts responsibility. He is extremely remorseful. He did get involved in this offense, Your Honor, because of the very extreme violent conditions in his -- in his country. And of course when people in other positions of power in his country asked him to get involved, of course, you know, Mr. Keech at that time made a decision to help people as he has always helped people who have asked him for help.

But now Mr. Keech does realize that he needs to do things the right way. He can't just engage in illegal activity or criminal activity to assist people. So rather, you know, going forward, Mr. Keech knows that he is going to -- he wants

to continue helping people, but he wants to continue helping people in the right way, in a legal way, in a way he has always done his entire life until he got involved with this offense.

I did also want to point out, Your Honor, that as part of this offense the Defense thought it was very significant that Mr. Keech stand to gain no sort of a monetary or political benefit in this case. He really did do this strictly based on the severe conditions and sort of the desperate climate in South Sudan.

As the Defense put in its memorandum, we are asking for a time-served sentence. I know that the guideline range for a offense that is a -- has a base level offense of 23 is 46 to 57 months. If that does get adjusted to a base level offense of 20 for other circumstances, the new range would be 33 to 41 months. It is the Defense position that this is too much time to achieve those sentencing goals that I talked about earlier at the beginning of my speech.

But Mr. Keech is someone who is -- he could absolutely be rehabilitated. He is not someone who is a risk to engage in future criminal activity. And I think that what would be appropriate in this case, Judge, would be a time-served sentence because Mr. Keech has already served a little bit over one year and nine months. And for this level of offense -- I know it is very serious, but given all of the mitigation I do believe that a time-served sentence would be appropriate, or

slightly above a time-served sentence. But I do think a variance would be warranted, Judge.

To answer your first question in a little bit more detail, Mr. Keech does plan to go to Uganda, plans on taking a break from his political work for a time. He plans on focusing on his family, focusing on his ranch. He does have cattle in Uganda.

And I'll tell you, Judge, that right now one of Mr. Keech's daughters is very mentally ill. Not just because of this case, there are other factors as well, but I will tell you that Mr. Keech being in custody for this long, her uncertainty of when he is going to come home, her mental health seriously has declined. She had made statements to her mother about hurting herself. And when she did find out that the original sentencing date got continued from November to mid-December, she broke down in tears due to the uncertainty of when her father is coming back.

But I will tell the Court that Mr. Keech is hopeful to go to Uganda. The Government has no objection to that. He is hopeful to focus on his farm, focus on his family. And in the future I don't know where his political activism will take him, but he will assure you that he will never be involved in any sort of criminal activity again.

And, Your Honor, I say this very sincerely. I know that Mr. Keech has some words for you once everyone has

presented everything, but I would be hopeful that you would consider everything that the Defense has presented and sentence him to a time-served sentence.

THE COURT: Mr. Rizzi, I do have a few follow-up questions for you. First of all, you didn't quite answer my question, and maybe it's because I didn't answer (sic) it as directly as I should have.

You have alluded to the fact that Mr. Keech doesn't want to engage in criminal activity in the future. Does he intend to engage in violent activity on behalf of his country?

MR. RIZZI: No, Your Honor. I don't think that Mr. Keech has any intention to engage in any sort of violent activity. And I do -- would allow Mr. Keech to answer the Court directly as opposed to me speaking on his behalf so the Court can see how sincere he is about sort of what his goals are and sort of what his ideas are about, you know, his future conduct, Your Honor. And so if you wish to address Mr. Keech directly about his plans and sort of -- I have no problem with you speaking to him directly about any of these things.

THE COURT: I'll do so, but I do have another question. I mean, your argument touched on many of the 3553(a) factors, but it didn't address deterrence and how a time-served sentence here would serve the purposes of general deterrence or respect for the law.

Tell me how I can sentence someone to this serious

crime -- for this serious crime with time served and promote respect for the law and generally deter others who might want to engage in similar conduct for whatever reason.

MR. RIZZI: Our position, Your Honor, is that since Mr. Keech has already served --

THE COURT: Twenty-two months.

MR. RIZZI: -- approximately 22 months, Your Honor, that is a very significant sentence that he's served. He just happened to serve it prior to his sentencing.

