TIMOTHY COURCHAINE
United States Attorney
District of Arizona
AMY C. CHANG
Arizona State Bar No. 027566
RAYMOND K. WOO
Arizona State Bar No. 023050
M. BRIDGET MINDER
Arizona State Bar No. 023356
Assistant United States Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: amy.chang@usdoj.gov
Email: raymond.woo@usdoj.gov
Email: bridget.minder@usdoj.gov

JOHN EISENBERG
Assistant Attorney General
National Security Division
LESLIE C. ESBROOK
New York State Bar No. 5406301
District of Columbia Bar No. 1670737
Trial Attorney
Counterintelligence and Export Control Section
950 Pennsylvania Ave, NW
Washington, DC 20530
Email: Leslie.Esbrook@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>vs.<br>Peter Biar Ajak,<br>Defendant. | CR-24-00394-PHX-SHD-002<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

Over the course of several months, defendant organized a complex scheme to illegally procure and export over $4 million worth of extremely dangerous, military-grade weapons and ammunition from the United States to South Sudan without the required export licenses. At the time of his arrest, defendant believed that the weapons he was amassing would be smuggled through a U.S. military base in Kenya, transported to the

South Sudanese border, and distributed to South Sudanese military personnel who would use the weapons to overthrow the current government. Defendant knew his conduct was illegal—he admitted as much to undercover agents and signed fictitious invoices to cover his tracks. Defendant also knew his conduct could endanger civilian lives—he anticipated that the South Sudanese government would "shoot people down" in the streets with live ammunition. Despite these dangerous consequences, defendant risked violence and destabilization in his home country so he could seize power for himself and become South Sudan's next president.

Defendant was arrested before these plans could come to fruition. Given the seriousness of the conduct, the government recommends a high-end sentence, followed by a three-year term of supervised release. The government believes such a sentence appropriately accounts for the nature and circumstances of the offense, defendant's history and characteristics, and the need to promote respect for the law, provide just punishment, and afford adequate deterrence.

**Factual and Procedural Background[1]**

This case arises from an attempted coup. After his hopes for effectuating a democratic regime change in South Sudan (*e.g.*, through free and fair elections) failed to come to fruition, defendant, his co-defendant Abraham Chol Keech, and others, decided to

---

[1] In determining the applicable guidelines range and appropriate sentence, this Court has wide latitude to consider virtually any information related to defendant's background, character, and conduct. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a [defendant] which a court … may receive and consider for the purpose of imposing an appropriate sentence."); *see also* U.S.S.G. § 1B1.3 & cmt. (background) (in determining the applicable sentencing range, the court may consider *all relevant conduct*, including "[c]onduct that is not formally charged or is not an element of the offense of conviction"); U.S.S.G. § 1B1.4 & cmt. (background) (in determining the appropriate sentence, "the court may consider, *without limitation*, any information concerning the background, character and conduct of the defendant") (emphasis added); *see also* U.S.S.G. App. B, Part III, § 5K2.21 (dismissed and uncharged conduct remains relevant for sentencing purposes and can form the basis for an upward variance).

A detailed summary of the factual background and regulatory framework for export cases can be found in the draft Presentence Investigation Report (PSR, Doc. 169, ¶¶ 7-30) and Complaint (Doc. 3).

bring about that change through force. But to forcibly install himself as the next leader of South Sudan, defendant needed weapons. And ammunition. And money (lots of it) to procure that arsenal and illegally export it from the United States to the waiting hands of disaffected military leaders in South Sudan. To that end, in fall 2023, defendant—a well-connected political activist living in Washington, D.C.—agreed to leverage his connections to illegally procure and export these weapons and seize power for himself.

