UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_________________

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. 2:24-cr-00394-02-SHD |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | February 6, 2026 |
| **Peter Biar Ajak,** | ) | |
| | ) | **AMENDED AS TO** |
| Defendant. | ) | **TUT JAKANY'S STATEMENT** |
| ______________________________ | ) | |

**BEFORE: THE HONORABLE SHARAD H. DESAI, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**SENTENCING**

Official Court Reporter:
**Kimberly Portik, RMR, CRR, CRC**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
United States Attorney's Office
By: **Amy Chang, Esq.**
**Raymond K. Woo, Esq.**
**Mary Bridget Minder, Esq.**
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004

For the Defendant:
Kurt M. Altman, PLC
By: **Kurt M. Altman, Esq.**
12621 North Tatum Boulevard, Suite 102
Phoenix, Arizona 85032-7710

**P R O C E E D I N G S**

(Defendant is present and in custody.)

THE COURTROOM DEPUTY: This is Case No. CR2024-0394, United States of America vs. Peter Biar Ajak. This is the time set for sentencing.

Would the parties please announce for the record.

MS. CHANG: Good morning, Your Honor. Amy Chang, Ray Woo, and Bridget Minder for the United States.

THE COURT: Good morning, Ms. Chang, Mr. Woo, and Ms. Minder.

MR. ALTMAN: And good morning, Your Honor. Kurt Altman on behalf of Mr. Ajak, who is present and standing next to me right here at the podium.

THE COURT: Good morning, Mr. Altman.

And good morning, Mr. Ajak.

My name is Sharad Desai, and I am the district judge who will be sentencing you today.

Throughout this hearing I will be looking down at my iPad. This is where I am taking notes and where I have all of my notes, which are extensive in this case, captured. So if I'm looking down, I'm not checking my email or doing something else. I am fully engaged in this hearing.

We'll start the hearing by discussing the presentence report and the United States Sentencing Guidelines recommended sentence in this case. We'll address the objection at that

time. I will offer the lawyers and you an opportunity to speak. And I understand there will also be speakers speaking on your behalf, and I will hear them then. I will explain the factors that I have considered in reaching my sentencing decision. I will then issue your sentence. And finally I will advise you of your right to appeal.

If at any point during this hearing you have questions for your counsel, please let Mr. Altman know, and I'd be happy to give you the opportunity to speak privately with him.

Does that sound fair?

THE DEFENDANT: Absolutely.

THE COURT: Thank you. We are ready to proceed with your sentencing. Can you please state your full name and date of birth.

THE DEFENDANT: Peter Biar Ajak. Date of birth January 1st, 1984.

THE COURT: In preparation for today's hearing I have reviewed a lot of material: the superseding indictment; the presentence report; the plea agreement; the briefing on the Government's objection to the draft presentence report concerning the two-level adjustment for the defendant's aggravating role; the sentencing memoranda; approximately 16 character letters that were submitted on Mr. Ajak's behalf, including an op ed that he had penned in 2020 in the *Wall Street Journal* that was appended to one of those letters. And

I've reviewed them, all other pertinent documents in the file in this case.

Mr. Altman, have you reviewed the presentence report with your client?

MR. ALTMAN: I have, Your Honor.

THE COURT: Thank you. Are you aware of any errors in the presentence report?

MR. ALTMAN: We are not at this time, Your Honor.

THE COURT: Thank you. Do you have any objections to the facts set forth in the presentence report?

MR. ALTMAN: We do not.

THE COURT: Do you have any objections to the guidelines calculations in the presentence report?

MR. ALTMAN: No, Your Honor.

THE COURT: Do you have any other objections to the presentence report?

MR. ALTMAN: No, Your Honor.

THE COURT: Thank you.

Mr. Ajak, have you reviewed the presentence report with your counsel?

THE DEFENDANT: Yes.

THE COURT: And are you satisfied with the services of your counsel?

THE DEFENDANT: Absolutely.

THE COURT: Ms. Chang, other than the objection

concerning the aggravating role, is the Government aware of any errors or does it have any objections to the presentence report?

MS. CHANG: No, Your Honor. Thank you.

THE COURT: I will adopt the facts set forth in the presentence report and will now consider the Government's objection to the lack of a two-level increase to the total offense level based on their belief that Mr. Ajak played an aggravating role in this crime.

The parties submitted thorough briefing on this topic, so I don't think I need too much argument on it. But I'm happy to hear from the parties in case they want to make a record or otherwise want to make an argument to sway me one way or the other.

So, Ms. Chang, I'll let you go first.

MS. CHANG: Thank you, Your Honor.

As noted, our only objection to the PSR is that we do believe Defendant's leadership role merits a two-level upward adjustment. This enhancement is warranted if you look at the factors listed in Note 4 of 3B1.1 as they pertain specifically to the weapons export scheme. As you mentioned, we've addressed those fully in our brief, so I won't belabor them. I just want to just highlight three things in particular.

First, Defendant really exercised decision-making authority over every aspect of this scheme: what weapons to

buy, how to ship them, and how to pay for them. Those were decisions that he had the authorization to make, not his co-defendant or anyone else.

Second, I think there's this focus in Defendant's response on the length of his participation. And the cases are very clear that the length of the participation, the duration, is not dispositive. The cases tell us that you can be a leader and an organizer for just one day and still merit that enhancement. What the Court is looking at is the nature of that participation, the impact of that participation. And in this case the evidence is abundantly clear that it was only once Defendant got involved that this case really moved forward.

And then third, Your Honor, we did want to highlight that Defendant had the most to gain from this scheme because he was going to be the next leader of South Sudan. You can contrast that with his co-defendant, Mr. Keech, who wasn't going to have any role in the new government.

And, Your Honor, just one last point is that we are -- the Government's not overreaching here. The guidelines allow for an up to four-level increase for role -- aggravated role if there are five or more participants or if the scheme was otherwise extensive. I think there's certainly an argument that we could have asked and would have been justified in asking for a four-level role enhancement. We've only asked for

two because we do think a two-level increase is sufficient to account for his aggravated role in this scheme.

So, Your Honor, there's certainly more than a preponderance of evidence to support the two-level enhancement, and we ask that his offense level be increased accordingly.

THE COURT: Thank you, Ms. Chang.

Mr. Altman?

MR. ALTMAN: Thank you, Your Honor.

Again, I won't belabor what we've written or frankly the response from the presentence report writer, which was excellent and probably better than mine if I'm honest.

Judge, just to address those three points, and I will say again we have focused on the fact that Mr. Ajak didn't enter this scheme or conspiracy until, I think it was, October or November of '23, and it ended within three or four months after that. The fact that he was recruited into the scheme by others that have been involved in this for, frankly, years shows that he was not a leader. The fact that he was effective/semi-effective in his role in the scheme, overall scheme, doesn't make him a leader, Judge.

I think I may have used some analogy in the argument, but, you know, this was a team game. It was -- absolutely required every team member to make it move forward. And Mr. Ajak, contrary to what the Government says, didn't have decision authority over everything. He worked in concert with

many people who I have discussed who were not indicted in this case that very well could have been with the co-defendant and actually with undercovers.

So he was not directing every aspect of this. He helped move it along just like the financier helped move it along, just like the person who found the financier helped move it along, just like his co-defendant helped move it along. There's nothing to distinguish him under the law or the facts of this case to distinguish him from any other essential member of the conspiracy. He didn't lead this, he didn't start it, and he was recruited into it.

So we do think that the objection -- let me say this right -- the objection to the presentence report filed by the Government should be overruled by this Court and the two-level enhancement, even if they're saying they are not reaching and could have asked for four, should be denied.

THE COURT: Thank you, Mr. Altman.

So under United States Sentencing Guidelines Section 3B1.1(c), I can impose a two-level upward enhancement or adjustment if the defendant was an organizer, leader, manager, or supervisor of criminal activity involving five or -- fewer than five participants. And Application Note 4 states that I can consider the decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share

of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. And I can consider all relevant conduct, including that which is set forth elsewhere in the presentence report and in the record.