Again, Your Honor, our request for the variance and our request for the time served really comes for purposes of his mitigation, which is really unique to him. I would agree with the Court that if someone else in his circumstances found themselves in this sort of predicament however did not have the mitigation Mr. Keech had, I don't know that I would be here asking for a time-served sentence. But I do think that Mr. Keech's -- his background and sort of the impact he has, the positive things he has done do warrant that. And so I think that the Court can be -- can rest assured that imposing a 22-month sentence that has been served is an appropriate sentence given the mitigation specifically to this case.

But I agree with you, Your Honor; this is a very serious case. It's a case where I would not expect there to be a leniency unless there were extreme mitigation, which I believe we have here. And so I think for purposes of

deterrence, Your Honor, I think that when we look at Mr. Keech as an individual as opposed to just an accused person on a file, we see someone who has an extensive history of being law-abiding; we see someone who has an extensive history of making a positive impact.

And I think for purposes of deterring Mr. Keech, he will tell you he is never going to be involved in any sort of violent or criminal activity again. But if we are looking at just deterrence as a whole to other folks who may not have those redeeming qualities who engage in this sort of conduct, you know, this is a significant sentence Mr. Keech has already served in my opinion. Twenty-two months is very significant. And I hope that's helpful to the Court.

THE COURT: Thank you, Mr. Rizzi.

I first have a question for my courtroom deputy. Would you mind hopping up here, Mr. Vasquez.

(The Court and courtroom deputy confer.)

THE COURT: Counsel, would you all mind approaching for sidebar.

(Sidebar discussion held, not contained in this transcript.)

THE COURT: Thank you for your patience, Mr. Keech.

And first I will say thank you to everyone who is here to support Mr. Keech. That does show tremendous support from the community.

You have the right to speak to me before I sentence you today. Is there anything you would like to say?

THE DEFENDANT: Yes, Your Honor. I thank you for giving me this opportunity to address the Court.

I express everything. I have been writing that letter or the -- the last night. I spent the whole night last night to write that letter to you, and that express everything that I have done. I regret everything that lead me to this court. I regret everything that happened to me and to my family and also violating the law of this country. I completely apologize, sincerely apologize to the people and the Court and the people of America.

Your Honor, I'm not going to talk about everything. I have written everything. There are so many confidential thing in this case that I'm not going to talk about, but I just want to address the issue of my children, that -- the main reason that is going to let me go back to Uganda. My child, my first daughter, she is completely broke down. She was a good student. She has never been sick. She has been very active. Since I was arrested, she start declining in school, in everything. And I completely regret putting my family in such a situation.

I want to address also the issue you raised with my attorney. Your Honor, I've never owned a gun in my life. And buying weapons is not what I do. I'm a social worker, and what

I do is to help people.

This thing is just something that happened that I actually regret accepting. Being a U.S. citizen is actually what got me into this. I was planning to come to America after actually working for an organization helping people in South Sudan to protest for their rights. When my life was threatened, I moved to Uganda. I stayed there and still actually have, but my role was just to take care of my family. And then I was given more assignment. When all those assignment finished, I planned to return to America. I have my American father here, Chris Osorio; we were working to resettle my children and wife to this country.

So the general asked me if I can actually visit a company that had been negotiating with them since 2016, 2017. They have been trying to send somebody here, but it was difficult because they cannot get someone who have an American passport. So knowing me is when they actually asked me if I can come here, and my role was actually to come and witness.

How I got into this until the end is something that I will regret. I will be stupid if I will accept something like this again, to be asked to go and do something that is illegal. I will never violate the law. I have never -- I don't even have a traffic violation in South Sudan or in Utah, where I've been living. I've never -- I regret actually getting myself this record at this age of 45. It would be very stupid for me

to actually do this again.

If I go back, my activities in South Sudan is done. I've done my part when I was there. This time is to take care of my family. I'm not getting involved in any political activities until peace return in South Sudan. Thank you.

THE COURT: Thank you.

Ms. Chang, I look forward to hearing from the Government.

MS. CHANG: Thank you, Your Honor.

The Government recommends a mid-range sentence. That's in keeping with Probation's recommendation as well.

In recommending such a sentence, the Government has considered the extensive mitigation that Defense counsel and Defendant have spoken about both today and in their filings, including that he doesn't have any criminal history, which is of course accounted for by his criminal history category of I; the fact that he has experienced an extremely challenging childhood; and that he has worked hard since receiving asylum in the United States to get his education and contribute to the community, aside from this offense.