## I. Defendant's Illegal Procurement and Export Scheme

On November 3, 2023, co-defendant Keech introduced defendant to undercover agents from the U.S. Department of Defense (UC-1) and Homeland Security Investigations (UC-2) who were posing as Arizona-based arms dealers.[2] A few days later, on November 8, 2023, defendants participated in a videoconference with the UCs. Defendant explained to the UCs that he was looking to start "basically a coup … with both internal and external fronts" against the current South Sudanese government. He explained that he wanted to "knock it over and rebuild a new country," and that he would be installed as the new "Prime Minister" and "head of the government." To accomplish this regime change, defendant told the UCs he needed anti-tank weapons to "knock out" the ten to thirteen functioning tanks in South Sudan, as well as anti-aircraft systems to shoot down the South Sudanese military's two to five operational helicopters. When UC-1 reminded defendants that U.S. sanctions "prevent[ed] the movement of these weapons" to South Sudan and that they could not export the weapons legally, defendant told the UCs the sanctions would be "lifted immediately" after the regime change. He further offered to execute a Memorandum of Understanding (MOU) that would make the UCs the official arms supplier to South Sudan after defendant took power. (PSR, ¶¶ 13-14.)

---

[2] Keech first met with the UCs in February 2023. However, as explained in the Government's Objection to the Draft Presentence Investigation Report and Reply, Keech's early fundraising efforts had stalled, and he and other co-conspirators did not have the money to proceed with the scheme. (Doc. 170 at 3-4; Doc. 174 at 3 n.1.) It was not until defendant entered the conspiracy that the project gained funding and momentum. Additional information regarding defendant's introduction to the UCs can be found in the Government's Response to Defendant's Motion to Dismiss (Doc. 132, filed under seal).

On December 22, 2023, defendants spoke with UC-1 about various shipment options. UC-1 explained he could ship the weapons as sea cargo or move the weapons via a U.S. military air shipment. Either method, however, came with potential exposure—UC-1 reiterated that "what we're doing is illegal because these things need a license to go. And the U.S. is not sending anything to South Sudan. So there is a risk." UC-1 added that if he were to move the weapons via U.S. military planes, doing so would cost a premium because he would "have to pay off the guys that are moving it." He further stated, "Let me be clear. The U.S. military is not behind this. … I'm paying off individual guys to get this. So it's not like this is authorized. This is completely unauthorized." Despite these warnings, defendant told UC-1 he preferred an air transport because "the faster, the better for us," and "within a week, we could have [the weapons] at the border of South Sudan where our people will be waiting for them." (PSR, ¶ 16.)

Later that day, defendant sent Keech a photo of a hand-written "shopping list" of weapons for "Immediate Consignment for Operation Free South Sudan," which Keech then sent to the UCs at defendant's direction. The shopping list included hundreds of rifles, more than a million rounds of ammunition, and three Stinger missile systems, totaling more than $1 million. The list also included a $213,145 transportation fee (roughly 20% of the total cost) for transportation from "AZ to South Sudan." (PSR, ¶ 17.)

Over the next few months, this shopping list grew, as defendant sought to add additional weapons to his stockpile, including weapons for his own personal use. For example, on January 25, 2024, defendant asked UC-1 to procure a helmet, bulletproof vest, and "special" sniper rifle for himself. He explained that "because I'm obviously going to be leading this mission," he needed "something really dependable and something that is easy and something that is pretty bad ass." Defendant also told UC-1 that although several South Sudanese military generals remained involved in the coup planning, "they [were] not the decision makers." Defendant added, "[U]ltimately, if I'm happy, then everybody should be happy." (PSR, ¶ 20.)

On February 9, 2024, defendant told UC-1 he had secured funding and would pay for the weapons via a wire transfer from a U.S.-based bank account. Defendant further directed UC-1: "What you will need to do though is [to bill it like] something that is more creative," such as "humanitarian whatever," or "humanitarian support for democracy." Defendant also asked UC-1 to increase the quantities of RPG launchers, PKM machine guns, and RPG rounds in the order. (PSR, ¶ 21.)