The Government's objection and reply, which are Documents 170 and 174 in this case, lay out in great detail why Mr. Ajak should be deemed subject to this two-level enhancement. And I'm not going to read -- repeat everything that the Government laid out in those filings, but the Government's position and explanation was comprehensive and convincing.

I will go through a number of the factors that I considered, but, again, this is not exhaustive. I mean, Mr. Ajak organized a coup, or an intended coup, in South Sudan where he would be installed as the interim president. If you look at Section 10 of the plea agreement at Page 11, it states -- this is part of his factual basis for the plea -- "Following this nondemocratic regime change, I intended to take power as South Sudan's interim president."

Paragraph 14 of the presentence report, which describes a November 8, 2023 videoconference, further demonstrates his role as a leader in this crime. He stated that he was, quote, "looking to start basically a coup with

both internal and external fronts." He indicated that he wanted to, quote, "knock it over and rebuild a new country." He indicated that he would be installed as the new prime minister and head of the Government.

Paragraph 19 of the presentence report describes a January 20, 2024 message that he sent to Mr. Keech, and that included an 18-page document titled Operation Free South Sudan, which set forth his goals in conducting the coup. It was a detailed plan.

The presentence report also describes a January 25, 2024 conversation he had with the undercover agent -- one of the undercover agents and stated that he was, quote, "obviously going to be leading this mission." And then he also mentioned that although several generals remained involved with the plan, he was the ultimate decision-maker on the weapons purchase.

The Government also provided information about the cabinet that Mr. Ajak was selecting for his future government. And I think it's important to note that that did not include Mr. Keech, but it did reflect that Mr. Ajak was thinking about what would happen after his coup would be completed.

Beyond that, he selected the suppliers of arms and the arms needed. There was a November 3, 2023 videoconference -- it's described in the presentence report -- that illuminates the roles that he and Mr. Keech played. At that meeting he made statements indicating that he had a leadership role in the

conspiracy, noting that his potential suppliers could not supply all the weapons required and that he was looking to the undercovers to supply the remaining weapons.

In one of the videoconferences that I previously described, he went into some detail about the weapons he needed, the support he expected from third parties, and the fact that he would execute a memorandum of understanding that would make the undercovers the official arms suppliers for South Sudan once he took power.

He discussed the method of transporting arms. He was the one who discussed how they would be disguised so as to seem legitimate, and he signed the falsified invoice for the arms.

Critically, he solicited and successfully obtained the funds to purchase and illegally export the firearms, was engaged with third parties for their support. And without the funds, this coup attempt would've been dead in the water. And all of this is described in the presentence report as well as the filings by the Government, so I won't go into additional detail there.

With respect to Mr. Keech, I do think it's important to contrast Mr. Ajak's conduct in this case with Mr. Keech's. Mr. Keech was more akin to being a middleman and a conduit for generals in South Sudan. He was kept out of the loop of the financing which Mr. Ajak handled, and really his role was -- Mr. Keech's role was to coordinate opposition groups and assist

with the procurement of weapons.

With respect to, Mr. Altman, your position on this, your main argument is really a temporal one, you know, that Mr. Ajak could not have been an organizer or leader or manager or supervisor because the efforts to procure weapons for a coup began before his engagement.

I am not aware of any hard or fast rule that someone must have been part of a conspiracy at the outset or for any specific duration in order to receive an upward adjustment under Section 3B1.1(c), and the Government has cited cases in its reply suggesting that at least other circuits have concluded that 3B1.1 may not even include a temporal factor, the application note certainly doesn't state one, and that even if it does include such a factor it wouldn't be dispositive.

Even if I were to consider it a factor, taking into consideration all the other factors set forth in Application Note 4, I do believe a two-level increase is warranted due to Mr. Ajak's aggravating role in this case. And ultimately I do appreciate the work done by the presentence report writer and you, Mr. Altman, but I didn't find this to be a particularly close case. I think the standard for a two-level increase is more than sufficiently met here.

So with this one exception, I will otherwise adopt the contents of the presentence report as providing the foundation for my sentencing decision. I find that the advisory

sentencing guidelines range in this case is 57 to 71 months based on a total offense level of 25 and a criminal history category of I.

The parties' plea agreement does not include a sentencing cap. The presentence report writer has recommended a sentence of 52 months. The Government has requested a sentence at the high end of the advisory guidelines range. And I look forward to hearing from the Defense as to what the appropriate sentence is in this case.

Mr. Altman, before I hand this off to you, I understand that you have some speakers that are here to speak on Mr. Ajak's behalf.

MR. ALTMAN: That's correct, Your Honor. And I was going to ask this Court how you would like us to do that. We could certainly step back to counsel table and I could call them up one at a time. I believe there's five, Your Honor. They'll describe who they are, and they're going to try to keep it brief and to the point, but they certainly want to have their say about Mr. Ajak, so we appreciate that you --

THE COURT: Please go ahead and sit at counsel's table.

And I will say that I have read the voluminous almost 40 pages of character letters submitted on Mr. Ajak's behalf, but I am happy to hear from anyone who would like to speak on his behalf.

MR. ALTMAN: Thank you, Judge.

And, Judge, for the record, the first speaker -- I'll just call them up and then get out of the way -- is Lant Pritchett.

So, Mr. Pritchett.

MR. PRITCHETT: Your Honor, my name is Lant Pritchett, and I'm here as a character witness for Peter.

For 20 years I was a professor at Harvard Kennedy School in a program -- a two-year master's program that trained people in how to practice development and help countries become more prosperous and capable. And in that course of 20 years, I taught a thousand very incredible, capable students. And of all the thousand students, I think maybe the one that impresses me most is Peter. And the reason Peter impressed me most is his character and commitment. And let me just give three short sort of illustrations of Peter's commitment to help his country of South Sudan and his willingness to sacrifice for that.

First, when Peter first applied to our program, we had a very strict rule that we didn't accept applicants fresh from undergraduate. And he was fresh from undergraduate, and so we rejected him only on that basis. He was otherwise qualified. And he came to us and he explained that, yes, he understood that he needed more experience, but he also explained that his country was headed to independence in 2011 and if he didn't have our training by 2011 and wasn't ready to help his country

with this transition he would not have the same level of impact that he would have. And we were persuaded. We never go back on our admissions decisions, but we were persuaded that he had a compelling case that he needed this training now and that he had a vision of helping his country and we could help him with our training. So we admitted him, and he was an excellent student in our program.

Later, second example is when his country was on its transition to independence, I went with Peter and worked with Peter and worked with the transition government at the time, and I could see two things. One, that South Sudan was a country that desperately needed people of Peter's caliber and training and commitment. I've been in my life in the poorest places in the world, and South Sudan through centuries of oppression and injustice was the worst place, and it desperately needed Peter.

And I also saw that Peter, by working on independence, had to make a choice between compelling -- complying with the green card requirements that he stay in the United States and being in his country of South Sudan to help at a time they needed help. And he made the choice to help, to stay in South Sudan, sacrifice the privilege of becoming a United States citizen, which he very much valued and very much would have liked to have, but he saw that his role at a critical time was more important and so he was willing to make personal

sacrifice for that commitment.

The last, Peter, in his engagement with South Sudan, said some things that the current government didn't like, and they put him not even into prison. They put him into a holding facility and military intelligence where he was tortured. And he was sacrificing for his attempt to help his country. And part of the mistreatment was they would turn the lights off and on at arbitrary intervals to, you know, mentally imbalance you by not allowing you to adopt a common rhythm. And so he was periods just in complete blackness.

But there was one of the staff at the prison surreptitiously slipped him a Bible. And during the periods in which the light went on, he would read the Bible in order to during his periods of darkness maintain faith and maintain hope. And Peter emerged from a period of torture and prison still a man of faith, still a man of unity, still a man preaching goodness for his country and committed to his country.

So I think his actions need to be seen in that light. And I know as a judge you have the awesome responsibility of giving out justice. And I think justice needs to fit the crime, and there's no question that Peter committed a crime that deserves punishment. But I think justice should also fit the man. And Peter is a good man and Peter is a great man, and that's my witness. Thank you.

THE COURT: Thank you, Mr. Pritchett.

MR. ALTMAN: Thank you, Your Honor.