So the Government acknowledges that mitigation and we've accounted for it. We've accounted for it in the plea offer that was made. As Your Honor knows, the plea that was made and accepted does allow Defendant to avoid a 25-year mandatory minimum on an extremely serious count, and that is a

significant benefit already to the defendant. Given that, we do not believe that any further variance, including a variance all the way down to time served, is appropriate or warranted in this case.

As we've described in our sentencing memo, this was an incredibly serious crime. It's honestly hard to imagine a more serious and more destabilizing crime than illegally exporting this volume of weapons from here to a country that's already awash in arms and in a very precarious position. Had Defendant's scheme succeeded, $4 million worth of arms, including antitank, antiaircraft weapons would have flooded South Sudan and endangered countless civilian lives.

Your Honor, this was also not a momentary lapse in judgment or a brief mistake. This was a scheme that lasted for more than a year. It required planning, it required coordination, and, as Defendant has discussed, it required him traveling from Uganda to the United States for this particular purpose. And when he was here, he made numerous trips to Phoenix; three separate times he came to Arizona to inspect weapons. He also spoke with the UCs, the undercover agents, dozens of times on calls. He exchanged hundreds of text messages with the UCs, with his co-defendant, and with others. And he did all this, Your Honor, knowing that the conduct was illegal.

The UCs told him on numerous recorded calls this is

illegal; we don't have licenses for these weapons to go; we are bribing people to make this happen, and we will go to jail if we get caught. And Defendant on these calls and on his post -- during his post-arrest interview acknowledged that this conduct was illegal, that he knew it, and that there were sanctions against these weapons going to South Sudan. All of that is to say, Your Honor, that there were many moments over the course of the year where Defendant could have said this is wrong, it needs to stop, and I need to get out of this, this is dangerous, and he didn't.

So, Your Honor, while his childhood was uniquely challenging, while the situation in South Sudan is tremendously troubling, it's very hard to set aside that the decisions that Defendant made day in and day out for more than a year were all meant to get these very dangerous weapons out of our country and into a very difficult situation in South Sudan.

Given these factors, Your Honor, we do not believe that a time-served sentence is sufficient to promote respect for the law, to provide adequate deterrence, including the general deterrence that Your Honor mentioned. And for those reasons, we are asking the Court to impose a mid-range sentence in this case.

THE COURT: Thank you, Ms. Chang. I do have a couple of follow-up questions.

MS. CHANG: Of course.

THE COURT: First of all, I'm relatively new on the bench, and this is the first case of its kind that has come before me.

Can you describe how sophisticated this conspiracy was? And really what I'm interested in understanding is how close was this actually to, you know, resulting in firearms leaving the country? And I guess that question presupposes that there were no UCs involved. But I really want to understand the real risk posed by this defendant.

MS. CHANG: Thank you, Your Honor.

And I will just say that I think it's important that the UCs were not the only weapons dealers that these defendants were engaging in. As early as I think November 8th, one of the call -- the first calls that Defendant had with his co-defendant, Peter Ajak, and the UCs, they discussed that they had other sources of weapons in Europe and that these UCs were meant because the other sources couldn't come up with all of the weapons that they want. And then in February, February 12th, Mr. Keech told the UCs we have other sources of weapons here, as in in Africa, and that are closer but that -- Mr. Keech told the UCs but we want to use you guys, we want to get the weapons from you.

Mr. Ajak had a similar statement in February of 2024: We've got other options. We could get these from one of our neighboring countries and truck them across the border.

And so they really wanted the weapons. It just so happens that they were farthest along with the UCs. And it -- had they not been UCs in this case, it would have happened. Money had been sent; $2 million had been transferred by the time the arrests occurred.

So in terms of how close were they to getting -- to, like, consummating this entire deal? It was right on the cusp. And had these not been UCs, I think we would've seen these weapons go out, leave the country.

THE COURT: Thank you, Ms. Chang. I have a couple more questions.

Can you confirm that this plea agreement and the Government's sentencing recommendation were provided with the input and support of all of the pertinent stakeholders in the executive branch?

MS. CHANG: Yes, Your Honor.

THE COURT: Thank you.

And one last question. I've never seen anything like paragraph 3(d) of the plea agreement regarding the foreign travel while on supervised release.

Can you walk me through what you're trying to accomplish there?