Over the next few days, defendant continued to refine the weapons quantities and the fake paper trail. For example, on February 12, 2024, UC-1 sent defendant a revised purchase order that included the increased weapons and ammunition quantities requested by defendant. Defendant responded, "Ok. Now prepare another invoice for humanitarian aid supplies of the equivalent amount." The next day, defendant again asked UC-1 to increase the weapon quantities (adding five more Stinger missiles) and instructed UC-1 to "make the fake invoice of the humanitarian aid." When UC-1 called defendant for help "get[ting] this fake invoice right," defendant explained that the donation he received was for purported humanitarian purposes, and he had an MOU with his financier that contemplated "costs for contracting a company for security provision for field activities inside South Sudan and refugee camps." Defendant therefore instructed UC-1 that the fake invoice "should appear like costs for what a normal security company would need, [in order] to provide security inside a country that has hostilities." Defendant directed UC-1 to "basically break that into … components," to make it appear that he had "contracted [the UC] company to provide security for [defendant's] humanitarian, human rights, and civic engagement inside South Sudan." After the call, defendant sent UC-1 an encrypted text message with the specific language to use on the invoice. (PSR, ¶ 22.)

As these obfuscation efforts continued, on February 16, 2024, defendant expressed concerns that the UCs would fail to deliver the weapons as promised. In response to these concerns, UC-1 told defendant, "I have never misled you in the fact that there are risks, but that's why there's a premium that we're asking for payment." UC-1 added, "if I get caught,

… I go to jail, [UC-2] and I go to jail, we lose everything that we've worked for." (PSR, ¶ 22.)

Despite his reservations, defendant doubled down on working with the UCs, explaining his long-term vision for obtaining American weaponry after the coup:

> We have another option of just buying within our neighborhood in Africa, [but] what makes your part of the deal attractive to us is not just … what you can provide us for this current effort, but once we do succeed, … we want to have access to American arms. … [T]his is part of what make[s] our relations with you attractive. Otherwise, we could easily buy from Ethiopia, or from any of our neighboring countries that have hostility towards South Sudan[,] and just … truck [the weapons] across the border."[3]

Defendant also stressed how potentially lucrative the deal would be for the UCs themselves, reassuring the UCs that defendant's status as a "well-known" public figure gave him credibility in future dealings:

> [I]t is a great opportunity, [UC-1]. I hope you truly understand that. I know you may have some certain risk, you may feel a certain way. But let me assure you—you can Google me and you can find me on Google. There is a Wikipedia page about me. You can find what I have been doing, what I am up to. I am a very well-known person. So when I talk about something like this, you can be very sure that I will deliver. … [O]nce we succeed, we want to rebuild an entire army. So if you think about what is the value on that, you're talking about billions and billions and billions of dollars. And this is [an] opportunity that is available to you. … This is going to be life changing for you and [UC-2] … [and] we are offering you that opportunity.

On February 22, 2024, defendant, Keech, and another individual recruited by defendant (PERSON-6 in the Complaint, Doc. 3) traveled to Phoenix and met with the UCs to inspect a sample of the weapons on their "shopping list." Defendant handled and inspected the weapons; he also tried on a helmet and a bulletproof vest and handled two different rifles for his own personal use, telling the UCs, "I've gotta be leading from the front, not the back." (PSR, ¶ 24.)

---

[3] In addition to potential weapons suppliers in Africa, defendant also told UC-1 on November 3, 2023, that he was working with potential suppliers in Europe. (PSR, ¶ 13.)













During the meeting, defendant signed an invoice to purchase nearly $4 million worth of weapons and ammunition, including ten Stinger missiles (costing $800,000), two hundred grenade launchers, more than a thousand machine guns and rifles, and over 3.5 million rounds of ammunition. This purchase price included a $575,000 "transportation" and risk fee.