Next would be Richard Newfarmer.

MR. NEWFARMER: Hello. My name is Richard Newfarmer.

I've known Peter Biar Ajak for 15 years. Among the people that I have met in the course of my 30-year career as a development economist working at World Bank, University of Notre Dame, in Latin America, Asia, Africa, Peter is one of the most exceptional in terms of his commitment to the values of democracy and political participation and good governance for his own country. I say this, and three instances I think kind of illustrate this point.

The first is his very decision to come back to South Sudan after he got his master's degree from Harvard. There are very few people that were born in the center of South Sudan in a dusty cow-herding community that ended up with a degree from Harvard. That alone made him stand out. So when I got to meet him in 2011 as working for the country director for the International Growth Centre, a joint venture of the London School of Economics and Oxford University where we were trying to provide policy advice to the government, having access to a local economist that really knew the ins-and-outs of the South Sudanese economist was invaluable. He worked with us, providing papers and presentations to government on economic policy and working with civil society at the same

time.

Eventually, of course, warring factions within the government tore apart the government and precipitated the civil war that actually occurred in December of 2013. In fact, I was in Juba the week before that crisis occurred, and I had to evacuate our expat staff during that period because it was quite traumatic, lives lost.

Peter chose to stay in South Sudan and to work with continuing engagement over the next three or four years, working with civil society organizations even when it was difficult, organizing a young leaders forum. He went around to the refugee camps where he had grown up to bring people in to the political process in South Sudan. He worked with a wrestling -- he organized a wrestling foundation for young workers, young people. This was what he was doing during that period.

Of course, eventually a third instance I think where it shows his commitment to the country was when he, after being exiled in Nairobi, freed from jail at last, came back to the United States, where he could have had a pretty comfortable career in the university because by that time he had become -- he had gotten a Ph.D. at Cambridge University, one of the best schools in Europe. He could have had a pretty comfortable life. He chose not to. He chose to continue to work on political change in South Sudan. In fact, in 2022 he sent me a

declaration for a political party that he formed that would participate in an election that was to have been held in 2024. That election never happened because it was postponed indefinitely by the military government that now rules South Sudan.

In any case, it would be easy, I think, looking at South Sudan today to despair. If you read the headlines last week, for example, 180,000 people have been displaced by the civil violence that's occurred by the repression of the government.

In that circumstance I'm sure Peter and the South Sudanese community would likely feel despair, so I can understand Peter in this circumstance. That said, I know that underneath this all the values that will come forth with Peter are the commitment to political process, the commitment to human rights evident in the paper that he had written for the founding of his political party, as well as substituting the corruption of the regime and replacing it with good governance. These are the values of Peter Biar Ajak that I know.

I do hope the Government and the political process or the legal process that we see now will soon free Peter to return to the important work that he is undertaking for South Sudan.

THE COURT: Thank you, Mr. Newfarmer.

MR. ALTMAN: Thank you, Judge.

Next is Mr. Tut Jakany.

MR. JAKANY: Your Honor, my name is Tut Jakany. I am an activist. Dedicated most of my career on political prisoners in South Sudan. And I'm also a South Sudanese American who grew up here in America and had the need to go back home and do some work and bring some awareness.

Your Honor, I take this opportunity in your presence to express my sincere gratitude for your service and the careful consideration to these matters.

I would like to share how I came to know Dr. Peter Biar and why his case matter deeply to me. I first learned of Dr. Biar through an interview he did on Kenyan television where he spoke about the fragile peace agreement that was signed in 2018, and he highlighted the mismanagement of the leaders, explaining leaders who are actually interest -- they are putting their interests first rather than the aspiration of the South Sudanese people.

Just days after the interview, Dr. Ajak was abducted at Juba International Airport while traveling to Aweil to meet with the Lost Boys who are -- have a tremendous history and the suffering they have shared.

At that same time, I was actively advocating for the release of South Sudanese political detainees who had been abducted from Nairobi, Kenya. And during this period I was based in Addis Ababa, Ethiopia. The families of those

detainees were devastated. No clear information about whereabouts, condition of their loved ones. Those detainees were James Gatdet Dak, Samuel Dong Luak, Aggrey Idris, and Marco Lokidor. Recognizing the danger that Dr. Ajak was facing, I included his name is my advocacy, believing that his life was similar at risk.

Those concerns reinforced when prison broke out -- a prison riot broke out in the notorious Blue House in Juba. In that facility, the detainees were held where I believe to be -- or where all their family believed to be held. Families, journalists all rushed to the prison. And given the government history of violence against detainees, in that moment of chaos, uncertainty, the only detainee who spoke to the media was Dr. Peter. He courageously confirmed that James Gatdet Dak was alive but had been transferred to another facility. He also clarified that Samuel Dong Luak and Aggrey were not held at that prison. And the only person that was detained was Marco Lokidor. Marco Lokidor was a close friend of mine.

In 2015, during the peace agreement process in Pagak, Upper Nile, where I'm from, he saved my life. I was detained and facing a possibility of being thrown into a pit that had been dug to hold prisoners. Because of this history, Dr. Ajak courage and speaking out during this prison riot deeply affected me. From that moment onward, I admired him, not only for the -- his bravery, but for his unwavering commitment to

free, democratic, and just South Sudan.

After his release to presidential pardon, I follow up with Dr. Ajak in Nairobi, Kenya. Even then his life remained at risk. Eventually he and his family forced to flee and later reside in Washington, D.C.

About a month later after relocation, I traveled to Washington, D.C., where I met him in person for the first time. From there we began advocating together for peace, unity, justice among South Sudanese communities in the United States. We traveled to areas with large population of South Sudanese Americans such as Des Moines, Iowa, Nebraska, and engaging in communities the importance of national unity and nonviolence and free and fair elections and the release of political prisoners. Dr. Peter empowered me in countless ways. He introduced me to networks, platform, opportunities, and strengthened my advocacy for peace, social justice, and democratic reform.

Most recently, I was elected into a leadership council in a position that many of us South Sudanese do not experience to be elected. That opportunity was possible because of Dr. Peter mentorship and support. To many South Sudanese, he remains a powerful voice against injustice and a source of aspiration and a reminder that rejecting war and embracing shared nationality is both possible and necessary.

Your Honor, as I can conclude my statement, if it is

within your discretion, I respectfully request that you consider allowing Dr. Ajak to spend the remainder of his time with his family, his children who misses him very much, and his presence would be a tremendous source to comfort for them and the people of South Sudan. Thank you.

THE COURT: Thank you, Mr. Jakany. Congratulations on your selection to the leadership council, and best of luck.

MR. ALTMAN: Thank you, Judge.

Next is Ryan Rafaty.

MR. RAFATY: Thank you, and good morning, Your Honor.

My name is Ryan Rafaty. I stand before you today as a friend of 12 years and as an academic peer who has witnessed Dr. Peter Biar Ajak's character evolve from the lecture halls of Cambridge, where we met, to his life here in the United States.

My purpose here is to provide this Court with a clear picture of the man I know, primarily a scholar whose life's work has been the intellectual pursuit of peace and a devoted family man whose character is defined by rigorous commitment to others. Peter's defining characteristic since I knew him in Cambridge was always his desire to transform his personal trauma into a disciplined academic focus on state building. We met as doctoral candidates at Cambridge where we were both finalizing our Ph.D.s in politics and international studies.

Now, while others might have been consumed by the

bitterness of their past, Peter channeled his experience as lost boy of Sudan into a singular inquiry: how to construct a just and stable nation. It was the topic of his Ph.D. thesis.

I recall this distinct evening at Trinity College when he first articulated his generational exit concept to me. The thesis was striking. He believed that stability could only be achieved through a peaceful, gradual transfer of power to a younger, educated generation. He is an intellectual whose adult life has been dedicated to the proposition that the pen is more necessary and indeed much mightier than the sword.

His political philosophy deeply rooted -- was deeply rooted, and still is, in an appreciation of American democratic values. In our countless hours debating the foundations of just governance, Peter frequently praised the United States, even against my own criticism of its foreign policy sometimes, for its pivotal role in supporting South Sudan's emergence as the world's newest sovereign country. He viewed the American model not just as a benefactor but as a blueprint for liberty in his own country, often citing the Declaration of Independence.