MS. CHANG: Yes, Your Honor. We in part -- as part of our negotiations, we understood from Defense counsel and Defendant that he was interested, after he had served his

custodial sentence, in leaving the United States and going back to Uganda so he could be reunited with his family. Given that desire, we thought as long as he is in compliance and that Probation is okay with it that we would not oppose a request by Defendant to leave the district.

I think that does happen with -- in other cases, not necessarily to Uganda. But if Defendants want to move states and leave the supervision of the district where they were convicted, that does happen. And so including that in the plea was to address a request by the defendant and thinking ahead that in the future he might want to return to his family in Uganda.

THE COURT: So I'm trying to figure out what the mechanics of this would be. Would the parties move to terminate supervised release so he could leave forever for Uganda? Maybe the presentence report writer can weigh in.

THE PROBATION OFFICER: Your Honor, this has been staffed with the Probation office. Our office would not be able to supervise him in Uganda. So if it is the Court's intention to order that he be allowed to travel to Uganda, it would be our recommendation that he not be placed on supervised release.

THE COURT: Got it.

I mean, my inclination right now is that if I were to put him on supervised release, then we would -- the parties

would come seek permission to let him travel and terminate supervised release.

MS. CHANG: I think that's a really nice way to handle it, Your Honor.

THE COURT: Okay. Does that make sense to you?

THE PROBATION OFFICER: Yes, Your Honor.

THE COURT: Thank you.

Because I don't know what his time frame is for potentially leaving, so I don't want a period of him being in the United States and not on supervised release.

MS. CHANG: Thank you, Your Honor.

THE COURT: And that is all the questions I had for you, Ms. Chang. Thank you.

MS. CHANG: Thank you.

THE COURT: Having considered the guidelines and the parties' arguments, I am accepting the plea agreement, and the sentence I impose will be consistent with it.

Counsel, is there any legal cause as to why sentence should not now be imposed?

MS. CHANG: None from the Government. Thank you.

MR. RIZZI: None from the Defense, Your Honor.

THE COURT: Thank you.

I've considered all of the documents filed, all of the comments made in court, which were very helpful to me in evaluating the appropriate sentence, as well as the factors set

forth in Section 3553(a). And I'm going to walk through those factors because I think the seriousness of this case and the nature of the potential sentences Mr. Keech could have served are warranted.

So with respect to the nature and seriousness of the offense, I agree with the Government that this was incredibly serious. Mr. Keech, you conspired to purchase almost 4 million in very dangerous weapons that were intended to be used to overthrow the government in South Sudan. And the presentence report lists out the weapons, the quantities, the prices. It all totals up to a little less than 4 million. I was deeply disturbed to see the volume of automatic rifles, the Stinger missile systems, the antitank rounds for the rocket-propelled grenade launcher. I mean, this was -- these are military weapons and were intended to be used for military purposes.

It's crystal clear to me that you knew that it would have been illegal to export these firearms to South Sudan without a license. And it's especially troubling to me that you knew that doing so would have required the bribery and bribing United States military members and corrupting our service people.

I was troubled to see that you intended to disguise the arms shipments as humanitarian relief aimed at the refugee camps in South Sudan.

I've taken note that this conspiracy was extensive and

it progressed far beyond the planning stage. It lasted over a year; $2 million was actually paid, and your conspirators were ready to transfer the remaining $2 million or so to continue with the conspiracy.

I was also troubled by the acknowledgement that it was likely that people in the current administration in South Sudan would be harmed and possibly killed as a part of this insurrection, and that concerns me.

At the end of the day, the history of South Sudan is terribly sad with significant violence, loss of life, conflict-induced food insecurity, the displacement of millions of people, and it's unclear to me how dumping more arms of the nature that you were intending to procure would have done anything but exacerbate the situation and cause more suffering. So that's a long way of saying that I find the crime incredibly serious.

With respect to your personal history and characteristics, I do note that you had no criminal history, which does speak well of you, and that has been taken into account in the guidelines calculation. I've taken into consideration your extremely traumatic childhood. I understand at the age of three you were taken away from your parents to be with your uncle at a cattle camp where you learned to raise and slaughter cattle while also living in deplorable conditions. Just a few short years later, at the age of seven, you walked

on foot a thousand miles to Ethiopia to flee the second Sudanese civil war. At that time you witnessed your uncle being murdered during an attack on the cattle camp, and during the march to Ethiopia you had to witness hundreds of young boys dying from violence, famine, disease, and you had to help bury some of them.