| Item | Quantity | Unit Price | Total |
|---|---|---|---|
| 1. AK-47 Rifles (Full Auto) | 1,000 | $350.00 | $350,000.00 |
| 2. PKM Rifles | 300 | $675.00 | $202,500.00 |
| 3. RPG-7 launcher | 200 | $575.00 | $115,000.00 |
| 4. 7.62x39 ammo | 2,000,000 | $.17 | $340,000.00 |
| 5. 7.62x54 ammo | 1,500,000 | $.21 | $315,000.00 |
| 6. PG-7 HE round | 1000 | $600.00 | $600,000.00 |
| 7. PSL Sniper Rifle | 70 | $1092.50 | $76,475.00 |
| 8. FIM92 Stinger System | 10 | $80,000.00 | $800,000.00 |
| 9. Satellite phone | 20 | $1,200.00 | $24,000.00 |
| 10. Handheld Radio | 50 | $500.00 | $25,000.00 |
| 11. M67 Hand Grenades | 500 | $60.00 | $30,000.00 |
| 12. PG-7VT/PG-7T AT Round | 500 | $800.00 | $400,000.00 |
| 13. AN/PVS Monocular | 10 | $12,000.00 | $120,000.00 |
| | | Subtotal- | $3,397,975.00 |
| | | Transportation- | $575,000.00 |
| | | **Total -** | **$3,972,975.00** |

To conceal the nature of the transaction from U.S. banks, defendant also signed a second, fictitious invoice for the same purchase amount for consulting services to develop "security provisions for field activities related to human rights, humanitarian, and civic engagement inside South Sudan refugee camps," the language he provided UC-1 via encrypted text message on February 13, 2024. (PSR, ¶ 24.)

Line Item:

| | |
|---|---|
| 1. Consulting Services to Develop Security Provisions for Field Activities Related to Human Rights, Humanitarian, and Civic Engagement Inside South Sudan Refugee Camps. | $1,000,000.00 |
| 2. Items Required to Implement Activities Associated with Contingency Refugee Operations (to include but not limited to initial site surveys, communications equipment for associated personnel, access control equipment, perimeter fencing, traffic control equipment, fire suppression/prevention equipment etc.) | $1,000,000.00 |
| 3. Shipping, Installation and Training of Systems and Equipment. | $1,972,975.00 |
| **Total -** | **$3,972,975.00** |

Between February 19, 2024, and February 26, 2024, defendant caused a total of $2 million to be deposited into the UCs' Arizona-based bank account in four separate installments. Defendant explained he was staggering the payments "to avoid a bank review" and to "avoid suspicion, which is good for you and us." (PSR, ¶ 23.) In addition to these weapons-related payments, defendant also directed a $50,000 payment to himself, a $75,000 payment to his wife, and a $275,000 payment to Keech (among other coup-related payments).[4] (*See* PSR, ¶ 26; Doc. 60, at 10-13, filed under seal.)

## II. Defendant's Arrest, Post-*Miranda* Interview, and Indictment

On March 1, 2024, defendants planned to meet with the UCs for a final weapons inspection. After traveling to Phoenix for a second time, defendant was arrested by authorities on a federal criminal complaint. (PSR, ¶ 25; Docs. 3, 24). In a post-*Miranda* interview, defendant admitted he was aware of the arms embargo on South Sudan, and that his hometown of Bor, South Sudan, was the weapons' intended destination. He explained that he raised millions of dollars to fund the effort by convincing his financier that he wanted "to restore human rights, to engage in humanitarian [and civic] activities in South Sudan," and concealing his "real effort[s]," including the weapons purchase. Defendant said he then signed two invoices with the UCs—the actual weapons invoice and the fake security services invoice—and caused $2 million to be transferred to the UCs' bank account. (PSR, ¶ 27.)