His advocacy has consistently championed the idea that the path of prosperity in his homeland lies in actualizing these democratic processes on the ground and maintaining strong positive ties with the west. This commitment to constructive governance remained his focus even while he was seeking asylum.

I remember vividly when Peter came over to my apartment in D.C. and wanted to record a speech. I have recording equipment at home. Wanted to record a speech intended to be broadcast to the citizens and diaspora from South Sudan. The speech was a precise opposite of a call to arms. This was in 2023 in the summer. It was a detailed 10-point policy framework centered on building affordable electricity grids, modernizing agriculture, and attracting foreign investment. I sat and listened as he passionately laid out his technocratic vision where economic policies and good governance were tools of national revival. And these were words of a builder, not a destroyer.

Furthermore, I'll just mention another anecdote more recently. Peter's resilience and generous spirit have been demonstrated even during his recent confinement in the Arizona detention center. Throughout this difficult period, I have sent him dozens of books from -- ranging from Boethius's *The Consolations of Philosophy* to Voltaire's *Candide*, and his appetite for this literature has been voracious. In our phone calls, his voice carried a distinct palpable joy derived from the intellectual nourishment. And yet what I find most inspiring by that is not just his own reading but his instinct to look out for those around him. He tells me after finishing these books -- and there are literally dozens -- he passes them on to fellow inmates, ensuring that they too might find solace

in the written word. So even in confinement he seeks to elevate the community around him.

Finally, just very briefly I want to say that the man I know is also devoted to his family. While Peter and his family were settled in Bethesda, my wife and I were invited to their home for a barbecue and Peter prepared -- that Peter had prepared himself for everyone. In watching them that afternoon, I saw a man who is first and foremost a dedicated husband and a loving father. The care with which he tended to his guests and his four children revealed a gentle spirit that is the center of his gravity. It was clear to me then as it is now that his family is his primary motivation and his greatest source of joy. So I have no doubt that Peter has the capacity to return to being a law-abiding and productive contributor to society, and I look forward to the day when we can once again gather our families for a meal and continue our shared lifelong journey as scholars of statecraft and peace.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Rafaty.

MR. ALTMAN: And finally, Your Honor, Nyathon Mai, Mr. Ajak's wife.

MS. MAI: Your Honor, this is going to be a difficult one after what they have said. My name is Nyathon Mai. I am Peter's wife and the mother of our four children. Professionally I'm a geologist currently working for the State

of Arizona. I appreciate the opportunity to speak before the Court.

I want to begin by acknowledging the seriousness of the offense before us here in court, Your Honor. I do not minimize it, and I respect and -- the responsibility the Court carries in determining an appropriate sentencing.

I would start by saying Peter and I met nearly two decades ago in South Sudan. At the time he was a young economist working at the World Bank, and I was a geology student studying in Australia and I had returned home to support South Sudan in the referendum which lead to the independence of South Sudan.

Peter's office where he work at the World Bank was across my family's home. And every evening Peter would leave a handwritten note at the gate when he leaves office going home. And he was a respectful and intentional young man that I met. And he even told me, he said that I wanted to do everything a way that -- sorry. Just a moment.

THE COURT: Take your time.

MS. MAI: I'll skip this line because it's making me emotional.

From the beginning, I learned that the Peter -- from the beginning, I learned that the Peter was a man who loved knowledge. He believed deeply in peace and unity. He cared for his parents, supported his siblings' education, and he love

his faith. If you go to church and you find somebody with the off-beat tone, I will be assured that that's Peter. The man that I married in 14 years has remained a constant in those values.

However, in the months leading up to his arrest, I observed a change that deeply concerned me. Peter was working to evacuate family members from South Sudan after he received warning they could be targeted because of his activism in South Sudan. So he moved his brothers out of South Sudan and he was working to evacuate his father out of South Sudan because of safety.

I saw him struggle with deep -- with sleep and showing signs of stress. I then seen stress that I have never seen before. As his wife, I recognized these as a symptom of unresolved trauma from his detention in South Sudan as a political prisoner.

As his wife I recognize these as symptoms of unresolved trauma from his prior detention in the political prison in South Sudan. He had never -- since we moved to D.C., Peter had never seeked professional counseling to address some of those stresses. And I believe his untreated trauma affected his judgment during his period that brought us here.

Your Honor, we have four children. Our eldest son is 13 year old. He is quiet and thoughtful young man. He dreams of becoming an NBA player one day. He is a self-taught

pianist, and this Friday I just got a news that he has been selected to play somewhere. Since his father's absence, he has tried to step into a role beyond his age. He helped me care for his siblings. He's --

They were supposed to be here today, but because of his age and because of our concern we thought that would be appropriate for him not to speak. So he gave me a note to say that please read that to the judge; I want him to hear my voice. So after my speech I will read his note shortly.

Our second child is nine years old, Baraka. He is kind and curious and deeply attached to his father. He often say his dad make the best steak, and I believe that's so because Peter can grill really well.

We have a five-year-old daughter who shares a particular deep one with Peter. She was conceived while Peter was a political prisoner in South Sudan, and their connection has always been strong since she was born because of what we represent in Peter's life.

Our youngest daughter is two and a half year old. She was only ten months when Peter was detained. Peter named her after my grandmother because my grandmother meant the world to me and calling her name of my grandmother every day kind of gave me the comfort that my grandmother is looking over me while we go into this difficult season.

Peter was and remain a hands-on father even in his

absence. He handled -- before he was detained, Peter handled school routine, meals, homework, bedtime, and discipline of the children. He was very good at that. He walk our boys to the bus stop every morning and walk them to school if they miss their bus.

Recently I asked our nine-year-old son what would happen -- what would be the biggest change if Dad was to come home today. He said we would be out more. We would rustle -- I would rustle with him and we would grill together.

These were not simple roles, Your Honor. They were shared responsibility that created stability and security for our children.

Peter's detention has removed this stability. I am the only sole provider of the family, handling emergencies, medical appointments, school transportation, discipline, and extracurricular activities as I try to make their life go on as much as possible. When something goes wrong, Your Honor, there's no one to step in. I'm the only person. At times, our five-year-old daughter would ask me, Mom, what would happen to us if something happened to you today? And I also reassure her that Dad is not far away; one day he will come home. But the truth is I constantly carry this worry about what would happen if just on the road today I have an accident or got injured while Peter remains away. We have four children that have no person to step in.

There was -- there has been incident where others have threatened to call the police because my children had to wait a few extra minutes after sport practice while I complete multiple pick-ups. I run from work. And one incident involved Deng, our son 13-year-old, where he was at basketball tournament. One day as I was delayed in traffic while picking up his siblings from daycare and after-school program, an elderly woman noticed that he was the only child left behind, so she decided to stay behind with him. But she called me and said that if you're not here in ten minutes I'm going to call the police.

After this incident have happened several times, I decided to pull the kids out of basketball because it wasn't -- as much as it was their peace, it was not stable and I was not -- there was not safety for them.

The most difficult moments are medical emergencies at night, Your Honor. I have had to face frightening medical situation where calling an ambulance was not an option because I had no one to stay with the other children at night. In some instances I have driven to the emergency room with all of them or locked them in one room while I keep my son's phone on to make sure that I monitor them while I handle the other emergencies.

Peter absence has eroded the level of safety and security I'm able to provide our children because this is just

beyond what I can provide so far. Since his arrest, Peter has -- but, Your Honor, since his arrest Peter has shown general remorse in the offense that he has committed and also the consequences his absence has created to his -- to us, his family. In private conversation, I've heard a man who has taken responsibility without defensiveness and reflected deeply on accountability. He understands the harm caused and is committed to making amends.

Your Honor, I understand that the Court must consider deterrence, accountability, and public interest. I respect that responsibility as I stand before you. I ask the Court to also consider this reality: This is a man with four young children, and his continuing absence has created ongoing hardship and risk to the young generation we are raising.