I understand that once you were at the camp in Ethiopia there was very little supervision for you and your fellow refugees, and you lived in deplorable conditions, without electricity, without water, and lacking adequate food and clothing. When you returned to South Sudan at the age of 11, unfortunately things did not improve because a year later due to additional violence you had to then flee to a refugee camp in Kenya.

I understand that you then came to the United States as part of the Lost Boys of Sudan with another 4600 boys from Sudan, and you were granted asylum in 2001 and citizenship in 2007. And I do understand that you did return to South Sudan to generally organize for the opposition and seek nonviolent means to promote the political positions that you were supporting. I understand that that work got you some threats and that you relocated to Uganda with your -- I believe your ex-wife may have already been there or moved there, your wife and children moved there, and they are all now living in Uganda in a refugee camp.

And I'm very sorry to hear about your daughter's condition and her suffering. And while I certainly will take that into consideration, at the end of the day it was your conduct that created this situation. So while I certainly wish her and your family the best, I have to weigh all of the factors in reaching the appropriate sentence in this case.

I do believe a sentence beyond time served is necessary to serve a deterrent effect. I'm frankly less concerned about Mr. Keech himself committing another crime in the United States, but I am wary in this situation, this type of crime of setting an expectation that 22 months is adequate given the circumstances of this case and the large volume of weapons and the nature of those weapons. I do believe the sentence I impose will promote respect for the law, and I have taken that into consideration.

I have taken into consideration the fact that one of the dismissed counts, had Mr. Keech been convicted of it, he would've been subject to a mandatory minimum of 25 years and potentially a guideline sentence of life. So the actual seriousness of the offense is reflected there somewhat and maybe not necessarily in the guidelines calculation.

At the end of the day, I am going to grant a variance. I have considered all the factors, and a variance is appropriate in this case, and I am going to grant what is effectively a three-level variance. And I am going to sentence

within the range of what would be a three-level variance, but that sentence is going to be 41 months. Based on my evaluation of the factors, I do believe a sentence of 41 months, which is just shy of 3.5 years, is sufficient but not greater than necessary to comply with the purposes of sentencing set forth in Section 3553.

I've also considered the factors set forth in Section 3583 and do believe a period of supervised release of 36 months, which is three years, is appropriate to ensure Mr. Keech's success as he transitions back to society after incarceration to the extent he remains in the United States.

At this point I'm going to review some more formal language, some of which will appear in the judgment in this case. Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that Abraham Chol Keech is hereby committed to the Bureau of Prisons for an imprisonment term of 41 months. This consists of 41 months on Count 1 and 41 months on Count 2, all such terms to run concurrently. The defendant shall pay a special assessment of $200 which shall be due immediately. The Court finds that the defendant does not have the ability to pay and orders the fine waived.

The defendant shall pay a total of $200 in criminal monetary penalties due immediately. Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows: The balance is due in

equal monthly installments of $25 over a period of eight months to commence 60 days after release from imprisonment. If incarcerated, which will be the case here, payment of criminal monetary penalties is due during imprisonment at a rate of not less than $25 per quarter, and payment shall be made through the Bureau of Prisons Inmate Financial Responsibility Program. The Court hereby waives the imposition of interest and penalties on any unpaid balance.

Upon release from imprisonment, the defendant shall be placed on supervised release for 36 months. The term consists of 36 months on Count 1 and 36 months on Count 2, all such terms to run concurrently. And as we previously discussed, to the extent Mr. Keech would like to return to Uganda we can discuss termination of supervised release and permission to travel to Uganda.

While on supervised release, the defendant shall comply with the mandatory and standard conditions of supervision as adopted by this court in General Order 17-18. Of particular importance, Mr. Keech, you shall not commit another federal, state, or local crime during the term of supervision. The mandatory drug testing provision is suspended.

Within 72 hours of sentencing or release from the custody of the Bureau of Prisons, you shall report in person to the probation office in the district to which you are released.

Mr. Rizzi, have you reviewed the mandatory and standard conditions of supervision set forth in General Order 17-18 with your client?

MR. RIZZI: Previously.

THE COURT: And do you waive a reading?

MR. RIZZI: Yes, Your Honor.

THE COURT: Thank you.