Defendant also explained that he did not believe the current South Sudanese government would be willing to hold free and fair elections. Because merely advocating

---

[4] As detailed in the Government's Response to Defendant's Motion to Revoke Detention (Doc. 60, at 10-13, filed under seal), defendant paid himself $50,000 purportedly for the development of training materials regarding "best practices related to the furtherance of human rights, civic, environmental and conservation programs in refugee camps and across South Sudan." He also paid his wife $75,000, purportedly for a "desk review" of "prevailing human rights, conservation, humanitarian, and civic programs." This money for his wife, however, was actually intended to pay for human intelligence gathering in South Sudan to support the coup. Both the $50,000 and the $75,000 payments were deposited in defendant's personal bank account; nearly all of it was later transferred to his joint account with his wife and then to her personal account and other accounts held by his three minor children. None of these funds have been recovered by the United States. *See* Doc. 60, at 10-13, for additional details.

for such elections had failed, he believed "something different needed to be done." That "something different," defendant explained, was to "agitate" for a popular uprising and armed takeover of the country. He noted that the current South Sudanese government had made it known that it does not have tear gas or rubber bullets, and that the military would respond to popular protests with live ammunition. Defendant therefore "wanted … to create a situation where people were going to protest," and anticipated that the South Sudanese "[g]overnment would probably shoot people down," resulting in public outrage that would "spark a revolution." (PSR, ¶ 27.)

Defendant further explained that the weapons he was amassing would be distributed to military personnel in Bor and used to take over the capital (Juba) on "D-Day." He added that the ten Stinger missiles—the most destructive weapons in the arsenal—would be used to take over South Sudan's helicopters and defend against air attacks from neighboring countries or Russian forces. Defendant explained that although he hoped for a bloodless uprising, the weapons would be seen as a "show of force," and he would return fire if shot at. He said that the uprising would not occur until he arrived in South Sudan and that he was planning to abandon his immigration status in the United States and "go to the ground" in South Sudan. He explained that while he is not himself a military commander, his role was to provide money and weapons to the generals to effectuate the coup. He would then become the "interim president" of South Sudan once the coup succeeded. (PSR, ¶ 28.)

Many of defendant's plans for executing the coup were memorialized in an 18-page document titled "Operation Free South Sudan," which he sent to Keech on January 20, 2024, and was found in his electronic communications after his arrest. In the document, defendant acknowledged the arms embargo on South Sudan and stated that one of his objectives was to "engender a public uprising, resulting in the change of the current regime in South Sudan." The document laid out a plan for this uprising and the "dissolution of the current regime," including the hour-by-hour deployment of various military forces around Juba who would "occupy the Presidential Palace, [National Security Service] Headquarters, Defense HQs, reinforce the Airport, secure South Sudan Broadcasting

Corporation, and initiate the arrest of key officials." In a slide titled "AFTERMATH," defendant anticipated the "[e]lection and swearing-in of the leadership of the interim Government," and a "[h]ouse-to-house disarmament exercise and the arrest of the notorious actors of the previous regime." Defendant also set a timeline for the execution of the coup, which envisioned that the "logistics" (weapons and ammunition) would depart the United States by February 15 and arrive in Bor before the coup's execution on April 5, 2024.[5] (PSR, ¶ 19.)

On March 6, 2024, a Phoenix grand jury returned an indictment charging defendants with three export crimes related to the weapons procurement and export scheme. (Doc. 14.) Because defendants sought to export Stinger missile systems—which are heat-seeking, man-portable, shoulder-fired, supersonic missiles designed to shoot down aircraft—a superseding indictment was returned on April 30, 2025, to add a charge related to these weapons systems (Count 4). (Doc. 71.[6]) On August 7, 2025, just a month before the four-week trial was set to begin (*see* Doc. 57), defendant pleaded guilty to Counts 1 and 2 of the superseding indictment. (Docs. 152, 153.) Pursuant to the parties' plea agreement, which has been accepted by the Court, the government has agreed to dismiss Counts 3 and 4; the dismissal of Count 4 allows defendant to avoid a mandatory minimum sentence of 25 years in custody. (Doc. 153; PSR, ¶ 93.) The parties have no agreements regarding defendant's sentence. (Doc. 153; PSR, ¶¶ 4, 93.)

---

[5] Defendant also sent Keech a list of proposed cabinet leaders in the new government. For example, defendant proposed that several of the opposition generals who were on early calls with the UCs would assume roles as the new "Minister of Defense" and "Chief of Defense Forces" after the coup. Keech was not listed for any future cabinet position.