If the Court determine that additional punishment is necessary for Peter, I respectfully ask for consideration of home confinement or a similar alternative with strict condition and supervision. Such structure would allow Peter to be held accountable while being physically present to assist me during emergencies and ensure safety for our children. It would also relieve our eldest son from trying to fill his father's role, allowing him to focus transitioning to high school as he is in August and being a child. Home confinement would also enable Peter to pursue professional counseling to address his unresolved trauma, a work that is essential to rehabilitation

and prevention and prevent future poor judgment.

Your Honor, this is the end of my statement. I have one from our son. It's very short.

THE COURT: Please go ahead, Ms. Mai.

MS. MAI: Okay. Thank you.

Your Honor, good afternoon. My name is Deng Ajak. I am Peter's son. It has been about 694 days since I last hugged my father; 694 days since we last had our Friday steak dinner, the one he always made for us; 694 days since we had our regular one-on-one talk at the pack. It has been 772 days since we watched a Super Bowl together and 984 days since we watched a Heat and Celtic game.

They love their basketball. That I can attest to.

These are small moments, Your Honor, but they mattered. They were how my dad show up for us.

When I was younger, there was a day at church when my finger got caught in a door. My father immediately stepped in, opened the door, and said, "That is my son. How dare you hurt my son." From that day on, I didn't see just him as my father; I saw him as someone who would always protect me. That is who my dad has always been to me.

My father is a dad, a friend, a son, and a brother. He -- his absence affects all of us, my siblings, my mom, and everyone sitting behind me today.

He thought he was going to be here.

This August I will be starting high school, and if there's anything in my life I would need it is my father to walk me through that high school door. There are things a son learns from his dad, how to grow up, how to make a good decision, how to become a man, things like getting a driver's license, choosing the right classes, or even just asking for advice. My dad was that for me, and I don't have that anymore.

I miss my father every day. If there is one thing I hope you take from this, Your Honor, it's my dad is a good person regardless of what we are here today for the case.

And I love you, Dad.

Thank you for listening, Your Honor. That's from Deng.

THE COURT: Thank you, Ms. Mai, and thank you to your son.

Mr. Altman and Mr. Ajak, please approach.

Mr. Altman, please go ahead when you are ready with your argument on behalf of your client.

MR. ALTMAN: Thank you, Judge.

Obviously I can't even touch what you just heard and what you've read that I've also read in the letters. So I'm not going to sit here and belabor Mr. Ajak's character, Judge. I think you know what it is. I think you know what his history has been. You've heard from people here in person and you've read the letters which we appreciate.

There are some things I do want to say in regards to sentencing; however, Judge, I think -- and we would ask this Court for a sentence of no more than 30 months. I know that would require a variance from the new guidelines, but I think it's appropriate and I'll tell you why.

First of all, when you look at the -- I guess the goals of sentencing and what this Court is supposed to consider, I think, as going through all those, as I put in my memo and -- I just don't think any additional time more than 30 months will serve any of those goals. Mr. Ajak doesn't need -- clearly doesn't need any more education and training. And I think more time in custody is not going to reinforce those goals -- more time than 30 months, I should say, is not going to reinforce those goals in any greater effect.

This was -- and please don't take anything I say here as an excuse for Mr. Ajak's conduct, because the other part of how educated and how hard he's worked and how smart he is is he knows better. And if I were sitting in your shoes, I think one of the things that would go through my mind is, like, well, he should have known better. And he did, Judge, and he regrets this whole episode terribly, not only because of what it's done to him -- in fact, that's the least, Judge.

He knows that what he was actually trying to do, actually trying to bring to South Sudan -- make no mistake, which is a country that is led by a military dictator that

makes people disappear, tortures them, kills them in order to stay in power. He has worked his entire life to change that and, I think somebody said it, to bring a blueprint and make the South Sudan look like the democracy we have here in America.

He knows that his conduct has probably set that back years. He knows what his conduct has done to his family, which you just heard. And he regrets that.

But when you look at the sentencing goals, Judge, and you talk about respect for the law, which I understand this Court has to consider, there can be no more respect for our laws than trying to create something in their image. Did he go about it the wrong way? A hundred percent. Was it out of frustration and poor judgment? Hundred percent. But when you look at the goals set out in 3553, any additional time is not going to help advance those goals for this man.

And I know this Court -- and, you know, Judge, I'll tell you that I was here for the co-defendant sentencing, so I have a little insight that this Court is not -- I presume this Court will say something similar, like you're not really worried about reoffending with Mr. Ajak. I don't know.

But I certainly understand the Court's desire to create and impose a sentence that creates some sort of general deterrence to not only Mr. Ajak but the public out there, the very many South Sudanese dissidents in the back of the

courtroom and everybody else. And I can tell you, Judge, that seeing Mr. Ajak, as I indicated in my memo, standing in an orange jumpsuit, in shackles, a Cambridge Ph.D. in front of a United States District Court judge, that image alone creates the deterrence to the general public that this Court's looking for. That doesn't mean he shouldn't be held accountable, that doesn't mean that this Court shouldn't impose an appropriate sentence. But I'm telling you that this image in and of itself is dramatic and will create the deterrence that this Court's looking for.

Other things that this Court I think has to consider, according to the statute and is well aware, is the avoidance of disparity in sentencing. Certainly that means the co-defendant, Mr. Keech, somebody similarly situated and in the same circumstance. But I've addressed in my memo, I've addressed in many motions, I do think this Court can and has to consider other people involved in this conspiracy that are not standing before this Court and that were not indicted and that were essential to the ongoing conspiracy itself.

This Court itself said without the funds this would have been dead in the water. Well, Mr. Ajak, I understand his involvement in obtaining those funds, but he didn't recruit the funder; somebody else did. He didn't have that money. There were other folks involved. And the Government has an absolute right to decide who they charge, how they charge, when they

charge in their discretion, and I'm not questioning that, Judge. But I am saying that the people that are not here can be considered by this Court when imposing a sentence.

And, finally, talking about disparity and more specifically as to Mr. Keech, one of the things that sets Mr. Ajak apart from Mr. Keech in this situation is his citizenship. You know, Mr. Ajak was here -- was brought back over from South Sudan after those horrific experiences on certain immigration levels and then eventually granted asylum. He does not have United States citizenship. So this case, obviously a federal felony, will likely cause some sort of procedure, removal procedure, to Mr. Ajak when it's all over.

He is literally, Your Honor, a man without a country. It is not an exaggeration to say that if he is deported to the country where his passport is, the South Sudan, he will be imprisoned at best, killed at worst. So it does not end here, and it does not end for Mr. Ajak when his sentence, whatever that may be, ends in the Bureau of Prisons. It is going to be a constant struggle that he has created, but a constant struggle for him to remain here, to remain with his family, and to remain safe, quite frankly, Judge. So I think that when looking at sentencing and sentencing disparities and trying to avoid those disparities is a legitimate concern that this Court can consider.

What he did was certainly the wrong thing, Your Honor.

But this was a curated sting where those weapons and the actual goal was never going to happen. It was never possible through undercovers. Again, I understand the law. That doesn't make it any better; that doesn't make his intent any different. But I think that's also a consideration, Judge.

Mr. Ajak has paid a terrible price for an absolutely terrible decision that only he made. He wasn't forced. I don't think he will tell you he was. But I think when you take into account his history and characteristics, all the other sentencing factors, the avoidance of disparity, the general deterrence, everything we've talked about, I think a 30-month sentence -- no greater than a 30-month sentence is appropriate, Judge. He will get back to his family. They will end up residing somewhere. He will continue to work hard in the right way to do good works. But first and foremost, he is going to get back to his family and take care of them, and that's what he would ask this Court for.

So thank you, Judge. I know he wants to say a few words.

THE COURT: Thank you, Mr. Altman.

Mr. Ajak, you have the right to speak to me before I sentence you today. And I understand that there is something you would like to say, so please go ahead.

THE DEFENDANT: Thank you, Your Honor, for the opportunity.

I really do not have a lot to say. The first thing that I would like to say is that I fully accept my responsibility in this incident and I take full responsibility for my action. People have talked a little bit about some of the things that might have led me to make this judgment. But the truth of the matter is I was frustrated and I was impatient, and I allowed those frustrations and impatience to alter my judgment into making terrible decisions that have led me to where I am today.