Have you reviewed the special conditions set forth in the presentence report with your client?

MR. RIZZI: Yes, Your Honor.

THE COURT: Do you have any objections to those special conditions?

MR. RIZZI: No, Your Honor.

THE COURT: Do you waive a reading of those special conditions?

MR. RIZZI: I do.

THE COURT: Thank you.

I will incorporate by reference those special conditions set forth in the presentence report in my judgment. I do believe they are reasonable.

I'm going to read the forfeiture provision right now. The defendant's interest in the following property shall be forfeited to the United States: $1,972,975 in United States currency seized from the bank account of U.S. Company-1 on March 1st, 2024.

Mr. Rizzi, do you have any objections to the forfeiture provision?

MR. RIZZI: No, Your Honor.

THE COURT: Mr. Keech, did you understand the entirety of the sentence I imposed, including the period of incarceration, the supervised release and associated conditions, and the forfeiture?

THE DEFENDANT: Yes, Your Honor.

MR. RIZZI: And, Your Honor, I think I just -- for clarification for myself, this may be a silly question, but for the 41 months, the Court is giving him credit for the time he has already served?

THE COURT: Correct. That's a standard part of our judgments, and that's something that the Bureau of Prisons calculates.

MR. RIZZI: Just to make sure.

THE COURT: So effectively it's another 19 months, and that doesn't even take into consideration, you know, the credits that Mr. Keech will receive.

MR. RIZZI: Thank you, Your Honor.

(The defendant and counsel confer.)

THE COURT: Do you have any questions, Mr. Rizzi? Anything you want to follow up on? It's totally fine.

MR. RIZZI: No, Your Honor.

THE COURT: And if you need a moment, I'm happy to

give you time with your client.

MR. RIZZI: We're -- I think we're all set. Thank you so much, though.

THE COURT: I want to make sure.

Mr. Keech, your plea agreement contains an appellate waiver. It states that with a small number of exceptions that are specifically described in the plea agreement you have given up your right to appeal as long as the sentence I imposed is consistent with the plea agreement.

Counsel, do you agree that the sentence I imposed is consistent with the plea agreement?

MS. CHANG: Yes, Your Honor. Thank you.

MR. RIZZI: It is, Your Honor.

THE COURT: I find that Mr. Keech has voluntarily, knowingly, and intelligently waived the right to take an appeal or a collateral attack in this matter except as set forth in the plea agreement.

Mr. Keech, if you want to appeal based on one of the grounds that you have not waived, you would need to file a notice of appeal with the Clerk's office no more than 14 days from the date your judgment is filed. If you are unable to pay appeal costs, you have the right to ask for permission to appeal without having to pay appeals costs and counsel will be appointed to represent you.

Did you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Thank you.

Ms. Chang, does the Government move for dismissal of Counts 3 and 4 of the superseding indictment as to this defendant?

MS. CHANG: Yes, we do. Thank you, Your Honor.

THE COURT: Thank you.

I will dismiss Counts 3 and 4 of the indictment as -- of the superseding indictment as to this defendant.

Mr. Keech, you have an incredibly sad story, but it's also uplifting in many ways in the tremendous work that you have done. And it pains me that after doing work as a social worker and for your community you got embroiled in what was a scary and serious crime that could have resulted in significantly more suffering of others, and I hope that you have learned that that's not the path.

I hope you are able to reunite with your family in Uganda after you serve your custodial sentence. I hope that you are able to maintain a connection with them before you do return, and I do wish you and your family and your community well. I am confident that I'm not going to see you again, that you won't be in this situation again, but ultimately I thought the sentence I imposed was the appropriate one in this case.

Counsel, is there anything further that we need to address?

MR. RIZZI: If I can just confer with my co-counsel about one thing, Your Honor, please?

THE COURT: Sure.

(Counsel confer.)

MR. RIZZI: There's nothing from the Defense, Your Honor.

THE COURT: Thank you, Mr. Rizzi.

MS. CHANG: And nothing from the Government. Thank you, Your Honor.

THE COURT: Thank you, Ms. Chang.

Thank you all for being here.

We are adjourned.

(Proceedings conclude.)

---oOo---

**C E R T I F I C A T E**

I, KIMBERLY PORTIK, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 18th day of December, 2025.

/s/ Kimberly Portik
Kimberly Portik, RMR, CRR, CRC