[6] Count 1 charges a violation of 18 U.S.C. § 371, Conspiracy to Violate the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR) (22 U.S.C. § 2778 and 22 C.F.R. Part 120, *et seq*.); Count 2 charges a violation of 50 U.S.C. § 4819 and 15 C.F.R. Parts 736.2 and 774, Conspiracy to Violate the Export Control Reform Act (ECRA) and the Export Administration Regulations (EAR); Count 3 charges a violation of 18 U.S.C. § 554, Smuggling Goods from the United States; and Count 4 charges a violation of 18 U.S.C. § 2332g, Conspiracy to Export Missile Systems Designed to Destroy Aircraft.

## The Guidelines Range and PSR

The draft Presentence Investigation Report calculates an offense level of 23 and a criminal history category of I, which corresponds to a sentencing guidelines range of 46 to 57 months in custody. (PSR, ¶ 78.) The PSR further observes that if defendant had been convicted of all counts at trial, his resulting sentencing guidelines range would have been life in custody.[7] (PSR, ¶ 93.) The PSR recommends a mid-range sentence of 52 months, followed by three years of supervised release. (PSR, p. 24-25.)

As explained in its Objection to the Draft Presentence Investigation Report and Reply (Docs. 170, 174), the government agrees with the draft PSR's calculations with one exception—it believes that defendant's leadership role in the offense merits a two-level upward adjustment to his total offense level under U.S.S.G. § 3B1.1(c) (Aggravating Role). Defendant oversaw nearly every aspect of the weapons export scheme, exercised decision-making authority and directed co-conspirators, and would have benefitted most from the scheme's success, becoming the next leader of South Sudan. Defendant himself acknowledged as much, telling investigators, "I made the decisions[,] and I had the drive for most of what happened. … Anyone else that is caught up in this was probably because they were persuaded by [me]." (*See* Doc. 170 at 2, 7 n.4.) Given his leadership role, the government believes defendant should receive a two-level upward adjustment to offense level 25. If the government's objection is sustained, defendant's Sentencing Guidelines range would be 57 to 71 months in custody.

## The 18 U.S.C. § 3553(a) Factors

After considering the nature and circumstances of the offense, defendant's history and characteristics, and the relevant public policy factors, the government respectfully recommends a sentence at the high-end of the final adjusted guidelines range, followed by three years of supervised release. The government believes such a sentence reflects

[7] As noted above, had defendant been convicted of all counts at trial, he would also have been subject to a 25-year mandatory minimum sentence on Count 4, *see* 18 U.S.C. § 2332g(c)(1) (setting criminal penalty of 25 years to life imprisonment).

defendant's relative culpability when compared with his co-defendant Keech—who was sentenced to 41 months in custody (Doc. 187)—and is sufficient but not greater than necessary to comply with the § 3553(a) factors.

**I. The Nature and Circumstances of the Offense**

By any measure, defendant's offense conduct was exceptionally serious. For months, defendant led a scheme to procure and export military-grade weapons to overthrow a sitting government and install himself as president. These weapons included ten Stinger missiles, two hundred grenade launchers, more than a thousand machine guns and rifles, and millions of rounds of ammunition—an extraordinarily dangerous cache. Furthermore, amassing this stockpile was not the work of a moment. Rather, defendant spent four months—and dozens of phone calls, hundreds of text messages, and two trips to Phoenix—selecting the weapon types, quantities, and shipment methods; securing funding from private donors; preparing and signing fake documents to conceal the transactions; and directing payments to the UCs, himself, his wife, and his co-defendant, among others.

What's more, defendant did so knowing that his conduct was illegal. Throughout their communications, the UCs repeatedly admonished defendant that the exports were unauthorized, they would have to bribe U.S. military service members to transport the weapons, and they could go to jail if they were caught. Despite these warnings, defendant doubled down on the scheme, reassuring the UCs that sanctions would be lifted following the coup and together they could realize his long-term vision for obtaining American arms for his newly formed government in South Sudan.