And there's nothing that pain me more than the words that I was hearing from my wife about the impact that my actions have had on my family. I knew it, but to hear those words as they were spoken was something entirely different that I was not prepared for.

I know my intentions. No matter how much people may speak about them, at least the way I feel in my heart, my intentions were good. We are a country that has been at war forever. I'm 42 years old; I've never voted in my entire life. I don't even know how it feel like to vote. And no other South Sudanese have ever had such an opportunity.

I tried for many years when I was in South Sudan to push for democratic elections. We did everything we could. The worst was to bring people on the street because they got shot, and then there's nothing else that you can do after that.

I spent two years in horrible detention because of

that. And after that, they still pursued me until I came here to the United States. And for many years in the U.S., I did everything I could to rally the support of the American government to help us make those elections happen. I spoke before the U.S. Senate, articulated exactly what the need of South Sudanese people are. When President Biden got elected, he convened the first democracy summit. I was privileged to participate in it, and all I asked for was for the U.S. support in making democratic election happen.

And one thing that is unique about South Sudan is that we have a U.N. Peacekeeping Force, very large one, of 22,000 that is in the country. I even argue that let the U.N. be mandated to hold an election as it has been done in other countries, has been done in Ivory Coast, has been done in Timor-Leste. It could be done in South Sudan.

None of that ever happened, and every single time the election are postponed. And this postponement happen; our people are suffering in a very devastating way.

So it was either to turn my heart away from that and focus on my own life or find a different strategy that worked. I'm not saying what I did was right. Indeed, looking back on it, it was the worst possible thing to do. But because of the impatience as a result of those frustrations and also personal pain result of my detention in the prison, but even after I came to the United States the government of South Sudan

continued to pursue me and to pursue my family in South Sudan, sending people to come to look after me here in the United States -- and even the president came here for the first time in 2023, and I was reaching out to have peace with him and see a way we can move our country forward. But he threatened to kill me, and then he start going after my family. And this was the same time that the agents were reaching out to me about providing weapons.

So all of this just coincided, and all this frustration and all this pain fuelled the bad judgment on my part that led me to where I am today. I'm not saying that any of this thing excuse what I have done. I'm just trying to explain so that you understand how I could have made such an error in the judgment.

So that's what happened. My ambition in South Sudan is not a position. It's not to be a president. I think the prosecution seemed to focus too much on that. That's not really the point. The point is to live in a free society, to know what it is like to speak your mind without somebody coming to look for you in your house; to vote, stand in the line. Those basic things, these are the things that I and every South Sudanese aspire for. Position is not the issue.

And the country that we are trying to build is country that respect the rule of law. And for me, the second greatest strategy in this, aside from the impact this has caused on my

family, is the offense that I have caused to the United States. And this country has done a lot for me than I could possibly ever repay. I came here as a refugee, and this country gave me opportunities that has allowed me to become someone that has a voice. And I built so much relationship here across different aspect of U.S. society, and some of these people today are wondering how is it that I came to make such a decision.

So for me, I regret that I offended. I created this offense and offended the U.S. Government, which I have always seen as a source of inspiration and also as a source of support. For me, being held accountable is precisely the kind of society that we want to create in South Sudan, where everyone could be held accountable. We want to create a country that is based on rule of law. So for me to stand here today, yes, is a pain to me and is a pain to my family, but at the end of the day is a good thing because this is exactly what we would want to happen in South Sudan, that if you commit an offense you can be held accountable and there is a just process.

This is not the process that I went through when I was in South Sudan when I was detained. Was entirely different. For 11 month, I did not even appear before a judge. But when I was detained here, the very next working day -- I was detained on a Friday, but on Monday I appeared before a judge. So there's still a lot that we as people of South Sudan can learn

here, and I hope going forward I will be able to make a better decision.

But, Your Honor, one thing that I ask of you is for me to return to my family as soon as I can so that I can help the -- with -- my wife with so much burden that has fallen on her as -- because it has been because of me that she is in all of this trouble.

So thank you for your time. And, again, I truly apologize for all my actions not just only to the Court but also to the plaintiff and all to the people that are offended by the decision that I have made.

THE COURT: Thank you, Mr. Ajak.

Would the Government like to make its argument?

MS. CHANG: Thank you, Your Honor.

The Government recommends a sentence at the high end of the final adjusted guidelines range, which is more than the 41 months received by his co-defendant, Abraham Keech. In recommending that sentence, Your Honor, we acknowledge the mitigation that's been presented, and indeed we have accounted for that mitigation in the plea offer that we made to Defendant which dismissed Count 4 and allowed Defendant to avoid a 25-year mandatory minimum sentence.

However, we do not believe any lesser sentence, including varying down all the way to 30 months, which is almost time served in this case, is warranted, and that's

because the 3553(a) factors weigh heavily in favor of a significant custodial sentence.

I want to talk first about the nature and circumstances of the offense. Your Honor, this was an extraordinarily serious crime. There are few crimes more dangerous, more destabilizing than trying to export this volume of weaponry out of the United States to go start a coup. That's why the sanctions regime and the export laws were put in place in the first place. Had Defendant's plan gone as he'd hoped, $4 million worth of arms, including Stinger missiles, missiles that can shoot an aircraft out of the sky, would have flooded South Sudan, which we heard today is currently experiencing armed conflict and escalating violence.

Defendant's plan would have introduced more weapons, more violence into that situation and intensified the danger to civilians who Defendant anticipated would take to the streets and protest only to be shot down by government authorities. And unlike his co-defendant, Defendant himself would have been armed, armed with a powerful sniper rifle and tactical gear and ready, in his words, to return fire if shot at and go house to house, disarming and removing the people from the previous regime.

Your Honor, putting those lives at risk, both civilian and government, that's incredibly serious and incredibly dangerous. Not only was the conduct serious and dangerous, it

was long-running and repeated. As you're aware, Your Honor, the broader conspiracy lasted more than a year, and over the course of Defendant's participation he oversaw nearly every aspect of this scheme: he secured funding from private donors; he created the fake paper trail; he directed the payments, the payments to the UCs, the payments to himself, to his wife, to his co-defendant; and he made all the decisions about what to buy, how much of it to buy, and how and when to ship it.

Mr. Altman spoke briefly just now about the nature of the investigation, that it was a sting, and seems to suggest that the fact that it was a sting should be mitigating. That's not the case. Defendant wasn't tricked into doing this. He really wanted to buy these weapons.

First, he didn't know it was a sting, so for thinking about his state of mind he really thought this was happening. He knew it was illegal, and he did it anyways. Defendants were also the drivers of this operation. Defendant was introduced to the UCs through his co-defendant, who was introduced through other of his colleagues. They were the drivers and the people who put together the shopping list and made this happen.

And most importantly, Your Honor, the UCs weren't Defendant's only source of supply. I think you cited something earlier when we were discussing the objection. But they really wanted to get these weapons, and they had multiple lines in the water for potential suppliers. From one of the very early

calls Defendant referenced a potential supplier from Europe, and all the way through the conspiracy, as late as February of 2024, both he and his co-defendant were speaking with UCs about other options, getting weapons from neighboring countries and trucking them across the border.

Over the course of his participation, he traveled to Phoenix two separate times to inspect weapons. He talked to the UCs dozens of times, exchanged hundreds of text messages with them to put this scheme into motion. He did all this knowing the conduct was illegal. The UCs repeatedly told him this is illegal, we don't have the licenses to do this, we're bribing people to make this happen, and we'll go to jail if we're caught. But despite these warnings, Defendant doubled down on the scheme. He admitted during the recorded calls as well as in his post-arrest interview that he knew South Sudan was sanctioned and that the conduct was illegal. And he said today he knew what he was doing was wrong, but he made the choice, the extended, repeated choice to violate the law.

After years of schooling, after years of working within the South Sudanese government and building up the goodwill you've read about in those letters and heard about from the speakers today, Defendant was really uniquely positioned to effect change through democratic processes. But, instead, Defendant chose to exploit that goodwill, to trade upon his stellar reputation, and set up this arms deal. He

even told the UCs you can Google me; there's a Wikipedia page about me; I'm very well-known; I'm a good person to go into business with, and I will help you get rich.