Defendant willingly took these risks because he had much to gain if the scheme succeeded. Although the sudden influx of $4 million worth of arms would have been extremely destabilizing and dangerous for countless South Sudanese civilians, defendant was willing to risk armed violence to seize power for himself. His seeming disregard for the dangerous consequences of the offense therefore weighs strongly in favor of a high-end sentence.

## II. Defendant's History and Characteristics

Although the nature and circumstances of the offense are serious, defendant's history and characteristics are to some extent mitigating. Defendant has no criminal history. And as detailed in the PSR, defendant experienced a "very difficult childhood," fleeing his hometown as a young child and residing in various refugee camps until immigrating to the United States in 2001. Despite these challenges, defendant completed his education, obtaining advanced degrees from Harvard and Cambridge, and advocated for human rights and democracy in South Sudan until the instant offense. He was also detained as a political prisoner in South Sudan for nearly two years. (PSR, ¶¶ 56-59.)

The government recognizes that defendant's history and characteristics are unique and has therefore accounted for these specific mitigating factors in its plea agreement and sentencing recommendation. Indeed, the government carefully considered defendant's history and characteristics (among other factors) when offering a plea agreement that allowed defendant to plead guilty to Counts 1 and 2 (which carry five- and 20-year statutory maximums, respectively), rather than Count 4 (which carries a mandatory minimum sentence of 25 years in custody and a statutory maximum—and recommended guidelines sentence—of life). *See* U.S.S.G. App. B, Part III, § 5K2.21 (Dismissed and Uncharged Conduct) (allowing Court to consider dismissed or uncharged conduct when determining seriousness of the offense).

No further downward variance is warranted. *See United States v. Davis*, 340 Fed. App'x 863, 865 (4th Cir. 2009) (affirming guidelines sentence when government argued it had already accounted for defendant's history and characteristics when offering plea that dismissed charge carrying a ten-year mandatory minimum). Although defendant (and his co-defendant) endured severe hardships as children, so did the nearly 20,000 other Lost Boys who were similarly displaced by the South Sudanese civil war and who did not direct a complex illegal weapons scheme. Furthermore, defendant—who has benefitted from an education and training at the highest levels—was uniquely capable of bringing about positive change through legal means, had his self-reported "impatience" not gotten the best

of him. (PSR, ¶ 33 (reporting to the Probation Officer he "should have thought of a better way to resolve the crisis in South Sudan, but he became impatient and became involved with the instant offense").) As a leader in the South Sudanese community, defendant arguably bore a greater responsibility to serve as an example for others. Defendant's history and characteristics therefore do not merit any additional downward variance.

**III. Public Policy Factors**

A high-end sentence is also sufficient but not greater than necessary to satisfy the public policy factors set forth in 18 U.S.C. § 3553(a). Such a sentence appropriately reflects the seriousness of the offense and the need to promote respect for the law and provide just punishment; avoids unwarranted sentencing disparities, including with respect to his co-defendant Keech; and affords adequate deterrence and protects the public from further crimes. *See* 18 U.S.C. § 3553(a)(2)(A)-(C), (a)(6).

As noted above, the seriousness of defendant's offense cannot be overstated. Throughout our history, Congress and the President have controlled and regulated the export of arms and other goods to further U.S. national security and foreign policy interests. *See generally United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 322-324 (1936) (summarizing the extensive use through the nation's history of embargoes and export controls, and reversing lower court's dismissal of an indictment charging conspiracy to export firearms to South America in violation of arms embargo). The Ninth Circuit has similarly long recognized the government's "important interest" in the regulation of international arms traffic. *See*, *e.g.*, *United States v. Chi Mak*, 683 F.3d 1126, 1135-36, (9th Cir. 2012) (observing that the AECA and its predecessor statute "substantially advance important governmental interests" in regulating international arms exports); *see also* 22 U.S.C. § 2778(a)(1) (authorizing the President to control the export of defense articles "[i]n furtherance of world peace and the security and foreign policy of the United States"); 50 U.S.C. § 4811 (authorizing export controls for "national security and foreign policy" reasons, including to control the proliferation and acquisition of conventional weapons). Defendant's conduct—in seeking to illegally export highly-controlled defense articles to

overthrow a foreign government and seize power for himself—exemplifies the grave harm to U.S. national security that Congress sought to punish and deter through these statutes.