So, yes, he wanted to help South Sudan, but good intentions don't excuse criminal conduct. Multiple things can certainly be true, that he wanted to help, but he also wanted to return as the next president, to come back to South Sudan with an arsenal of sophisticated U.S. weaponry at his back.

As he said today, Defendant knew what he was doing was wrong, but he got impatient and he made the choice to violate the law. He had the education, the training, the connections to do something really good in South Sudan, but not the patience, so he turned to weapons and violence to achieve his goals. He abandoned the pen that we heard about earlier in favor of the sword.

So given these factors, anything less than a high end sentence, especially a 30-month sentence, is not sufficient to avoid unwarranted sentencing disparities, promote respect for the law, or provide adequate deterrence. In fact, anything less would actually create an unwarranted sentencing disparity between him and his less culpable co-defendant.

In our sentencing memo, Your Honor, we cited a number of analogous cases, but the most analogous case is that of his co-defendant. We're talking the same crime, the same facts, same statutes of conviction, except that this defendant is more

culpable than his co-defendant. And his co-defendant, Mr. Keech, received a sentence of 41 months.

Mr. Altman also spoke a little bit about the immigration consequences as a reason that might account for a sentencing disparity between the two. We understand that argument, but, Your Honor, we accounted for his immigration consequences in the plea when we offered a plea that would dismiss Count 4 and help him avoid that mandatory 25-year sentence.

THE COURT: Ms. Chang, before we move off of the immigration consequences, is it likely that Mr. Ajak will be removed from the United States as a result of this conviction?

MS. CHANG: So, Your Honor, one of the things that we often do in a plea agreement is that we require a defendant to stipulate to his removal. We did not require that here, and instead we even went a step further and included language that would set him up for an argument that acknowledges he believes he has these fear factors that could make it -- you know, wouldn't be right for him to be returned to South Sudan. And so in terms of what the process would be down the road, I think that's a decision for the immigration court to handle. But in cases like this, we often have defendants stipulate to their removal, and we did not do that here.

THE COURT: Thank you, Ms. Chang.

MS. CHANG: And so we think those immigration

consequences we have account -- this is all to say, Your Honor, we've baked those into the plea agreement and we have thought about them and discussed them at length with Defendant, and so they should not be further mitigating for a reduced sentence.

And so, Your Honor, to avoid unwarranted sentencing disparities and in light of the other 3553(a) factors, we do respectfully request that the Court impose a high-end sentence followed by a term of supervised release. We do believe that sentence is sufficient but not greater than necessary to satisfy the purposes of sentencing.

THE COURT: Thank you, Ms. Chang.

I do have one question for the presentence report writer. There's been a discussion and a suggestion in this case that I consider alternatives to prison confinement.

Does the presentence report writer have anything to discuss or address with respect to that?

THE PROBATION OFFICER: Your Honor, I mean, nothing further regarding that. That is up to the Court. That is an option if the Court does want to consider that. If the Court does consider that, I do have language for you if you need that.

THE COURT: Thank you.

Having considered the guidelines and the parties' arguments, I am accepting the plea agreement and the sentence I impose will be consistent with it.

Counsel, is there any legal cause as to why sentence should not now be imposed?

MS. CHANG: None from the Government. Thank you.

MR. ALTMAN: No, Your Honor.

THE COURT: I have considered the voluminous documents filed in this case, the comments made in court, all of which were helpful and appreciated, and of course the factors set forth in Section 3553(a). I will walk through a number of those factors.

I'll start with the nature and seriousness of this offense. As I think everyone acknowledges, this was a very serious offense. Mr. Ajak conspired to purchase almost $4 million in dangerous weapons that would be used to overthrow the existing government of South Sudan. The weapons included fully automatic AK-47 rifles; FA PKM rifles; RPG-7 launchers, which are rocket-propelled grenade launchers; various antitank rounds for those launchers; a Stinger missile system; hand grenades; sniper rifles; and a significant amount of ammunition.

Mr. Ajak knew that it was illegal to export these firearms -- or not just firearms, arms to South Sudan without a license. He knew that doing so would involve bribing United States military members. He intended that the arms be disguised as humanitarian relief for refugee camps in South Sudan.

This conspiracy was extensive. It progressed far beyond the planning stage, lasted over a year in total. $2 million was actually paid, and conspirators were ready to transfer the remaining almost $2 million. Mr. Ajak did pay himself and his wife a total of $125,000 which has never been recovered by the Government.

The goal of this activity was to topple the current regime, and Mr. Ajak would be installed as the president. He knew that the regime would, quote, shoot people down during any uprising and planned to use Stinger missiles to shoot down three South Sudan helicopters.

I acknowledge that the history of your country, Mr. Ajak, is terribly sad. It's been marred by significant violence, loss of life, conflict-induced food insecurity, the displacement of millions of people, and the lack of voting, the lack of liberty, the lack of other freedoms. At the same time, it is unclear to me how adding more weapons, especially this nature, and injecting additional violence into the mix would do anything other than exacerbate the situation and cause even more suffering. And as you, yourself, have acknowledged, your conduct in this case has likely set back the prospects of positive change and freedom in South Sudan by years. In other words, it was counterproductive.

I've taken into consideration Mr. Ajak's criminal history, which is to say that you have none. I have considered

that.

I've considered your history and characteristics. And if I was to spend a significant amount of time on this, we would be here all day. You are a very impressive person. You have overcome incredible challenges in your life to obtain a top-notch education. And until this crime, you were using your immense skills to promote peace, build bridges, and lead peaceful political change.

I understand that you were born in Bor, that you maintain a good relationship with your parents and your siblings. You had a traumatic life. You were part of the Lost Boys of Sudan when the second Sudanese civil war broke out in 1988; you were six. You were forced to flee to Ethiopia, where you lived for three years in a refugee camp. You were forced to fight as a child soldier in the Red Army of South Sudan until you were 15, and in 1999 you were placed in a refugee camp. I understand, actually, that you were -- you were placed in a refugee camp in Kenya until 2001. I understand that you also had limited interactions with your parents starting at the age of 6.

In 2001, you came to the United States as a refugee and stayed with a foster family in Philadelphia. You graduated college in 2007. Then you attended Harvard until 2009 and received a master's in public administration in international development. You then spent some time in South Sudan, but then

went on to Cambridge in England from 2013 to 2018 and you earned a doctorate in politics and international studies.

You were engaged in human rights activities and political dissent against the South Sudanese government, including as part of the South Sudan Young Leaders Forum, and ultimately your peaceful conduct led you to be detained as a political prisoner in inhumane conditions, including solitary confinement, restricted food, the lack of medical care, and all of this was at the notorious Blue House. And I have considered the incredible story about your role in mediating a peaceful outcome of the prison revolt while you were there.

You were released in 2020, began living in Kenya, but you immediately, or nearly immediately, started suffering political persecution and threats to your life from the South Sudanese government, even while living in Kenya. That led you to come to the United States in July of 2020, and you came on an emergency visa and have lived in Bethesda, Maryland, until your arrest in this case. You were granted asylum in 2023, and at that time I understand that you were a fellow at Harvard, focused on South Sudan's political and economic future. And I believe you were in that position until your arrest in this case.

I understand that you have four children with your wife, Ms. Mai. I understand that they are struggling financially and personally with you in detention. It was

extremely sad to hear from your wife about the challenges posed by your absence and the damage that this is doing to your family. And I will say I did appreciate Ms. Mai placing the blame on you for the fact that you are in this situation and accepting that.

The character letters and statements that were made here in court today are moving. They reflect the immense impact that you have had on many, many others throughout your life and reflect the incredible challenges that you have surmounted. The letters describe you as intelligent, driven, smart, charismatic, and a compelling leader, someone who had always hoped to be a leader for your country. And I understand that that's why you never accepted United States citizenship, because you did intend to return to serve your country. The letters describe someone who is committed to peace and building bridges between different groups. And I could go on and on. The letters, approximately 40 pages long in total, use dozens of superlatives to describe you, Mr. Ajak.