A high-end sentence reflects not only the seriousness of the offense, but also avoids unwarranted sentencing disparities, including with respect to his co-defendant. As detailed above and in the Government's Objection to the Draft Presentence Investigation Report and Reply, defendant oversaw—and was the driving force behind—nearly every aspect of the weapons export scheme. (Docs. 170, 174.) Although both co-defendants participated in meetings and calls with the UCs, defendant alone signed the invoices, directed payments to the UCs, Keech, himself and his wife, and exercised decision-making authority regarding delivery methods and product types and quantities. Defendant also supervised and managed others, directing Keech to send the UCs the "shopping list" of weapons, and recruiting others (PERSON-6) to attend the weapons inspection on February 22, 2024. And unlike Keech—who anticipated no position in the new government—defendant planned to install himself as the country's next leader, and to reward others with various cabinet positions. Defendant's sentence should therefore reflect his higher level of culpability.

A high-end sentence is also consistent with the sentences imposed in cases involving similarly situated defendants. *See*, *e.g.*, *United States v. Patsulya*, No. CR-23-00770-001-PHX-DWL, Doc. 105 (D. Ariz. Apr. 2, 2025) (imposing 70-month sentence for more culpable co-defendant who devised, supervised, and carried out scheme to traffic sensitive aircraft components to Russia); *United States v. Hunt*, No. 22-CR-00375, Doc. 70 (N.D. Ala. Feb. 25, 2025) (imposing high-end sentence of 60 months for defendant who sold industrial equipment to Iran in violation of economic sanctions); *United States v. Goltsev*, No. 23-CR-452-001, Doc. 93 (E.D.N.Y. Jan. 8, 2025) (imposing nearly high-end sentence for more culpable co-defendant who conspired to export millions of dollars' worth of electronic components to Russia, including those that were later found in Russian equipment on the battlefield in Ukraine); *United States v. Kuznetsov*, No. 21-CR-00099, Doc. 51 (E.D.N.Y. Apr. 30, 2024) (imposing guidelines sentence of 46 months for defendant who attempted to ship thousands of dollars' worth of specialized rifle

components and accessories to Russia). Indeed, as courts have recognized, the "best way to curtail unwarranted disparities is to follow the [sentencing guidelines], which are designed to treat similar offenses and offenders similarly." *United States v. Alford*, 89 F.4th 943, 953 (D.C. Cir. 2024) (internal quotations and citations omitted).

Finally, a high-end sentence is also significant enough to deter future crimes by defendant and protect the public. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). Defendant has no criminal history, and a high-end sentence represents a meaningful sanction for a first-time offender. As importantly, a within-guidelines sentence sends an appropriate message to others contemplating or committing similar conduct today. *See United States v. Zakhor*, 58 F.3d 464, 467 (9th Cir. 1995) (general deterrence is among the legitimate purposes of sentencing). Imposing a high-end sentence would thus promote respect for the law, provide just punishment, and protect the public.

**Conclusion**

For the foregoing reasons, the government respectfully asks the Court to impose a sentence at the high end of the final adjusted sentencing guidelines range, followed by a three-year term of supervised release.

Respectfully submitted this 28th day of January, 2026.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*s/Amy C. Chang*
AMY C. CHANG
RAYMOND K. WOO
M. BRIDGET MINDER
Assistant U.S. Attorneys

LESLIE C. ESBROOK
Trial Attorney, National Security Division

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrants:

Kurt Altman, *Attorney for Peter Biar Ajak*

*/s Alexandria Gaulin*
U.S. Attorney's Office