Some of those letters attempted to justify your conduct in the lens of you trying to bring freedom and democracy to South Sudan, and others suggested that you may have been tricked into engaging in this conduct. My response to those letters is that there is no justification for this conduct, and the record reflects that you knew what you were doing, you were eager to engage and participate in this

conspiracy, and that much is clear.

Others, and some including in this courtroom, have described the fact that the conduct that you engaged in here was a complete departure from what they knew of you and what they expected of you, and I agree. It is very difficult for me to square what I have read about you and how you have been described throughout your life as a peaceful policy advocate -- through your peaceful policy and advocacy work, how to reconcile that with your attempt to lead this violent coup in South Sudan.

I've considered the need for deterrence in this case. I'm less concerned about specifically deterring you, Mr. Ajak, from engaging in criminal conduct in the future and, frankly, I'm less concerned with the danger you pose to the public. I do believe that after this -- I certainly hope that you will use your tremendous skills to effectuate change in a peaceful manner. But I've considered those.

I have considered deterrence to others who might be encouraged to engage in similar conduct. You are a leader in the South Sudanese community. You are a leader in the broader community of individuals trying to promote democracy in the world. You are well-known. And the sentence I impose has to take that into consideration, the fact that this will be well understood and known.

The sentence I impose is necessary to promote respect

for the law. That is absolutely critical in this case, where United States export laws were violated to effectuate a coup in another country. The export control laws exist; they were put in place by Congress and our president to further peace and security in the world and to further United States foreign policy.

I've considered the fact that Count 4 of this -- of the indictment, superseding indictment, was dismissed or will be dismissed. If it hadn't, you would've faced a mandatory minimum sentence of 25 years, and that charge does provide some indication of the actual seriousness of this offense.

I've considered the need to avoid unwarranted sentencing disparities. I've considered the cases that the Government cited in their sentencing memorandum for similar conduct, but I do agree with the Government that the most pertinent factor here for me with respect to sentencing disparities is the sentence I imposed on your co-conspirator, Mr. Keech, who, as I've already mentioned, is less culpable than you. And I have considered the possibility, which is still unclear, that you my suffer adverse immigration consequences as a result of this conviction regardless of the sentence I impose.

Accounting for everything, I will vary downwards four levels in this case, and I will apply a total offense level of 21, which would be associated with an advisory sentencing

guidelines range of 37 to 46 months. Based on my evaluation of the factors, I will sentence at the high end of that range and believe a sentence of 46 months, which is almost four years, is sufficient but not greater than necessary to comply with the purposes of sentencing set forth in Section 3553.

I have also considered the factors set forth in Section 3583 and believe a period of supervised release of 36 months, which is three years, is appropriate to ensure your success as you transition back to society after your incarceration.

I'm now going to read some more formal language, some of which will appear in your judgment in this case. Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that Peter Biar Ajak is hereby committed to the Bureau of Prisons for an imprisonment term of 46 months. This consists of 46 months on Count 1 and 46 months on Count 2, all such terms to run concurrently, which means at the same time. The defendant shall pay a special assessment of $200 which shall be due immediately. The Court finds that the defendant does not have the ability to pay and orders the fine waived.

The defendant shall pay a total of $200 in criminal monetary penalties due immediately. Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows: balance is due in equal monthly installments of $25 over a period of eight months to

commence 60 days after release from imprisonment. If incarcerated, which is the case here, payment of criminal monetary penalties is due during imprisonment at a rate of not less than $25 per quarter, and payment shall be made through the Bureau of Prisons Inmate Financial Responsibility Program. The Court hereby waives the imposition of interest and penalties on any unpaid balance.

Upon release from imprisonment, Mr. Ajak shall be placed on supervised release for 36 months. This term consists of 36 months on Count 1 and 36 months on Count 2. Again, all such terms to run concurrently, which means they will run at the same time.

While on supervised release, Mr. Ajak shall comply with the mandatory and standard conditions of supervision as set forth by this Court in General Order 17-18. Of particular importance, Mr. Ajak, you shall not commit another federal, state, or local crime during the term of supervision.

Within 72 hours of sentencing or release from the custody of the Bureau of Prisons, Mr. Ajak shall report in person to the probation office in the district to which he is released.

Mr. Altman, have you reviewed the mandatory and standard conditions of supervision set forth in General Order 17-18 with your client?

MR. ALTMAN: I have, Your Honor.

THE COURT: Do you waive a reading of those?

MR. ALTMAN: We waive a reading, Your Honor.

THE COURT: Thank you. Have you reviewed the special conditions of supervision set forth in the presentence report with your client?

MR. ALTMAN: We've gone over everything in the presentence report, so, yes, Your Honor.

THE COURT: Thank you. Do you have any objections to those special conditions?

MR. ALTMAN: No, Your Honor.

THE COURT: Do you waive a reading of those special conditions?

MR. ALTMAN: We do, Your Honor.

THE COURT: Thank you.

I will adopt the contents of the special conditions set forth in the presentence report for the reasons set forth in the report, and I will incorporate them now and in the judgment in this case.

I will also address the forfeiture in this case. Mr. Ajak's interest in the following property shall be forfeited to the United States: $1,972,975 in United States currency seized from the bank account of U.S. Company-1 on March 1st, 2024.

Mr. Ajak, did you understand the entirety of the sentence I imposed, including the period of incarceration, the

supervised release and associated conditions, and the forfeiture?

THE DEFENDANT: Yes.

THE COURT: Your plea agreement contains an appellate waiver. It states that with a small number of exceptions that are specifically described you've given up your right to appeal as long as the sentence I imposed is consistent with the plea agreement.

Counsel, do you agree that the sentence I imposed is consistent with the plea agreement?

MS. CHANG: We do, Your Honor. Thank you.

MR. ALTMAN: Yes, Your Honor.

THE COURT: Thank you.

I find that the defendant has voluntarily, knowingly, and intelligently waived the right to take an appeal or a collateral attack in this matter except as described in the plea agreement.

Mr. Ajak, if you do want to appeal, you would need to file a notice of appeal within 14 days after the clerk's office enters the judgment in this case. If you are unable to pay appeals costs, you have the right to ask for permission to appeal without having to pay appeals costs and counsel would be appointed to represent you.

Did you understand that?

THE DEFENDANT: I do.

THE COURT: Ms. Chang, does the Government move to dismiss Counts 3 and 4 of the superseding indictment as to Mr. Ajak?

MS. CHANG: Yes, we do. Thank you, Your Honor.

THE COURT: Thank you. I will dismiss them now.

Mr. Ajak, you have an incredibly sad background, and the trauma you endured as a child is heartbreaking. I acknowledge and appreciate your efforts to educate yourself and educate others about the plight of your people, and I applaud your initial efforts, frankly, that have encompassed most of your life, the vast majority of your life, all of your life except for your engagement in this crime, those efforts to peacefully effect change in South Sudan. But the coup you decided to attempt to orchestrate could have led to the deaths of hundreds or thousands directly and maybe harmed many, many, many more indirectly.

I hope -- I hope for peace and prosperity for the people of South Sudan. I hope for you and your loved ones' safety. I hope you are able to maintain a strong connection with your family and your children during your time of additional incarceration. And ultimately I hope you use your incredible knowledge, skill, experience, and all of the other traits that I didn't mention as a positive force for nonviolent change going forward after you are released.

Counsel, is there anything further that we need to

accomplish today?

MS. CHANG: Not from the Government. Thank you.

MR. ALTMAN: Judge, just one final thing. I would ask that -- I know this Court can only recommend, but you recommend that Mr. Ajak be placed in Arizona, if possible, or as close to the southwest to his family.

THE COURT: Certainly I will make a recommendation that he be placed in Arizona or in the southwest or as close as possible to family. Thank you.

And I appreciate everyone being here to support Mr. Ajak. I just appreciate it.

With that, Mr. Ajak is remanded to the custody of the marshals, and we are adjourned.

(Proceedings conclude.)

---oOo---

**C E R T I F I C A T E**

I, KIMBERLY PORTIK, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 6th day of February, 2026.

/s/ Kimberly Portik
Kimberly Portik, RMR, CRR, CRC